**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:24-cr-00091 (GHW) |
| -v- | |
| ANDREY KOSTIN et al., | |
| Defendants. | |

### DECLARATION OF DAVID C. RYBICKI IN FURTHER SUPPORT OF DEFENDANT VADIM WOLFSON'S MOTION TO SUPPRESS PRIVILEGED RECORDS

Pursuant to 28 U.S.C. § 1746, I, David C. Rybicki, declare under oath as follows:

1. I am a partner at K&L Gates LLP in Washington, D.C., and counsel to Vadim Wolfson.

2. I make this Declaration in support of Mr. Wolfson's Motion to Suppress Privileged Records.

3. Annexed as Exhibit A hereto is a true and accurate copy of the December 2018 signed engagement letter with ███████████████████████ (the "Firm").

4. Annexed as Exhibit B hereto is a true and accurate copy of the FD-302 memorializing ██████████████ interview with the government on April 24, 2023.

5. Annexed as Exhibit C hereto is a true and accurate copy of the FD-302 memorializing ██████████████ interview with the government on July 26, 2023.

6. Annexed as Exhibit D hereto is a true and accurate copy of the FD-302 memorializing ██████████████ interview with the government on July 27, 2023.

7. Annexed as Exhibit E hereto is a true and accurate copy of the FD-302 memorializing ██████████████ interview with the government on July 28, 2023.

8. Annexed as Exhibit F hereto is a true and accurate copy of an email chain between myself and the prosecution team, dated April 10, 2024, with the subject line "USA v. Kostin (24cr91) Attorney Custodians."

9. Annexed as Exhibit G hereto is a true and accurate copy of an email exchange between Mr. Wolfson's lawyer ███████████ and the Firm, dated September 7, 2015, with the subject line "Family office of Mr. Belyaev."

10. Annexed as Exhibit H hereto is a true and accurate copy of an email exchange between ████████████ and the Firm, dated July 15, 2016, with the subject line "ALTAMONTE: debts restructuring."

11. Annexed as Exhibit I hereto is a true and accurate copy of an email exchange between ████████████ and the Firm, dated October 13, 2016, with the subject line "SPENCER INVESTMENTS LIMITED."

12. Annexed as Exhibit J hereto is a true and accurate copy of an email exchange between ████████ and the Firm, dated May 6, 2014, with the subject line "Altamonte and Bentronian."

13. Annexed as Exhibit K hereto is a true and accurate copy of handwritten notes produced by the Firm.

14. Annexed as Exhibit L hereto is a true and accurate copy of handwritten notes produced by the Firm.

15. Annexed as Exhibit M hereto is a true and accurate copy of handwritten notes produced by the Firm.

16. Annexed as Exhibit N hereto is a true and accurate copy of a chart produced by the Firm.

17. Annexed as Exhibit O hereto is a true and accurate copy of a chart produced by the Firm.

18. Annexed as Exhibit P hereto is a true and accurate copy of a chart produced by the Firm.

19. Annexed as Exhibit Q hereto is a true and accurate copy of a chart produced by the Firm.

20. Annexed as Exhibit R hereto is a true and correct copy of a search warrant application produced by the government.

21. Annexed as Exhibit S hereto is a true and correct copy of a March 29, 2018, decision of the Nicosia District Court in Cyprus in *With Respect to FBME Bank Limited (Under Liquidation), United Republic of Tanzania, Appointing the Deposit Insurance Board of the United Republic of Tanzania and Recognising the Liquidators of FBME Bank Limited (Under Liquidation) in the Republic of Cyprus*. This case was retrieved from CyLaw.org, which is the website of the Cyprus Bar Association. The website provides an option to translate text from Greek to English, which was used to generate the enclosure.

22. Annexed as Exhibit T hereto is a true and correct copy of the December 8, 2022, judgment of the European Court of Justice in *Orde van Vlaamse Balies and Others*.

23. The government produced to Mr. Wolfson more than 16,000 pages of documents provided by the Firm. These documents contained client files, including files related to Mr. Wolfson.

24. Based on the metadata of the Firm's productions, it appears that these productions began in September 2023.

25. I attempted to speak with Mr. ███████, but in a July 2024 conversation, his U.S. counsel refused to make him available and indicated that ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████. I further understand from my November 2024 conversation with

Mr. ████████ U.S. counsel that the Firm did not conduct a meaningful privilege review

before providing documents to the government and instead determined *en masse* that the

documents did not relate to legal services.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 25, 2024
         Washington, D.C.

                                        /s/  David C. Rybicki
                                        David C. Rybicki

**EXHIBIT A**


**[FILED UNDER SEAL]**

**EXHIBIT B**


**[FILED UNDER SEAL]**

**EXHIBIT C**


**[FILED UNDER SEAL]**

**EXHIBIT D**


**[FILED UNDER SEAL]**

**EXHIBIT E**


**[FILED UNDER SEAL]**

**EXHIBIT F**

| | |
|---|---|
| **From:** | Deininger, Emily (USANYS) |
| **To:** | Rybicki, David C.; Felton, David (USANYS); Johnson, Oleksandra (CRM); Shugert, Shawn (NSD) |
| **Cc:** | Silverblatt, Rob S.; Harper, Michael C. |
| **Subject:** | RE: USA v. Kostin (24cr91) Attorney Custodians |
| **Date:** | Friday, April 12, 2024 5:43:30 PM |

---

**This Message Is From an External Sender**
This message came from outside your organization.

---

David—

The materials produced to you on March 27, 2024, included grand jury subpoena returns and voluntary productions that were not subject to filter team review.  To the extent some of them came from attorney custodians, including Herb Klein and Christodoulos Vassiliades, we did not seek any materials or information that would be protected by attorney-client privilege.  Klein and Vassiliades were both represented and advised by retained U.S. counsel in connection with their production of records to the Government.

The Government did not obtain, or request or instruct that any custodian obtain, waivers of the attorney-client privilege.  As you can see from US_00072032, Herb Klein informed us that he had obtained a waiver of privilege before producing certain records.  The Government relied on that representation.

Best,
Emily

---

**From:** Rybicki, David C. <David.Rybicki@klgates.com>
**Sent:** Wednesday, April 10, 2024 10:50 AM
**To:** Felton, David (USANYS) <DFelton@usa.doj.gov>; Deininger, Emily (USANYS)
<EDeininger@usa.doj.gov>; Johnson, Oleksandra (CRM) <Oleksandra.Johnson2@usdoj.gov>;
Shugert, Shawn (NSD) <Shawn.Shugert@usdoj.gov>
**Cc:** Silverblatt, Rob S. <Rob.Silverblatt@klgates.com>; Harper, Michael C.
<Michael.Harper@klgates.com>
**Subject:** [EXTERNAL] USA v. Kostin (24cr91) Attorney Custodians

AUSAs Deininger & Felton – During our review of the government's initial production, we notice that certain custodians, including Herb Klein and Christodoulos Vassiliades, are attorneys.  We have also seen a reference to a purported waiver of privilege on behalf of an unnamed client (US_00000072032 at 4 n.3).

Could you please advise:

1. Whether the documents we have received have all been reviewed by the filter team and released to the prosecution team as non-privileged;

2. The names of all clients you believe have provided waivers of the attorney-client privilege; and

3. Documentation reflecting the nature and scope of any such waivers.

Best regards, David



**David C. Rybicki**
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
+1 202.778.9370 (office)
+1 202.778.9100 (fax)
david.rybicki@klgates.com

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at David.Rybicki@klgates.com.

**EXHIBIT G**


**[FILED UNDER SEAL]**

**EXHIBIT H**


**[FILED UNDER SEAL]**

**EXHIBIT I**


**[FILED UNDER SEAL]**

**EXHIBIT J**


**[FILED UNDER SEAL]**

**EXHIBIT K**


**[FILED UNDER SEAL]**

**EXHIBIT L**


**[FILED UNDER SEAL]**

**EXHIBIT M**

**[FILED UNDER SEAL]**

**EXHIBIT N**

**[FILED UNDER SEAL]**

**EXHIBIT O**


**[FILED UNDER SEAL]**

**EXHIBIT P**


**[FILED UNDER SEAL]**

**EXHIBIT Q**


**[FILED UNDER SEAL]**

**EXHIBIT R**


**[FILED UNDER SEAL]**

**EXHIBIT S**


ECLI:CY:EDLEF:2018:A203

NICOSIA DISTRICT COURT
BEFORE HIM: F. Hatzigianni, P.E.D.

## No. Application: 373/17

## WITH RESPECT TO FBME BANK LIMITED (UNDER LIQUIDATION), UNITED REPUBLIC OF TANZANIA

## APPOINTING THE DEPOSIT INSURANCE BOARD OF THE UNITED REPUBLIC OF TANZANIA AND RECOGNISING THE LIQUIDATORS OF FBME BANK LIMITED (UNDER LIQUIDATION) IN THE REPUBLIC OF CYPRUS

## Application from the Deposit Guarantee and Resolution of Credit and Other Institutions Scheme dated 7.9.17

**Date:** 29th March 2018

**Appearances**:

On the Deposit Guarantee and Resolution of Credit and Other Institutions (CCS) Scheme - Applicants: Mr. P. Kourtellos with Mrs. S. Christou

For the Deposit Insurance Board of the United Republic of Tanzania (DIB) - Respondent: Mr. G. Z. Georgiou with Mr. K. Pashiardis

**INTERIM DECISION**

On 29.5.17 the Respondents filed a unilateral application requesting an Order of the Court recognizing the Republic of Cyprus as Liquidators of FBME BANK LTD (Under Liquidation)) pursuant to Decision of the Central Bank of Tanzania dated 5.5.17 which entered into force on 8.5.17. On 2.6.17 the Applicants appeared, among other persons, before the Court and declared their intention to register an objection to the said application. Subsequently, the Applicants registered on 7.9.17 the present application by which they request:

"A. Order of the Venerable Court ordering the DEPOSIT INSURANCE BOARD OF THE UNITED REPUBLIC OF TANZANIA, Applicants to the unilateral Application under the above title and number in their capacity as trustees and/or trustees and/or a person appointing and/or having the authority to appoint lawyers and/or legal advisers, for and in relation to and/or on behalf of FBME Bank Ltd from Tanzania to terminate and/or immediately revoke the appointment of George Z. Georgiou & Associates LLC Law Firm and/or the lawyers employed by FBME Bank Ltd lawyers by Tanzania due to a conflict of interest and/or due to an upcoming and/or visible and/or perceived conflict of interest (representation of an adverse interest) and/or in breach of their legal duties and/or principles of leniency and/or that the appointment and/or authorisation (retainer)) of that law firm is irregular and/or abusive.

B. Order of the Court suspending any proceedings pending before the Court (stay of proceedings) in relation to and/or in respect of the unilateral application under the above number and title until the hearing of the present."

The application is based on the Civil Procedure Procedural Regulations D.2, T.Th.2 and 6, D.5, D.5A, D.6, T.Th.1, 2, 4-9, D.9, T.Th.1-13, D.16, T.9, D.39, D.42 A, 48 T.Th. 1, 2, 3, 4, 7-9, 11-13, D.50, D.51, D.63 Th. 1, 2, D.64 T.Box 1-2, in Articles 3, 4, 5, 6, 7 and 9 of the Civil Procedure Law Cap. 6, Articles 21, 29(1)(c), 31, 32 and 68 of the Courts Law 14/60, Article 5 of the Official Languages of the Republic Law, Law 67/88, the Resolution of Credit Institutions and Investment Firms Law, Law 22(I)/2016, as well as the regulations of the European Parliament and of the Council (EU) No. Regulation (EC) No 1093/2010 and (EU) No 1093/2010. 648/2012, on Articles 14, 15, 17, 23, 25, 27 of Regulation (EU) No 648/2012. Regulation (EU) No 806/2014 of the European Parliament and of the Council of 15 July 2014 laying down uniform rules and a procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund, and amending Regulation (EU) No 806/2014; 1093/2010, Articles 26, 30, 30E, 32D, 33 of the Business of Credit Institutions Law N. 66(I)/1997, Articles 3 - 13, 334 - 344 of the Companies Law, Cap. 113, Articles 1 - 32 of the Deposit Guarantee Scheme and Resolution of Credit and Other Institutions Law, Law 5(I)/2016and the Deposit Guarantee and Resolution of Credit and Other Institutions Scheme Regulations of 2016, K.D.P. 27/2016, on common law and equity law) as well as the inherent and inherent powers, general practice and discretion of the Court and is supported by an affidavit by **Angelos Kapatais** dated 7.9.17.

**Angelos Kapatais** is Deputy President of the Applicants. He referred to the separate entity of the Applicants, their main duty which is to protect depositors from the consequences of the insolvency of a banking institution, as well as their purpose which is to pay compensation through the Bank Deposit Guarantee Fund or the Deposit Guarantee Fund of Co-operative Credit Institutions, depositors of covered institutions who pay a contribution to the respective Deposit Guarantee Funds if they are unable to repay their deposits. On 9.4.16, the Management Committee of the Applicants

announced the activation of the procedure for the payment of compensation by the Bank Deposit Guarantee Fund for deposits held with FBME Bank Ltd (Cyprus Branch) (Exhibit 1). It claims that due to this activation of the Applicants, they have a direct and present legal interest in any development related to the liquidation process FBME Bank Ltd (Tanzania), provided that, pursuant to section 330 (2) (d) of the Business of Credit Institutions Law (Law 66 (I)/1997), by compensating depositors of the Branch, they have become **priority creditors in** this winding-up procedure. The lawyers of the Applicants on 23.5.17, sent a letter to the lawyers of the Respondents (exhibit 2) requesting to be informed prior to any démarche for recognition by the domestic legal system of the Liquidator of FBME Bank Ltd (Tanzania). On 29.5.17, the lawyers of the Applicants received by email from the lawyers of the Respondents the application copy of the unilateral application dated 29.5.17.

It referred to FBME Bank Ltd incorporated in Tanzania, which had a duly registered branch in Cyprus since 17.11.03, as well as to Ayoub's two shareholders Farid Michel Saab and Fadi Michel Saab, who also held the positions of executive directors of the branch. FBME's authorisation to carry out banking operations through a branch in Cyprus was revoked by the Central Bank of Cyprus on 21.12.15 (Exhibit 5) and FBME was placed into resolution by Decree 356/14 of the Central Bank of Cyprus (Exhibit 6). The Central Bank as Resolution Authority had appointed FBME as Special Administrator from 21.7.14Dinos Christofides, who was replaced by Andrew Andronikou and on 11.1.16 by Christakis Iacovides who holds this position until today. On 24.7.14 FBME was placed under special administration in Tanzania, whereupon the Central Bank of Tanzania appointed Lawrence Mafuru as "statutory manager" of FBME in Tanzania. On 22.12.15 the Central Bank of Cyprus, as Resolution Authority, registered the application with no. 905/15 applying for a Special Liquidation Order for FBME and the appointment of its Special Liquidator. After a hearing, the said application was rejected on 10.5.17. Against this decision the Appeal No. 168/17, as well as cross-appeals and their adjudication is pending (Exhibits 9 - 15). On 5.5.17, the Central Bank of Tanzania revoked

FBME's banking licence and by decision of the Central Bank of Tanzania was placed in liquidation proceedings. On 8.5.17, the Central Bank of Tanzania appointed the **Deposit Protection Fund of the United Republic of Tanzania** i.e. the Respondents (DIB) as Liquidator of FBME.

It stated that in all proceedings pending before the domestic courts, FBME (Tanzania), its shareholders (Messrs. Ayoub Farid Michel Saab and Fadi Michel Saab), as well as the Tanzanian institutional administrator Mr. Mafuru, was represented by the law firm George Z. Georgiou & Associates LLC (hereinafter the law firm), except in Appeals, where shareholders are represented by another law firm. Specifically, the law firm represented in parallel, simultaneously or successively the following legal and natural persons: (a) FBME, b) the Branch in relation to the challenge of administrative decisions concerning the Branch and/or the bank, c) Messrs. Saab, personally and as directors of the Branch, Shareholders and creditors of FBME, d) FBMECS, e) the statutory manager of FBME, i.e. Mr. Lawrence Mafuru and (f) in the present tense the Deposit Insurance Board (DIB). (Relevant are items 16 - 35). It noted that there had been no change in FBME's legal representation, despite the appointment of the institutional administrator and subsequently the Respondents by the Central Bank of Tanzania. The law firm, together with the law firm Markides, Markides & Co., acted both for FBME and subsequently through its institutional administrator, as well as for the shareholders. Today the law firm represents the Respondents in the application in present proceedings and in Appeal No. 168/17, while for the shareholders in the Appeal appears the law firm Markides, Markides & Co.

It argues that the Respondents, as liquidators of FBME, must take into account the interests of all FBME creditors. However, the lawyers of the Respondents had previously represented a specific class of FBME's creditors, namely its shareholders. This leads to the conclusion that a conflict of interest arises with the appointment of the

law firm, which is prevented from representing the Respondents in the application if it acted and **is ambiguous** if it does not act even for the shareholders. The conflict of interest also arises due to the previous lawyer-client relationship between the law firm and the bank, branch and shareholders, whose interests were and are different. The law firm represented FBME's shareholders, who are now FBME's creditors, the institutional administrator Mr. Mafuru, while currently representing the Respondents, who are required to act impartially and independently in the best interests of all FBME creditors, including the Applicants.

It further submits that the circumstances concerning FBME are complex in law and in fact, there is disagreement and conflict in District Courts and Administrative and Appellate before the Supreme Court as well as International Commercial Arbitration between shareholders and the Republic of Cyprus and therefore the conflict of interest precludes the law firm from representing the Respondents. This is because the boundaries of interests are blurred of the Respondents as potential Liquidators and the shareholders, as is the difficulty of distinguishing between the interests of the shareholders-creditors and the interests of all other creditors. In the event that the Respondents seek legal advice concerning the shareholders or directors of the Bank, as well as the adoption of legal measures, the law firm will be prevented from providing legal advice, if it has placed itself in a manifest position of conflicting interests. The law firm is prevented from acting in any way against the shareholders or the Board of Directors of the Bank and the branch, if confidential information has come to its knowledge, because it previously acted for the shareholders of the Bank, the branch, the institutional administrator and now for the prospective Liquidators - Respondents. The above constitute circumstances of conflict of interest, bending of the principle of confidentiality of information as well as further conflicts of interest, to the detriment of the interests of the Applicants as creditors and the body of other creditors. The interests of all affected

creditors should be safeguarded and the integrity and integrity of the winding-up proceedings should be ensured.

It argues that there is an inevitable conflict of interest since the law firm until recently represented a specific class of FBME's creditors , namely its shareholders, **a relationship that probably** still exists. After FBME was allegedly placed in liquidation in Tanzania, the same lawyers appear as representatives of the alleged Tanzanian Liquidator, i.e. the Respondents. The Applicants' lawyers received relevant legal advice from English lawyers (presumption 36), which supports the content of this application. The law firm is prevented from acting as the lawyer of the Respondents, since in **the past or even today**, as lawyers for FBME shareholders and its institutional administrator, they have shared confidential information, which they are prevented from channeling and using as lawyers in addition to the Respondents, who should act impartially if recognized domestically and investigate whether any claim arises against persons, including shareholders. The law firm **may** directly or indirectly advise shareholders on intentions or evidence against them in order to cover up their subsequent actions, hence the risk of leakage of confidential information. Informing shareholders of the steps the Respondents intend to take because they use the same lawyers could cause irreparable damage to the interests of FBME's other creditors and to the mild and painless treatment of shareholders or other creditors who are favoured by shareholders. There is an impediment for the law firm to act independently vis-à-vis all creditors; due to its interconnection with shareholders - creditors, which affects the interests of the body of creditors, as well as of the Applicants.

The present application has been opposed by the Respondents, which is supported by an affidavit of **Panagiotis Katsapokkis** dated 10.10.17 and by which the following grounds of objection are raised:

1. The Court shall not have the power and/or discretion to prevent the Respondents from consulting and being represented by a lawyer of their choice.

2. Applicants do not have a legal right (locus standi) to forward this application, because the issue of representation of the Respondents does not concern them and does not affect them, since they have not previously been represented by the law firm so that there is a risk of conflict of interest to the detriment of the Applicants and the law firm did not receive any data and/or information of a confidential nature from them Claimants, which could be disclosed to the Respondents in the present case for the benefit of the Respondents and to the detriment of the Applicants.

3. There is no conflict of interest in relation to the representation of the Respondents, as long as the law firm has not received any data and/or information of a confidential nature that it could disclose in the context of the present proceedings to the detriment of the Applicants.

4. There is no question of parallel representation of the Respondents and the shareholders of FBME BANK LTD (Under Liquidation) by the law firm, provided that the representation of the shareholders has ended before the registration of this application.

5. The Respondents lawfully and/or regularly appointed the law firm as their lawyers, who are the lawyers of their choice and/or will.

6. The application is premature, logically, legally and materially unfounded and is intended to unfairly affect the rights of the Respondents and/or to delay, complicate and derail the hearing

of the Main Application, is abusive and was registered for other purposes.

7. Any approval of the application will constitute impermissible, unfair, unjustified interference in the matters of Liquidation of the Respondents and violation of the right to a fair trial and/or the right of the Respondents to be represented by a lawyer of their choice.

8. The affidavit supporting the application is irregular, invalid, irregular and cannot be taken into consideration in support of the application.

**Panagiotis Katsaprokkis** is a lawyer at the law office of the lawyers of the Respondents. He clarified that the Court never gave instructions to serve the Main Application on anyone and the sending of the Main Application on 29.5.17 via email to the lawyers of the Petitioners was done at the initiative of the lawyers of the Respondents. Reported to FBME Tanzanian Company, which until 21.12.15 held a licence from the Central Bank of Cyprus to operate a branch in the Republic of Cyprus for banking purposes, which did not have separate legal personality from FBME. On 10.5.17 the Nicosia District Court rejected the Central Bank of Cyprus' application for a special Liquidation of FBME (Exhibit 3), while on 5.5.17 the Central Bank of Tanzania ceased all banking operations of FBME, revoked its licence, placed it in Liquidation and appointed the Respondents as Liquidators with effect from 8.5.17 to liquidate FBME and take all necessary steps for the proper implementation, safeguarding and maintenance of its assets and the settlement of its liabilities in accordance with the Act. It alleges that the Applicants are confused as to the legal and factual status of FBME and in the affidavit supporting their application they intend to mislead the Court by presenting FBME and its Cyprus branch as if they were two separate legal entities.

He argued that the Applicants are not entitled as third parties to claim the requested Decrees, since the law firm has never had any cooperation, lawyer and client relationship with the Applicants, is not aware of any information that could be used against them, nor does it owe any duties of loyalty and confidentiality to them. Therefore, the legitimate interests of the Applicants are not affected in any way. In addition, there is no any conflict of interest between the Respondents and FBME's creditors, since the primary concern of the Respondents is to satisfy the claims of the entire body of creditors. The Main Application does not concern the Applicants and is not directed against any legal or natural person as a party. Therefore, the Applicants are not entitled to raise a conflict of interest issue between the Respondents and any other person. The only ones who possibly could raise the issue of termination of the representation of the Respondents; the application by the law firm is the **shareholders**, if the Main Application was directed against them and the law firm was still representing the shareholders of FBME or another creditor and at the same time the Respondents. FBME shareholders they never expressed concern about the representation of the Respondents in the application by the law firm and no testimony was presented by the Applicants alleging that the shareholders and the Respondents do not consent to the representation of the Respondents in the application by the law firm. Therefore, the Applicants, who are not involved in any way in the present proceedings, have no right or say regarding the lawyer whom the Respondents authorized to act on their behalf. The choice of lawyer does not depend on the beliefs and conjectures of the opposing party.

It accepts what the Applicants say about the legal proceedings that have been initiated and in which the law firm participated. However, it claims that the Applicants' reference to representation by the law firm of the FBME branch is incorrect. The respondents do not dispute that the law firm represented FBME's shareholders in their personal capacity in Cyprus and abroad. However, when the Respondents were appointed on 5.5.17 as Liquidators of FBME, they

contacted the law firm and when they discussed their possible representation by it, the law firm commenced proceedings to terminate further representation of the cases it was handling for the shareholders of the Bank, which (proceedings) were completed on 6.7.17. Therefore, the representation of shareholders by the law firm, has been terminated in all court proceedings in Cyprus and abroad (exhibits 4, 5). He added that the law firm informed the Respondents in the application that it had acted in the past for the shareholders of the Bank and therefore they were fully aware of the previous representation of shareholders by the law firm. He pointed out that the issue of representation of the Respondents by the law firm had previously been raised by the Central Bank of Cyprus by letter dated 25.5.17 to the Respondents (Exhibit 6). The Respondents rejected the contents of Exhibit 6 by letter dated 1.6.17 (Exhibit 7), in which they explained that they had been previously informed of the previous handling of cases by the law firm on behalf of the shareholders, did not see any conflict of interest and fully supported and trusted the law firm. Despite the inaccurate and misleading statements in the affidavit supporting the application, he stressed that the law firm no longer represents FBME shareholders as of 6.7.17, nor is it inextricably linked to them. The law firm represents the Respondents and advises them on Cyprus law issues in the Liquidation process. FBME Liquidation started on 8.5.17, is governed by Tanzanian law and the Respondents have Tanzanian lawyers who advise them on Liquidation issues.

It disagrees with the legal opinion of the London lawyers relied on by the Applicants, which has been given on an erroneous basis of facts namely that the law firm continues to represent FBME's shareholders. On the other hand, there is no question of the parallel representation of FBME shareholders and the Respondents, and therefore there is no conflict of interest between them; nor is there any risk of leakage of any confidential and inside information to shareholders. What the Applicants claim to the contrary are offensive and trivial comments about the law firm, as well as unsubstantiated speculations of the Applicants that have not been positively

demonstrated in the Court. Furthermore, nothing has been substantiated by the Applicants to show that the appointment of the law firm is inconsistent with its duty towards the interests of all creditors, other than vague scaremongering and misleading statements. He further stated that any confidential information that has come into the possession of the law firm from the representation of the shareholders, has no weight or impact on the outcome of the Main application, since it is not related in any way and will not be the subject of the Main Application. There is therefore no risk of breach of the duty of confidentiality. The Applicants did not specify any confidential information or the type of information that may have come into the possession of the law firm, so as to positively demonstrate to the Court that it has received confidential information in the context of the previous representation of FBME's shareholders. Finally, he submits that the present request cannot be based on the inherent power of the Court, the absence of specific legislative provision conferring jurisdiction on the Court to hear such an application.

The learned counsel for the parties has advanced their clients' positions with detailed oral arguments, which I have conducted with due care and specific reference to each other's submissions - to the extent necessary - will be made at the appropriate stage.

The **first question** facing the Court is whether the Court has **jurisdiction** to intervene and remove the appointment of a particular law firm from acting for a particular client.

In the English case **Rakusen v. Ellis, Munday & Clarke** (1912) 1 Ch. 831, recognized the Court's jurisdiction to intervene in cases where there is a risk of confidential information being leaked and to prohibit a lawyer from acting on behalf of a client. The above principle was recognized and extended by House of Lords in **Bolkiah v. KPMG** (1998) UKHL 52, (1999) 2 AC 222, (1999) 1 All E.R, 517, (1999) 2 WLR 215 (16th December, 1998) which formed the basis for the Court's assumption of jurisdiction to intervene in the appointment of a

lawyer when there is a possibility that (1) confidential information relating to another client's case may be leaked or (2) a conflict of interest may arise as a result of the appointment.

The following excerpt is relevant:

"*I consider that the nature of the work which a firm of accountants undertakes in the provision of litigation support services requires the court to exercise the same jurisdiction to intervene on behalf of a former client of the firm as it exercises in the case of a solicitor.* **The basis of that jurisdiction is to be found in the principles which apply to all forms of employment where the relationship between the client and the person with whom he does business is a confidential one. A solicitor is under a duty not to communicate to others any information in his possession which is confidential to the former client.** *But the duty extends well beyond that of refraining from deliberate disclosure.* **It is the solicitor's duty to ensure that the former client in not put at risk that confidential information which the solicitor has obtained from that relationship may be used against him in any circumstances. Particular care is needed if the solicitor agrees to act for a new client who has, or who may have, an interest which is in conflict with that of the former client. In that situation the former client is entitled to the protection of the court if he can show that his solicitor was in receipt of confidential information which is relevant to a matter for which the solicitor is acting against the former client's interest, for a new client.**"

It is therefore the conclusion of the Court **that the jurisdiction of the Court** to intervene and protect a customer in any case where there is a confidential relationship between the client and the provider, when there is a risk of confidential information in relation to his case being leaked to an opposing party or to someone who may become an opposing party, as well as when there is a conflict of interest between two clients, Both in cases of lawyers and generally in any

case of a professional whose relationship with his client is confidential.

**In the Bolkiah** case (above) the two conditions on the basis of which the Court may intervene and prohibit the appointment of a lawyer or other professional whose relationship with his client is confidential were defined. The **first** condition is the protection of confidential information and the **second** is protection against conflicts of interest.

In relation to **the protection of confidential information** the following passages from the **Bolkiah** case (above) are relevant:

> *"In the course of argument, however, he modified his position, accepting that there was no ground on which the court could properly intervene* **unless two conditions are satisfied: (i) that the solicitor was in possession of information which was confidential to the former client and (ii) that such information was or might be relevant to the matter on which he was instructed by the second client.** *This makes the possession of relevant confidential information the test of what is comprehended within the expression "the same or a connected matter". On this footing the Court's intervention is founded not on the avoidance of any perception of possible impropriety* **but on the protection of confidential information.**
>
> *My Lords, I would affirm this as the basis on the court's jurisdiction to intervene on behalf of a former client."*
>
> ..............................
>
> *"The duties of an accountant cannot be greater than those of a solicitor, and may be less, for information relating to his client's affairs which is the possession of a solicitor is usually privileged as well as confidential. In the present case, however, some of the information obtained by K.P.M.G. is likely to have attracted litigation privilege, though not solicitor-client*

*privilege, and it is conceded by K.P.M.G. that an accountant who provides litigation support services of the kind which they provided to Prince Jefri must be treated for present purposes in the same way as a solicitor."*

*..............................*

*"It is in any case difficult to discern any justification in principle for a rule which exposes a former client without his consent to any avoidable risk, however slight, that information which he has imparted in confidence in the course of a fiduciary relationship may come into the possession of a third party and be used to his disadvantage.* ***Where in addition the information in question is not only confidential but also privileged, the case for a strict approach is unanswerable.*** *Anything less fails to give effect to the policy on which legal professional privilege is based.* ***It is of overriding importance for the proper administration of justice that a client should be able to have complete confidence that what he tells his lawyer will remain secret.*** *This is a matter of perception as well as substance.* ***It is of the highest importance to the administration of justice that a solicitor or other person in possession of confidential and privileged information should not act in any way that might appear to put that information at risk of coming into the hands of someone with an adverse interest****."*

In relation to the burden of proof the following passage is relevant:

*"Accordingly, it is incumbent on a plaintiff who seeks to restrain his former solicitor from acting in a matter for another client to establish* ***(i) that the solicitor is in possession of information which is confidential to him and to the disclosure of which he has not consented and (ii) that the information is or may be relevant to the new matter in which the interest of the other client is or may be adverse to his own.*** *Although the burden of proof is on the plaintiff, it is not a heavy one.* ***The former may readily be inferred; the latter will often be obvious.*** *I do not think that it is necessary*

> *to introduce any presumptions, rebuttable or otherwise, in relation to these two matters. But given the basis on which the jurisdiction is exercised, there is no cause to impute or attribute the knowledge of one partner to his fellow partners. Whether a particular individual is in possession of confidential information is a question of fact which must be proved or inferred from the circumstances of the case."*
>
> *.............................*
>
> *"I prefer simply to say that the **court should intervene** unless it is satisfied that there is no risk of disclosure. It goes without saying that the risk must be a real one, and not merely fanciful or theoretical. But it need not be substantial."*

It follows from the above that the Court **must intervene** unless it considers that there is no risk of confidential information being leaked. In other words, there is **a positive** responsibility of the Court to intervene and protect the client.

Regarding **protection from Conflict of Interest** the following passage from the **Bolkiah** case (above) is relevant:

> *"It is otherwise where the court's intervention is sought by an existing client, for a fiduciary cannot act at the same time both for and against the same client, and his firm is in no better position. A man cannot without the consent of both clients act for one client while his partner is acting for another in the opposite interest. **His disqualification has nothing to do with the confidentiality of client information. It is based on the inescapable conflict of interest which is inherent in the situation.**"*

Furthermore, **Halsbury's Laws of England 4**[th] **ed. V.3(1)** para. 464 states that a lawyer has an obligation not to accept instructions to represent two clients whose interests will or may conflict. For example, a lawyer may not act on the same matter on behalf of an independent trustee and a party that has an interest in the assets of the trust. The following passage is relevant:

"*A barrister ought not to accept instructions or a brief to represent two clients whose interests will or may conflict. If, after a barrister has accepted a set of instructions or a brief on behalf of more than one client, there appears to be a conflict of interest between any one or more of such clients, he may not continue to act for any such client unless all such clients consent that he should so act, and he is able to do so without embarrassment.*"

In **Bristol and West Building Society v. Mothew** (1998) Ch.1 it was held that:

"*A fiduciary who acts for two principals with potentially conflicting interests without the informed consent of both is in breach of the obligation of undivided loyalty; he puts himself in a position where his duty to one principal may conflict with his duty to the other: see Clark Boyce v. Mouat [1994] 1 AC 428 and the cases there cited.* **This is sometimes described as "the double employment rule". Breach of the rule automatically constitutes a breach of fiduciary duty.**"

Relevant is the case **In the Matter of Y.Z. An Advocate (No.2) (1973) 1 C.L.R. 14,** in which the Supreme Court upheld a sentence against a lawyer who, while previously acting for the company, undertook to represent one of the company's shareholders in a dispute that arose between the company's shareholders.

I proceed to examine whether, in the circumstances of the case, the Court's intervention in appointing the law firm George Z. Georgiou & Associates LLC as lawyers of the respondents, in order to safeguard the interests of all affected creditors and to ensure the integrity and integrity of the Liquidation process, is justified in the circumstances of the case. if the Main Application succeeds. In particular, it is a suggestion by the learned counsel of the Applicants that circumstances of conflict of interest arise against the **Applicants as creditors** of FBME and the body of other creditors, since the law firm has provided services and represented at the same time,

simultaneously or successively, FBME, its shareholders, FBME CS, the institutional administrator of FBME and the Respondents. They place particular emphasis on the representation **of a particular class of FBME creditors**, **namely FBME's** shareholders, and claim that the relationship between that law firm and FBME's shareholders gives rise to a conflict of interest, since the respondents are required to act impartially and independently in the best interests of all FBME creditors FBME.

The first issue that the Court is called upon to decide is whether the **Applicants are entitled to register the present application, bearing in mind** the indisputable fact that the Applicants have never been represented by the law firm.

From the English case-law **Rakusen v. Ellis, Munday & Clarke** and **Bolkiah v. KPMG** (above) shows that the Court has jurisdiction to intervene in matters relating to the appointment of a lawyer at the request of a lawyer's client, where there is a risk that confidential information which he has disclosed to him may be used to his detriment as a result of representation by the same lawyer of another client. The jurisdiction of the Court concerns those cases where a lawyer has acted at intervals on behalf of two persons and one of the They wish to terminate the representation of the other person by the same lawyer in order to protect their interests. The following excerpt from **the Rakusen** case (above) is relevant:

> *"The jurisdiction is a jurisdiction to restrain the solicitor from giving the new client any assistance against the old client by reason of knowledge acquired as solicitor for the old client. If to ensure that result it is shown to be reasonably necessary to restrain the employment of the solicitor by the new client the injunction will be granted, but on no other ground could such an injunction be granted as against the client."*

The English High Court in the recent case **Georgian American Alloys Inc, a.o. v White &; Case LLP (registered in England and**

**Wales), White &; Case LLP (registered in New York, USA (2014) EWHC 94 (Comm)** issued an injunction prohibiting a law firm to act on behalf of a party even though the law firm did not have never act as an attorney for the Applicants. In the present case, the Applicants sought to prohibit further representation of lawyers acting for other parties (in a case between the Applicants and the 2 other parties). The Applicants alleged that the said lawyers (White & Case LLP) disclosed relevant and confidential information **concerning the Applicants** due to their previous representation of a company, in which all the above natural persons (Applicants and other parties) were shareholders. Therefore, the Court considered it justified to exercise its discretion in favour of issuing the Injunction since White & Case did receive information to which the Applicants did not consent to be used and which was relevant to the case between the Applicants and the other two shareholders.

It follows from the above that the jurisdiction of the English Courts has been extended to cases where the Applicant has never been represented by the law firm acting on behalf of a party, provided that a) the law firm **did receive** relevant and confidential information **concerning the Applicant**, due to the previous representation of the other party by the law firm and b) the Applicant did not consent to the use of such information, which are **relevant** to the case between the Applicant and the other party.

In the present case, as already mentioned above, the law firm never represented the Applicants. Against this background, the Applicants, in order to be entitled to register the present application, had to satisfy the Court that a) the law firm **did indeed** receive relevant and confidential information **concerning the Applicants**, due to its prior representation of the above legal and natural persons and in particular FBME shareholders and that b) such confidential information is **relevant to the Main Application** and the Applicants do not consent to be used in it. However, the Applicants made no such allegation in the affidavit supporting their application. They

simply made general, vague and unsubstantiated references to confidential information received by the law firm as a result of the prior representation of FBME shareholders, without specifying and specifying what this information is, what it consists of, whether it relates to the Applicants and whether it has any relation to the subject matter of the Main Application.

Therefore, it is the conclusion of the Court that the Applicants have not satisfied the Court as above and are therefore not entitled to register the present application. On the basis of the above, FBME shareholders may have been entitled to register such an application, but they never did so and never complained about the representation of the Respondents by the law firm; while the Respondents, in their letter (Exhibit 7) dated 1.6.17 to the Central Bank of Cyprus, explained that they had previously been informed of the previous handling of FBME shareholders' affairs by the law firm, which they fully trust.

Notwithstanding the Court's conclusion above, I proceed to examine whether the two conditions laid down in **the Bolkiah** case (above) on the basis of which the Court may intervene and prohibit the appointment of a lawyer or other professional whose relationship with his client is confidential are satisfied. In particular, if (a) there is a question of protection of confidential information and (b) if there is a question of protection from conflict of interest.

In the **Bolkiah** case (above) the principles applicable when the Court is called upon to intervene and terminate the appointment of a lawyer or other professional have been determined in order to prevent the risk of unauthorised **use of confidential information**. It follows from the above passages that the applicant must substantiate before the Court that a) the lawyer has confidential information concerning the applicant and he does not have consent to its disclosure, and (b) that such information is relevant or may be relevant to a new matter in which the interests of his new client are or may be contrary to his own.

In the present case, as mentioned above, the Applicants have never been clients of the law firm and have never been represented by it. Therefore, it is impossible for the law firm to possess confidential information **concerning the Applicants** that came to its knowledge due to their representation. The general, vague and unsubstantiated position of the Applicants that the law firm holds confidential information that came to its knowledge due to the previous representation of FBME shareholders, without specifying whether they **concern the Applicants**, or that there is a risk of leakage of confidential information by the law firm, which they **may** acquire in the future and which will concern shareholders, does not fall within the above conditions established by the case-law. As clarified by the Respondents, The law firm ceased to represent shareholders as of 6.7.17. Therefore, any possibility of disclosure of information by the law firm to shareholders and vice versa is eliminated.

In addition, the Applicants, who have the burden of proof, failed to satisfy the Court that the general and vaguely reported confidential information allegedly held by the law firm **is directly related to the Main Application**. As rightly stated in the affidavit accompanying the Respondents' objection, the Court in the Main Application will not consider any of the elements alleged and alleged by the Applicants that they have come or will come into the possession of the respondents and the law firm, but will be limited to examining the conditions for recognition in the Republic of Cyprus of the appointment of the Respondents as Liquidators of FBME BANK LTD (Under Liquidation).

For all the above is the conclusion of the Court that the Applicants failed to substantiate the aforementioned conditions regarding the **protection of confidential information**. Therefore, the relevant proposal of the Applicants is not accepted and rejected.

In the same **Bolkiah** case (above), the principles relating to protection against **conflicts of interest** applicable in cases where two clients are **represented in parallel** by the same lawyer whose interests conflict were also clarified.

In the present case, it is the position of the Respondents that the law firm ceased to represent FBME's shareholders with effect from 6.7.17, i.e. two months prior to the registration of the Main Application on 7.9.17. The Applicants do not dispute this fact since they refer to the "until recently" representation of shareholders by the said law firm, But they also claim that it is "ambiguous" if this does not continue to act even today for shareholders, that the relationship between them "probably" still exists, and that both in the past "or even today" they continue to act as lawyers for shareholders. Undoubtedly, these unfounded and unsubstantiated speculations of the Applicants cannot be accepted by the Court. The Applicants failed to substantiate by testimony before the Court, in a clear and positive manner, that indeed the law firm continues to represent FBME shareholders and therefore there is parallel representation of shareholders and respondents. Therefore, there is no question of parallel representation of FBME shareholdersand the Respondents and therefore there is no question of a 'conflict of interest' between them either, on the basis of the **Bolkiah** (above) and **Bristol and West Building Society** casesv **Mothew** (above). Furthermore, I repeat that the law firm has never represented the Applicants so that there is a question of parallel representation of the Respondents with the Applicants and consequently there is a conflict of interest issue, since the law firm does not owe any duties of loyalty and confidentiality to the Applicants. Finally, it is emphasized that the Applicants no evidence has been presented to the Court to the effect that FBME shareholders do not consent to the representation of the respondents by the law firm and that they expressed at any stage and in any way their concern about such representation of the respondents. On the other hand, the respondents, as mentioned above, in their letter dated 1.6.17 (Exhibit 7) to the Central Bank of Cyprus, they reported their information on

the previous handling of FBME shareholders' cases by the law firm, in which they expressed their full confidence.

For all the above, the application is rejected.

In view of this conclusion of the Court, I consider it unnecessary to deal with the suggestion of the learned counsel for the Respondents in the application for an erroneous procedural approach, which would only be of academic interest.

Costs are awarded for the benefit of the Respondents and at the expense of the Applicants, as calculated by the Registrar and approved by the Court.


(Yp.) ......................................
F. Hatzigianni, P.E.D.


Replica


Registrar

/CA

**EXHIBIT T**

JUDGMENT OF THE COURT (Grand Chamber)

8 December 2022 ([*])

(Reference for a preliminary ruling – Administrative cooperation in the field of taxation – Mandatory automatic exchange of information in relation to reportable cross-border arrangements – Directive 2011/16/EU, as amended by Directive (EU) 2018/822 – Article 8ab(5) – Validity – Legal professional privilege of the lawyer – Exemption from the reporting obligation for the benefit of lawyer-intermediaries subject to legal professional privilege – Obligation on that lawyer-intermediary to notify any other intermediary who is not his or her client of that intermediary's reporting obligations – Articles 7 and 47 of the Charter of Fundamental Rights of the European Union)

In Case C-694/20,

REQUEST for a preliminary ruling under Article 267 TFEU from the Grondwettelijk Hof (Constitutional Court, Belgium), made by decision of 17 December 2020, received at the Court on 21 December 2020, in the proceedings

**Orde van Vlaamse Balies,**

**IG,**

**Belgian Association of Tax Lawyers,**

**CD,**

**JU**

v

**Vlaamse Regering,**

THE COURT (Grand Chamber),

composed of K. Lenaerts, President, L. Bay Larsen, Vice-President, A. Arabadjiev, A. Prechal, K. Jürimäe, P.G. Xuereb, L.S. Rossi and D. Gratsias, Presidents of Chambers, F. Biltgen, N. Piçarra, I. Jarukaitis, N. Jääskinen, N. Wahl, I. Ziemele and J. Passer (Rapporteur), Judges,

Advocate General: A. Rantos,

Registrar: M. Ferreira, Principal Administrator,

having regard to the written procedure and further to the hearing on 25 January 2022,

after considering the observations submitted on behalf of:

– Orde van Vlaamse Balies and IG, by S. Eskenazi and P. Wouters, advocaten,

– Belgian Association of Tax Lawyers, CD and JU, by P. Malherbe, avocat, and P. Verhaeghe, advocaat,

–    the Belgian Government, by S. Baeyens, J.-C. Halleux and C. Pochet, acting as Agents, and by M. Delanote, advocaat,

–    the Czech Government, by J. Očková, M. Smolek and J. Vláčil, acting as Agents,

–    the French Government, by R. Bénard, A.-L. Desjonquères, E. de Moustier and É. Toutain, acting as Agents,

–    the Latvian Government, by J. Davidoviča, I. Hūna and K. Pommere, acting as Agents,

–    the Council of the European Union, by E. Chatziioakeimidou, I. Gurov and S. Van Overmeire, acting as Agents,

–    the European Commission, by W. Roels and P. Van Nuffel, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 5 April 2022,

gives the following

## Judgment

1     This request for a preliminary ruling concerns the validity of Article 8ab(5) of Council Directive 2011/16/EU of 15 February 2011 on administrative cooperation in the field of taxation and repealing Directive 77/799/EEC (OJ 2011 L 64, p. 1), as amended by Council Directive (EU) 2018/822 of 25 May 2018 (OJ 2018 L 139, p. 1) ('amended Directive 2011/16'), in the light of Articles 7 and 47 of the Charter of Fundamental Rights of the European Union ('the Charter').

2     The request has been made in proceedings between, on the one hand, the Orde van Vlaamse Balies (Flemish Bar Association, Belgium), the Belgian Association of Tax Lawyers, IG, CD and JU, three lawyers, and, on the other, the Vlaamse Regering (Flemish Government, Belgium) concerning the validity of certain provisions of Flemish legislation on administrative cooperation in the field of taxation.

## Legal context

### *European Union law*

#### *Directive 2011/16*

3     Directive 2011/16 has established a system of cooperation between the national tax authorities of the Member States and lays down the rules and procedures to be applied when exchanging information for tax purposes.

#### *Directive 2018/822*

4     Directive 2011/16 has been amended on several occasions, in particular by Directive 2018/822. That directive introduced an obligation to report any potentially aggressive tax-planning cross-border tax arrangements to the competent authorities. In that regard, recitals 2, 4, 6, 8, 9 and 18 of Directive 2018/822 state the following:

'(2)    Member States find it increasingly difficult to protect their national tax bases from erosion as tax-planning structures have evolved to be particularly sophisticated and often take advantage of the increased mobility of both capital and persons within the internal market. … It is therefore critical that Member States' tax authorities obtain comprehensive and relevant information about potentially

aggressive tax arrangements. Such information would enable those authorities to react promptly against harmful tax practices and to close loopholes by enacting legislation or by undertaking adequate risk assessments and carrying out tax audits. …

…

(4)     Recognising how a transparent framework for developing business activity could contribute to clamping down on tax avoidance and evasion in the internal market, the [European] Commission has been called on to embark on initiatives on the mandatory disclosure of information on potentially aggressive tax-planning arrangements along the lines of Action 12 of the [Organisation for Economic Co-operation and Development (OECD)] Base Erosion and Profit Shifting (BEPS) Project. In this context, the European Parliament has called for tougher measures against intermediaries who assist in arrangements that may lead to tax avoidance and evasion. It is also important to note that in the G7 Bari Declaration of 13 May 2017 on fighting tax crimes and other illicit financial flows, the OECD was asked to start discussing possible ways to address arrangements designed to circumvent reporting under the [Common Reporting Standard (CRS)] or aimed at providing beneficial owners with the shelter of non-transparent structures, considering also model mandatory disclosure rules inspired by the approach taken for avoidance arrangements outlined within the BEPS Action 12 Report.

…

(6)     The reporting of potentially aggressive cross-border tax-planning arrangements can contribute effectively to the efforts for creating an environment of fair taxation in the internal market. In this light, an obligation for intermediaries to inform tax authorities … would constitute a step in the right direction. …

…

(8)     To ensure the proper functioning of the internal market and to prevent loopholes in the proposed framework of rules, the reporting obligation should be placed upon all actors that are usually involved in designing, marketing, organising or managing the implementation of a reportable cross-border transaction or a series of such transactions, as well as those who provide assistance or advice. It should not be ignored either that, in certain cases, the reporting obligation would not be enforceable upon an intermediary due to a legal professional privilege or where there is no intermediary because, for instance, the taxpayer designs and implements a scheme in-house. It would thus be crucial that, in such circumstances, tax authorities do not lose the opportunity to receive information about tax-related arrangements that are potentially linked to aggressive tax planning. It would therefore be necessary to shift the reporting obligation to the taxpayer who benefits from the arrangement in such cases.

(9)     Aggressive tax-planning arrangements have evolved over the years to become increasingly more complex and are always subject to constant modifications and adjustments as a reaction to defensive countermeasures by the tax authorities. Taking this into consideration, it would be more effective to endeavour to capture potentially aggressive tax-planning arrangements through the compiling of a list of the features and elements of transactions that present a strong indication of tax avoidance or abuse rather than to define the concept of aggressive tax planning. Those indications are referred to as "hallmarks".

…

(18)     This Directive respects the fundamental rights and observes the principles recognised in particular by the Charter …'

*Amended Directive 2011/16*

5    Article 3 of amended Directive 2011/16 entitled 'Definitions' provides:

'For the purposes of this Directive the following definitions shall apply:

1.    "competent authority" of a Member State means the authority which has been designated as such by that Member State. When acting pursuant to this Directive, the central liaison office, a liaison department or a competent official shall also be deemed to be competent authorities by delegation according to Article 4;

…

18.    "cross-border arrangements" means an arrangement concerning either more than one Member State or a Member State and a third country where at least one of the following conditions is met:

(a)    not all of the participants in the arrangement are resident for tax purposes in the same jurisdiction;

(b)    one or more of the participants in the arrangement is simultaneously resident for tax purposes in more than one jurisdiction;

(c)    one or more of the participants in the arrangement carries on a business in another jurisdiction through a permanent establishment situated in that jurisdiction and the arrangement forms part or the whole of the business of that permanent establishment;

(d)    one or more of the participants in the arrangement carries on an activity in another jurisdiction without being resident for tax purposes or creating a permanent establishment situated in that jurisdiction;

(e)    such arrangement has a possible impact on the automatic exchange of information or the identification of beneficial ownership.

…

19.    "reportable cross-border arrangement" means any cross-border arrangement that contains at least one of the hallmarks set out in Annex IV;

20.    "hallmark" means a characteristic or feature of a cross-border arrangement that presents an indication of a potential risk of tax avoidance, as listed in Annex IV;

21.    "intermediary" means any person that designs, markets, organises or makes available for implementation or manages the implementation of a reportable cross-border arrangement.

It also means any person that, having regard to the relevant facts and circumstances and based on available information and the relevant expertise and understanding required to provide such services, knows or could be reasonably expected to know that they have undertaken to provide, directly or by means of other persons, aid, assistance or advice with respect to designing, marketing, organising, making available for implementation or managing the implementation of a reportable cross-border arrangement. Any person shall have the right to provide evidence that such person did not know and could not reasonably be expected to know that that person was involved in a reportable cross-border arrangement. For this purpose, that person may refer to all relevant facts and circumstances as well as available information and their relevant expertise and understanding.

In order to be an intermediary, a person shall meet at least one of the following additional conditions:

(a)    be resident for tax purposes in a Member State;

(b)     have a permanent establishment in a Member State through which the services with respect to the arrangement are provided;

(c)     be incorporated in, or governed by the laws of, a Member State;

(d)     be registered with a professional association related to legal, taxation or consultancy services in a Member State.

22.     "relevant taxpayer" means any person to whom a reportable cross-border arrangement is made available for implementation, or who is ready to implement a reportable cross-border arrangement or has implemented the first step of such an arrangement.

…

24.     "marketable arrangement" means a cross-border arrangement that is designed, marketed, ready for implementation or made available for implementation without a need to be substantially customised.

25.     "bespoke arrangement" means any cross-border arrangement that is not a marketable arrangement.'

6     Article 8ab of amended Directive 2011/16, entitled 'Scope and conditions of mandatory automatic exchange of information on reportable cross-border arrangements', was inserted by Article 1(2) of Directive 2018/822 and states:

'1.     Each Member State shall take the necessary measures to require intermediaries to file information that is within their knowledge, possession or control on reportable cross-border arrangements with the competent authorities within 30 days beginning:

(a)     on the day after the reportable cross-border arrangement is made available for implementation; or

(b)     on the day after the reportable cross-border arrangement is ready for implementation; or

(c)     when the first step in the implementation of the reportable cross-border arrangement has been made,

whichever occurs first.

Notwithstanding the first subparagraph, intermediaries referred to in the second paragraph of point 21 of Article 3 shall also be required to file information within 30 days beginning on the day after they provided, directly or by means of other persons, aid, assistance or advice.

2.     In the case of marketable arrangements, Member States shall take the necessary measures to require that a periodic report be made by the intermediary every 3 months providing an update which contains new reportable information as referred to in points (a), (d), (g) and (h) of paragraph 14 that has become available since the last report was filed.

…

5.     Each Member State may take the necessary measures to give intermediaries the right to a waiver from filing information on a reportable cross-border arrangement where the reporting obligation would breach the legal professional privilege under the national law of that Member State. In such circumstances, each Member State shall take the necessary measures to require intermediaries to notify, without delay, any other intermediary or, if there is no such intermediary, the relevant taxpayer of their reporting obligations under paragraph 6.

Intermediaries may only be entitled to a waiver under the first subparagraph to the extent that they operate within the limits of the relevant national laws that define their professions.

6.      Each Member State shall take the necessary measures to require that, where there is no intermediary or the intermediary notifies the relevant taxpayer or another intermediary of the application of a waiver under paragraph 5, the obligation to file information on a reportable cross-border arrangement lie with the other notified intermediary, or, if there is no such intermediary, with the relevant taxpayer.

…

9.      Each Member State shall take the necessary measures to require that, where there is more than one intermediary, the obligation to file information on the reportable cross-border arrangement lie with all intermediaries involved in the same reportable cross-border arrangement.

An intermediary shall be exempt from filing the information only to the extent that it has proof, in accordance with national law, that the same information referred to in paragraph 14 has already been filed by another intermediary.

…

13.      The competent authority of a Member State where the information was filed pursuant to paragraphs 1 to 12 … shall … communicate … the information specified in paragraph 14 … to the competent authorities of all other Member States …

14.      The information to be communicated by the competent authority of a Member State under paragraph 13 shall contain the following, as applicable:

(a)      the identification of intermediaries and relevant taxpayers, including their name, date and place of birth (in the case of an individual), residence for tax purposes, TIN and, where appropriate, the persons that are associated enterprises to the relevant taxpayer;

(b)      details of the hallmarks set out in Annex IV that make the cross-border arrangement reportable;

(c)      a summary of the content of the reportable cross-border arrangement, including a reference to the name by which it is commonly known, if any, and a description in abstract terms of the relevant business activities or arrangements, without leading to the disclosure of a commercial, industrial or professional secret or of a commercial process, or of information the disclosure of which would be contrary to public policy;

(d)      the date on which the first step in implementing the reportable cross-border arrangement has been made or will be made;

(e)      details of the national provisions that form the basis of the reportable cross-border arrangement;

(f)      the value of the reportable cross-border arrangement;

(g)      the identification of the Member State of the relevant taxpayer(s) and any other Member States which are likely to be concerned by the reportable cross-border arrangement;

(h)      the identification of any other person in a Member State likely to be affected by the reportable cross-border arrangement, indicating to which Member States such person is linked.

…'

### Belgian law

7      The decreet betreffende de administratieve samenwerking op het gebied van belastingen (Decree on administrative cooperation in the field of taxation) of 21 June 2013 (*Belgisch Staatsblad* of 26 June 2013, p. 40587; 'the Decree of 21 June 2013') transposes Directive 2011/16 in the Flemish Region (Belgium).

8     That decree was amended by the decreet tot wijziging van het decreet van 21 juni 2013, wat betreft de verplichte automatische uitwisseling van inlichtingen op belastinggebied met betrekking tot meldingsplichtige grensoverschrijdende constructies (Decree amending the decree of 21 June 2013 as regards the mandatory automatic exchange of information in the field of taxation in relation to reportable cross-border arrangements) of 26 June 2020 (*Belgisch Staatsblad* of 3 July 2020, p. 49170; 'the Decree of 26 June 2020'), which transposes Directive 2018/822.

9     Subsection 2 of Section 2 of Chapter 2 of the Decree of 21 June 2013 governs the mandatory filing, by intermediaries or relevant taxpayers, of information on reportable cross-border tax arrangements.

10    Article 11/6 of that subsection, as inserted into the Decree of 21 June 2013 by Article 14 of the Decree of 26 June 2020, defines the relationship between the reporting obligation and the legal professional privilege by which certain intermediaries are bound. It transposes Article 8ab(5) and (6) of amended Directive 2011/16. Paragraph 1 of that Article 11/6 provides:

'When an intermediary is bound by legal professional privilege, he or she is required:

1°     to notify any other intermediary or intermediaries in writing, giving reasons, that he or she is unable to comply with the reporting obligation, as a result of which that reporting obligation automatically rests with the other intermediary or intermediaries;

2°     in the absence of any other intermediary, to notify the relevant taxpayer or taxpayers of their reporting obligation, in writing, giving reasons.

The waiver from the reporting obligation shall take effect only when an intermediary has fulfilled the obligation referred to in paragraph 1.'

11    Article 11/7 of the Decree of 21 June 2013, as inserted into that decree by Article 15 of the Decree of 26 June 2020, states:

'… if the intermediary notifies the relevant taxpayer or another intermediary of the application of a waiver under Article 11/6(1), the obligation to file information on a reportable cross-border arrangement shall be incumbent on the other intermediary who has been notified, or if there is no such intermediary, the relevant taxpayer.'

**The dispute in the main proceedings and the question referred for a preliminary ruling**

12    By applications of 31 August and 1 October 2020, the applicants in the main proceedings brought an action before the Grondwettelijk Hof (Constitutional Court, Belgium), which is the referring court, seeking suspension of the Decree of 26 June 2020 and its annulment in whole or in part.

13    It is apparent from the order for reference that the applicants in the main proceedings dispute, in particular, the obligation provided for in the first subparagraph of Article 11/6(1) of the Decree of 21 June 2013, which was inserted into that decree by Article 14 of the Decree of 26 June 2020, which requires a lawyer acting as an intermediary, where he or she is bound by legal professional privilege, to inform the other intermediaries concerned in writing, stating reasons, that he or she cannot fulfil his or her reporting obligation. According to the applicants in the main proceedings, it is impossible to fulfil that obligation to provide information without infringing the legal professional privilege by which lawyers are bound. Furthermore, that obligation to provide information is not necessary in order to ensure that cross-border arrangements are reported, since the client, whether or not assisted by the lawyer, can him- or herself inform the other intermediaries and ask them to comply with their reporting obligation.

14    The referring court notes that the information which lawyers must file with the competent authority with regard to their clients is protected by legal professional privilege, if that information relates to activities

which fall within their specific tasks of defence or representation in legal proceedings and legal advice. It observes that the mere fact of having recourse to a lawyer is covered by legal professional privilege and that the same applies, a fortiori, as regards the identity of a lawyer's client. Information protected by legal professional privilege vis-à-vis public authorities is also protected with regard to other actors, such as other intermediaries.

15    The referring court states that, according to the *travaux préparatoires* for the Decree of 26 June 2020, the obligation for an intermediary to inform other intermediaries, giving reasons, that he or she is subject to legal professional privilege and that he or she will not therefore fulfil the reporting obligation is required in order to satisfy the requirements of Directive 2018/822 and to ensure that legal professional privilege does not prevent the necessary reporting.

16    That court notes that the actions in the main proceedings thus raise the question of the validity of Directive 2018/822, in so far as it has introduced such an obligation. Therefore, before a final ruling can be given on those actions, it is first necessary to resolve that question.

17    In those circumstances, the Grondwettelijk Hof (Constitutional Court), first, ordered the suspension, inter alia, of the first subparagraph of Article 11/6(1) of the Decree of 21 June 2013, as inserted by Article 14 of the Decree of 26 June 2020, in so far as that provision imposes on a lawyer acting as an intermediary an obligation to provide information to another intermediary who is not his or her client, until the date of publication of the judgment ruling on those actions. Second, that court decided to stay the proceedings and to refer the following question to the Court of Justice for a preliminary ruling:

'Does Article 1(2) of [Directive 2018/822] infringe the right to a fair trial as guaranteed by Article 47 of the [Charter] and the right to respect for private life as guaranteed by Article 7 of the [Charter], in that the new Article 8ab(5) which it inserted in [Directive 2011/16], provides that, where a Member State takes the necessary measures to give intermediaries the right to waiver from filing information on a reportable cross-border arrangement where the reporting obligation would breach the legal professional privilege under the national law of that Member State, that Member State is obliged to require the intermediaries to notify, without delay, any other intermediary or, if there is no such intermediary, the relevant taxpayer, of their reporting obligations, in so far as the effect of that obligation is to oblige a lawyer acting as an intermediary to share with another intermediary, not being his [or her] client, information which he [or she] obtains in the course of the essential activities of his [or her] profession, namely, representing or defending clients in legal proceedings and giving legal advice, even in the absence of pending legal proceedings?'

## Consideration of the question referred

18    As a preliminary point, it should be noted that, although the question put refers to the obligation to notify, laid down in Article 8ab(5) of amended Directive 2011/16, both with regard to intermediaries and, in the absence of any intermediary, to the relevant taxpayer, it is nevertheless apparent from reading the request for a preliminary ruling as a whole that the referring court is in fact seeking to ascertain only the validity of that obligation in so far as the notification must be made, by a lawyer acting as an intermediary ('the lawyer-intermediary'), within the meaning of Article 3(21) of that directive, to another intermediary who is not his or her client.

19    Where the notification provided for in Article 8ab(5) of amended Directive 2011/16 is made by the lawyer-intermediary to his or her client, whether that client is another intermediary or the relevant taxpayer, that notification is not capable of calling into question respect for the rights and freedoms guaranteed by Articles 7 and 47 of the Charter on account, first, of the absence of any obligation of legal professional privilege on the part of the lawyer-intermediary vis-à-vis his or her client and, second, of the fact that, at the stage of the execution by that client of his or her reporting obligations under that directive, the confidentiality of the relationship between the lawyer-intermediary and that client precludes the latter from being required to reveal to third parties and, in particular, to the tax authorities, that he or she has consulted a lawyer.

20     It is thus apparent from the order for reference that, by its question, the referring court asks the Court, in essence, to examine the validity, in the light of Articles 7 and 47 of the Charter, of Article 8ab(5) of amended Directive 2011/16, in so far as the Member States' application of that provision has the effect of requiring a lawyer acting as an intermediary, within the meaning of Article 3(21) of that directive, where he or she is exempt from the reporting obligation laid down in paragraph 1 of Article 8ab of that directive on account of the legal professional privilege by which he or she is bound, to notify without delay any other intermediary who is not his or her client of that intermediary's reporting obligations under paragraph 6 of that Article 8ab.

21     In that regard, it must be borne in mind that, in accordance with Article 8ab(1) of amended Directive 2011/16, each Member State is to take the necessary measures to require intermediaries to file information that is within their knowledge, possession or control on reportable cross-border arrangements with the competent authorities within 30 days. The reporting obligation laid down in that provision applies to all reportable cross-border arrangements and, therefore, both to bespoke arrangements, defined in Article 3(25) of amended Directive 2011/16, and marketable arrangements, defined in Article 3(24) thereof.

22     It should be noted that lawyers may, in the performance of their activities, be 'intermediaries' within the meaning of Article 3(21) of amended Directive 2011/16, by reason of the fact that they may themselves perform activities relating to designing, marketing, organising, making available for implementation or managing the implementation of reportable cross-border arrangements or, failing that, because they may provide aid, assistance or advice in relation to such activities. Lawyers carrying out such activities are thus, in principle, subject to the reporting obligation laid down in Article 8ab(1) of that directive.

23     However, under the first subparagraph of Article 8ab(5) of amended Directive 2011/16, each Member State may take the necessary measures to give intermediaries, and in particular lawyer-intermediaries, a waiver from filing information on a reportable cross-border arrangement where the reporting obligation would breach the legal professional privilege under the law of that Member State. In such circumstances, each Member State is to take the necessary measures to require intermediaries to notify, without delay, any other intermediary or, if there is no such intermediary, the relevant taxpayer of their reporting obligations under paragraph 6 of that article. That paragraph provides that, in such a case, the reporting obligation lies with the other notified intermediary or, if there is no such intermediary, with the relevant taxpayer.

24     It must nevertheless be pointed out that, under the second subparagraph of Article 8ab(5) of amended Directive 2011/16, intermediaries may only be entitled to a waiver under the first subparagraph thereof to the extent that they operate within the limits of the relevant national laws that define their profession, which it is, where relevant, for the national court to ascertain when applying that legislation. Therefore, it is only in relation to lawyer-intermediaries who actually operate within such limits that the validity of Article 8ab(5) of that directive must be examined in the light of Articles 7 and 47 of the Charter.

25     In that regard, it should be noted that Article 7 of the Charter, which recognises that everyone has the right to respect for his or her private and family life, home and communications, corresponds to Article 8(1) of the European Convention for the Protection of Human Rights and Fundamental Freedoms, signed in Rome on 4 November 1950 ('the ECHR'), while Article 47, which guarantees the right to an effective remedy and the right to a fair trial, corresponds to Article 6(1) ECHR.

26     In accordance with Article 52(3) of the Charter, which is intended to ensure the necessary consistency between the rights contained in the Charter and the corresponding rights guaranteed in the ECHR, without adversely affecting the autonomy of EU law, the Court must therefore take into account, when interpreting the rights guaranteed by Articles 7 and 47 of the Charter, the corresponding rights guaranteed by Article 8(1) and Article 6(1) ECHR, as interpreted by the European Court of Human Rights ('the ECtHR'), as the minimum threshold of protection (see, to that effect, judgment of 2 February 2021, *Consob*, C-481/19, EU:C:2021:84, paragraphs 36 and 37).

27     As regards the validity of Article 8ab(5) of amended Directive 2011/16 in the light of Article 7 of the Charter, it is apparent from the case-law of the ECtHR that Article 8(1) ECHR protects the confidentiality of all correspondence between individuals and affords strengthened protection to exchanges between lawyers and their clients (see, to that effect, ECtHR, judgment of 6 December 2012, *Michaud v. France*, CE:ECHR:2012:1206JUD001232311, §§ 117 and 118). Like that provision, the protection of which covers not only the activity of defence but also legal advice, Article 7 of the Charter necessarily guarantees the secrecy of that legal consultation, both with regard to its content and to its existence. As the ECtHR has pointed out, individuals who consult a lawyer can reasonably expect that their communication is private and confidential (ECtHR, judgment of 9 April 2019, *Altay v. Turkey (No 2)*, CE:ECHR:2019:0409JUD001123609, § 49). Therefore, other than in exceptional situations, those persons must have a legitimate expectation that their lawyer will not disclose to anyone, without their consent, that they are consulting him or her.

28     The specific protection which Article 7 of the Charter and Article 8(1) ECHR afford to lawyers' legal professional privilege, which primarily takes the form of obligations on them, is justified by the fact that lawyers are assigned a fundamental role in a democratic society, that of defending litigants (ECtHR, judgment of 6 December 2012, *Michaud v. France*, CE:ECHR:2012:1206JUD001232311, §§ 118 and 119). That fundamental task entails, on the one hand, the requirement, the importance of which is recognised in all the Member States, that any person must be able, without constraint, to consult a lawyer whose profession encompasses, by its very nature, the giving of independent legal advice to all those in need of it and, on the other, the correlative duty of the lawyer to act in good faith towards his or her client (see, to that effect, judgment of 18 May 1982, *AM & S Europe* v *Commission*, 155/79, EU:C:1982:157, paragraph 18).

29     The obligation laid down by Article 8ab(5) of amended Directive 2011/16 for a lawyer-intermediary where he or she is, on account of the legal professional privilege by which he or she is bound by national law, exempt from the reporting obligation laid down in Article 8ab(1) to notify without delay other intermediaries who are not his or her clients of their reporting obligations under Article 8ab(6) of that directive, necessarily entails the consequence that those other intermediaries become aware of the identity of the notifying lawyer-intermediary, of his or her assessment that the arrangement at issue is reportable and of his or her having been consulted in connection with the arrangement.

30     In those circumstances and in so far as those other intermediaries do not necessarily have knowledge of the identity of the lawyer-intermediary and of his or her having been consulted on the reportable cross-border arrangement, the obligation to notify, laid down in Article 8ab(5) of amended Directive 2011/16, entails an interference with the right to respect for communications between lawyers and their clients, guaranteed in Article 7 of the Charter.

31     Furthermore, it must be observed that that obligation to notify leads, indirectly, to another interference with that right, resulting from the disclosure, by the third-party intermediaries thus notified, to the tax authorities of the identity of the lawyer-intermediary and of his or her having been consulted.

32     It is apparent from Article 8ab(1), (9), (13) and (14) of amended Directive 2011/16 that the identification of the intermediaries is one of the items of information to be provided pursuant to the reporting obligation, that identification being the subject of an exchange of information between the competent authorities of the Member States. Consequently, in the event of notification under Article 8ab(5) of that directive, the third-party intermediaries notified, who are thus informed of the identity of the lawyer-intermediary and of his or her having been consulted in connection with the reportable cross-border arrangement and who are not themselves bound by legal professional privilege, must inform the competent authorities referred to in Article 3(1) of that directive not only of the existence of that arrangement and of the identity of the relevant taxpayer or taxpayers, but also of the identity of the lawyer-intermediary and of his or her having been consulted.

33     Accordingly, it is necessary to examine whether those interferences with the right to respect for communications between lawyers and their clients, guaranteed in Article 7 of the Charter, may be justified.

34    In that context, it must be recalled that the rights enshrined in Article 7 of the Charter are not absolute rights, but must be considered in relation to their function in society. Indeed, as can be seen from Article 52(1) of the Charter, that provision allows limitations to be placed on the exercise of those rights, provided that those limitations are provided for by law, that they respect the essence of those rights and that, in compliance with the principle of proportionality, they are necessary and genuinely meet objectives of general interest recognised by the European Union or the need to protect the rights and freedoms of others (see, to that effect, judgment of 6 October 2020, *Privacy International*, C-623/17, EU:C:2020:790, paragraphs 63 and 64).

35    In the first place, as regards the requirement that any limitation on the exercise of fundamental rights must be provided for by law, this implies that the act which permits the interference with those rights must itself define the scope of the limitation on the exercise of the right concerned, bearing in mind, on the one hand, that that requirement does not preclude the limitation in question from being formulated in terms which are sufficiently open to be able to adapt to different scenarios and keep pace with changing circumstances. On the other hand, the Court may, where appropriate, specify, by means of interpretation, the actual scope of the limitation in the light of the very wording of the EU legislation in question as well as its general scheme and the objectives it pursues, as interpreted in view of the fundamental rights guaranteed by the Charter (judgment of 21 June 2022, *Ligue des droits humains*, C-817/19, EU:C:2022:491, paragraph 114 and the case-law cited).

36    In that regard, it should be noted that, first, paragraph 5 of Article 8ab of amended Directive 2011/16 expressly lays down the obligation, for a lawyer-intermediary who is exempt from the obligation to file information on account of the legal professional privilege by which he or she is bound, to notify other intermediaries of their reporting obligations under paragraph 6 of that Article 8ab. Second, as has been found in paragraphs 29 and 30 of the present judgment, the interference with the right to respect for communications between lawyers and their clients, enshrined in Article 7 of the Charter, is the direct consequence of such notification by the lawyer to another intermediary who is not his or her client, in particular where that client was not aware, up to the time of that notification, of the identity of that lawyer and of the latter's having been consulted on the reportable cross-border arrangement.

37    Furthermore, as regards the interference resulting indirectly from that obligation to notify on account of the disclosure, by the notified third-party intermediaries, of the identity of the lawyer-intermediary and of his or her having been consulted to the tax authorities, that disclosure is due, as has been found in paragraphs 31 and 32 of the present judgment, to the extent of the obligations to provide information flowing from Article 8ab(1), (9), (13) and (14) of amended Directive 2011/16.

38    In those circumstances, the principle of legality must be considered to have been fulfilled.

39    In the second place, as regards respect for the essence of the right to respect for communications between lawyers and their clients, guaranteed in Article 7 of the Charter, it should be noted that the obligation to notify, established by Article 8ab(5) of amended Directive 2011/16, entails only to a limited extent the lifting, vis-à-vis a third-party intermediary and the tax authorities, of the confidentiality of the communications between the lawyer-intermediary and his or her client. In particular, that provision does not provide for an obligation, or even authorisation, for the lawyer-intermediary to share, without his or her client's consent, information on the content of those communications with other intermediaries and those intermediaries will therefore not be in a position to file such information with the tax authorities.

40    In those circumstances, it cannot be held that the obligation to notify laid down in Article 8ab(5) of amended Directive 2011/16 undermines the essence of the right to respect for communications between lawyers and their clients enshrined in Article 7 of the Charter.

41    In the third place, as regards observance of the principle of proportionality, that principle requires that the limitations which may, in particular, be imposed by acts of EU law on rights and freedoms enshrined in the Charter do not exceed the limits of what is appropriate and necessary in order to meet the legitimate objectives pursued or the need to protect the rights and freedoms of others; where there is a choice between

several appropriate measures, recourse must be had to the least onerous. In addition, an objective of general interest may not be pursued without having regard to the fact that it must be reconciled with the fundamental rights affected by the measure, by properly balancing the objective of general interest against the rights at issue, in order to ensure that the disadvantages caused by that measure are not disproportionate to the aims pursued. Thus, the possibility of Member States justifying a limitation of the rights guaranteed in Article 7 of the Charter must be assessed by measuring the seriousness of the interference which such a limitation entails and by verifying that the importance of the objective of general interest pursued by that limitation is proportionate to that seriousness (judgments of 26 April 2022, *Poland* v *Parliament and Council*, C-401/19, EU:C:2022:297, paragraph 65, and of 22 November 2022, *Luxembourg Business Registers and Sovim*, C-37/20 and C-601/20, EU:C:2022:912, paragraph 64).

42    Therefore, it is necessary to ascertain, first of all, whether the reporting obligation laid down in Article 8ab(5) of amended Directive 2011/16 meets an objective of general interest recognised by the European Union. If so, it must then be ensured, first, that the obligation is appropriate for attaining that objective, secondly, that the interference with the fundamental right to respect for communications between lawyers and their clients which may result from that obligation to notify is limited to what is strictly necessary, in the sense that the objective pursued could not reasonably be achieved in an equally effective manner by other means less prejudicial to that right, and, thirdly, provided that that is indeed the case, that that interference is not disproportionate to that objective, which implies, in particular, a balancing of the importance of the objective and the seriousness of the interference (see, to that effect, judgment of 22 November 2022, *Luxembourg Business Registers and Sovim*, C-37/20 and C-601/20, EU:C:2022:912, paragraph 66).

43    As the Advocate General observed in point 88 of his Opinion, the amendment made to Directive 2011/16 by Directive 2018/822 falls within the scope of international tax cooperation to combat aggressive tax planning, manifested by the exchange of information between Member States. In that regard, it is apparent in particular from recitals 2, 4, 8 and 9 of Directive 2018/822 that the reporting and notification obligations established by Article 8ab of amended Directive 2011/16 are intended to contribute to the prevention of the risk of tax avoidance and evasion.

44    Combating aggressive tax planning and preventing the risk of tax avoidance and evasion constitute objectives of general interest recognised by the European Union for the purposes of Article 52(1) of the Charter, capable of enabling a limitation to be placed on the exercise of the rights guaranteed by Article 7 of the Charter (see, to that effect, judgment of 6 October 2020, *État luxembourgeois (Right to bring an action against a request for information in tax matters)*, C-245/19 and C-246/19, EU:C:2020:795, paragraph 87).

45    As regards the question whether the obligation to notify laid down in Article 8ab(5) of amended Directive 2011/16 is appropriate and necessary for the attainment of those objectives, the French and Latvian Governments maintain, in essence, that such notification makes it possible, inter alia, to raise awareness among other intermediaries of their duty to comply with the reporting obligation and thus to avoid the possibility that those other intermediaries are not informed of the fact that the obligation to report the cross-border arrangement has been transferred to them pursuant to Article 8ab(6) of amended Directive 2011/16. Therefore, according to those governments, in the absence of an obligation on the lawyer-intermediary to notify, there is a risk that the cross-border arrangement will not be declared at all, contrary to the objectives pursued by that directive.

46    Even if the notification obligation established by Article 8ab(5) of amended Directive 2011/16 is indeed capable of contributing to the combating of aggressive tax planning and the prevention of the risk of tax avoidance and evasion, it must be held that that obligation cannot, however, be regarded as being strictly necessary in order to attain those objectives and, in particular, to ensure that the information concerning the reportable cross-border arrangements is filed with the competent authorities.

47    First, intermediaries' reporting obligations are clearly set out in amended Directive 2011/16, in particular in Article 8ab(1) thereof. Under that provision, all intermediaries are, in principle, required to file

information that is within their knowledge, possession or control on reportable cross-border arrangements with the competent authorities. In addition, in accordance with the first subparagraph of Article 8ab(9) of that directive, each Member State is to take the necessary measures to require that, where there is more than one intermediary, the obligation to file information lie with all intermediaries involved in the same reportable cross-border arrangement. No intermediary can therefore usefully argue that he or she was unaware of the reporting obligations to which he or she is directly and individually subject, merely because he or she is an intermediary.

48    Secondly, as regards the Latvian Government's argument that the obligation to notify reduces the risk that other intermediaries would rely on the fact that the lawyer-intermediary will report the required information to the competent authorities and that they will refrain for that reason from themselves making such a report, it should be noted, on the one hand, that, in so far as the consultation of a lawyer is subject to legal professional privilege, other intermediaries will not, as has been pointed out in paragraph 30 of the present judgment, necessarily be aware of the identity of the lawyer-intermediary and of his or her having been consulted concerning the reportable cross-border arrangement, which in such circumstances precludes such a risk from the outset.

49    On the other hand, even in the opposite situation in which other intermediaries have such awareness, there is no reason to fear that they would rely, without verification, on the lawyer-intermediary making the required report, since the second subparagraph of Article 8ab(9) of amended Directive 2011/16 specifies that an intermediary is to be exempt from filing the information only on condition that it has proof that the same information has already been filed by another intermediary. Furthermore, by expressly providing, in Article 8ab(5) thereof, that legal professional privilege may lead to a waiver from the reporting obligation, amended Directive 2011/16 makes a lawyer-intermediary a person from whom other intermediaries cannot, a priori, expect any initiative capable of relieving them of their own reporting obligations.

50    Thirdly, it should be borne in mind that any intermediary who, because of the legal professional privilege by which he or she is bound by national law, is exempt from the reporting obligation laid down in paragraph 1 of Article 8ab of amended Directive 2011/16 is nevertheless still required to notify without delay his or her client of his or her reporting obligations under paragraph 6 of that provision.

51    Fourthly, as regards the disclosure, by notified third-party intermediaries, of the identity of the lawyer-intermediary and of his or her having been consulted to the tax authorities, that disclosure also does not appear to be strictly necessary for the pursuit of the objectives of amended Directive 2011/16 of combating aggressive tax planning and preventing the risk of tax avoidance and evasion.

52    On the one hand, the reporting obligation on other intermediaries not subject to legal professional privilege and, if there are no such intermediaries, that obligation on the relevant taxpayer ensure, in principle, that the tax authorities are informed of reportable cross-border arrangements. In addition, the tax authorities may, after receiving such information, request, if necessary, additional information relating to the arrangement in question directly from the relevant taxpayer, who will then be able to consult his or her lawyer for assistance, or they may conduct an audit of that taxpayer's tax situation.

53    On the other hand, in view of the reporting waiver in Article 8ab(5) of amended Directive 2011/16, the disclosure to the tax authorities of the identity of the lawyer-intermediary and of his or her having been consulted will not, in any event, enable those authorities to require that lawyer-intermediary to provide information without the consent of his or her client.

54    At the hearing before the Court, the Commission submitted, however, in essence, that the disclosure of the identity of the lawyer-intermediary and of his or her having been consulted would be necessary in order to enable the tax authorities to ascertain whether that lawyer-intermediary is justified in relying on legal professional privilege.

55    That argument cannot be accepted.

56    It is true that, as has been pointed out in paragraph 24 of the present judgment, the second subparagraph of paragraph 5 of Article 8ab of amended Directive 2011/16 specifies that lawyer-intermediaries may only be entitled to a waiver under the first subparagraph of that provision to the extent that they operate within the limits of the relevant national laws that define their profession. However, the purpose of the reporting and notification obligations laid down in Article 8ab of that directive is not to check that lawyer-intermediaries operate within those limits, but to combat potentially aggressive tax practices and to prevent the risk of tax avoidance and evasion, by ensuring that the information concerning the reportable cross-border arrangements is filed with the competent authorities.

57    As is apparent from paragraphs 47 to 53 of the present judgment, that directive ensures that such information is provided to the tax authorities, without the disclosure to them of the identity of the lawyer-intermediary and of his or her having been consulted being necessary for that purpose.

58    In those circumstances, the possibility that lawyer-intermediaries might wrongly rely on legal professional privilege in order to avoid their reporting obligation cannot permit the inference that the obligation to notify laid down in Article 8ab(5) of that directive and the disclosure to the tax authorities of the identity and consultation of the notifying lawyer-intermediary which is the consequence thereof are strictly necessary.

59    It follows from the foregoing considerations that Article 8ab(5) of amended Directive 2011/16 infringes the right to respect for communications between a lawyer and his or her client, guaranteed in Article 7 of the Charter, in so far as it provides, in essence, that a lawyer-intermediary, who is subject to legal professional privilege, is required to notify any other intermediary who is not his or her client of that other intermediary's reporting obligations.

60    As regards the validity of Article 8ab(5) of amended Directive 2011/16 in the light of Article 47 of the Charter, it must be recalled that the right to a fair trial, guaranteed by that provision, consists of various elements. It includes, inter alia, the rights of the defence, the principle of equality of arms, the right of access to the courts and the right of access to a lawyer, both in civil and criminal proceedings. Lawyers would be unable to carry out satisfactorily their task of advising, defending and representing their clients, who would in consequence be deprived of the rights conferred on them by Article 47 of the Charter, if lawyers were obliged, in the context of judicial proceedings or the preparation for such proceedings, to cooperate with the authorities by passing them information obtained in the course of related legal consultations (see, to that effect, judgment of 26 June 2007, *Ordre des barreaux francophones et germanophones and Others*, C-305/05, EU:C:2007:383, paragraphs 31 and 32).

61    It follows from those considerations that the requirements implied by the right to a fair trial presuppose, by definition, a link with judicial proceedings (see, to that effect, judgment of 26 June 2007, *Ordre des barreaux francophones et germanophones and Others*, C-305/05, EU:C:2007:383, paragraph 35).

62    However, it must be stated that such a link has not been established in the present case.

63    It follows from Article 8ab(1) and (5) of amended Directive 2011/16, and in particular from the time limits laid down in those provisions, that the obligation to notify arises at an early stage, at the latest when the reportable cross-border arrangement has just been finalised and is ready to be implemented, and thus outside the framework of legal proceedings or their preparation.

64    As the Advocate General observed, in essence, in point 41 of his Opinion, at that early stage, the lawyer-intermediary is not acting as the defence counsel for his or her client in a dispute and the mere fact that the lawyer's advice or the cross-border arrangement which is the subject of his or her consultation may give rise to litigation at a later stage does not mean that the lawyer acted for the purposes and in the interests of the rights of defence of his or her client.

65    In those circumstances, it must be held that the obligation to notify replacing, for the lawyer-intermediary bound by legal professional privilege, the reporting obligation laid down in Article 8ab(1) of amended

Directive 2011/16 does not entail any interference with the right to a fair trial, guaranteed in Article 47 of the Charter.

66     It follows from all the foregoing considerations that the answer to the question referred is that Article 8ab(5) of amended Directive 2011/16 is invalid in the light of Article 7 of the Charter, in so far as the Member States' application of that provision has the effect of requiring a lawyer acting as an intermediary, within the meaning of Article 3(21) of that directive, who he or she is exempt from the reporting obligation laid down in paragraph 1 of Article 8ab of that directive on account of the legal professional privilege by which he or she is bound, to notify without delay any other intermediary who is not his or her client of that intermediary's reporting obligations under paragraph 6 of that Article 8ab.

**Costs**

67   Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (Grand Chamber) hereby rules:

**Article 8ab(5) of Council Directive 2011/16/EU of 15 February 2011 on administrative cooperation in the field of taxation and repealing Directive 77/799/EEC, as amended by Council Directive (EU) 2018/822 of 25 May 2018, is invalid in the light of Article 7 of the Charter of Fundamental Rights of the European Union, in so far as the Member States' application of that provision has the effect of requiring a lawyer acting as an intermediary, within the meaning of Article 3(21) of that directive, as amended, where he or she is exempt from the reporting obligation laid down in paragraph 1 of Article 8ab of that directive, as amended, on account of the legal professional privilege by which he or she is bound, to notify without delay any other intermediary who is not his or her client of that intermediary's reporting obligations under paragraph 6 of that Article 8ab.**

[Signatures]

---

\*   Language of the case: Dutch.