UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v-<br><br>ANDREY KOSTIN et al.,<br><br>                Defendants. | Case No. 1:24-cr-00091 (GHW) |

**DEFENDANT VADIM WOLFSON'S MOTION FOR A
BILL OF PARTICULARS, TO SUPPRESS FRUITS OF SEARCHES FOR LACK OF
PROBABLE CASE, AND TO REQUIRE PRODUCTION OF GRAND JURY
MATERIALS**

K&L GATES LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9370
Facsimile: (202) 778-9100

*Counsel for Defendant Vadim Wolfson*

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................................... 1
FACTUAL BACKGROUND ......................................................................................................... 2
    A.    Mr. Wolfson Buys the Aspen Property from Mr. Kostin in 2014 and Takes Out a Loan Related to the Purchase ................................................................... 2
    B.    Mr. Wolfson Repays the 2014 Loan ................................................................... 4
    C.    The Government Concedes It Lacks Any Evidence That Mr. Wolfson Paid Mr. Kostin in 2019 and Refuses to Adduce Support for its Claim of a "Nominee" Relationship Between Mr. Kostin, CC-1, and CC-3 .......................... 4
ARGUMENT .................................................................................................................................. 6
    A.    Mr. Wolfson Is Entitled to a Bill of Particulars ..................................................... 6
    B.    The Fruits of the Government's Searches Should Be Suppressed Due to Lack of Probable Cause to Support the Warrants ..................................................... 9
    C.    Mr. Wolfson Is Entitled to Grand Jury Materials ................................................. 13
CONCLUSION ............................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988)............................................................................................................13

*Franks v. Delaware*,
    438 U.S. 154 (1978)..........................................................................................9, 11, 12, 13

*Illinois v. Gates*,
    462 U.S. 213 (1983)............................................................................................................12

*Rivera v. United States*,
    928 F.2d 592 (2d Cir. 1991)...............................................................................................12

*United States v. Bin Laden*,
    92 F. Supp. 2d 225 (S.D.N.Y. 2000)....................................................................................7

*United States v. Blakstad*,
    No. 19 Cr. 486 (ER), 2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020) ......................................8

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987).............................................................................................7, 8

*United States v. Cabrera*,
    No. 22 CR. 10 (NRB), 2024 WL 967542 (S.D.N.Y. Mar. 5, 2024)..............................13, 14

*United States v. Hogan*,
    712 F.2d 757 (2d Cir. 1983)...............................................................................................13

*United States v. Jones*,
    43 F.4th 94 (2d Cir. 2022) .................................................................................................12

*United States v. Pinto-Thomaz*,
    352 F. Supp. 3d 287 (S.D.N.Y. 2018)..................................................................................7

*United States v. R. Enterprises, Inc.*,
    498 U.S. 292 (1991)............................................................................................................13

*United States v. Rajaratnam*,
    No. 09 Cr. 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) .................................8

*United States v. Soliman*,
    No. 06CR236A, 2008 WL 4490623 (W.D.N.Y. Sept. 30, 2008)........................................14

*United States v. Torres*,
  901 F.2d 205 (2d Cir. 1990), *abrogated on other grounds by United States v.
  Marcus*, 628 F.3d 36 (2d Cir. 2010) ...................................................................................7

**Other Authorities**

Fed. R. Crim. P. 6(e)(3)(E)(ii) ................................................................................................13

Fed. R. Crim. P. 7(f) ................................................................................................................7

Defendant Vadim Wolfson respectfully submits this memorandum of law in support of his Motion for a Bill of Particulars, to Suppress Fruits of Searches for Lack of Probable Cause, and to Require Production of Grand Jury Materials. The common threads tying together these forms of relief are the government's lack of direct evidence, misstatements made to create the appearance of proof, and refusal to provide information about evidentiary support.

## INTRODUCTION

The government concedes it has no direct evidence that any sanctioned party received funds as part of the 2019 transaction in which Mr. Wolfson repaid a loan extended to him in 2014 by his lender, an entity called Capital Business Finance. To fill this gaping evidentiary hole at the heart of its case, the government nonetheless insists it can prove that Mr. Wolfson's payment in 2019 was unlawful by offering indirect, circumstantial evidence that CC-1 and CC-3 are so-called "nominees" who own and control Capital Business Finance (and its subsidiary, CapitalInvest) on behalf of Office of Foreign Assets Control ("OFAC")-designated co-defendant Andrey Kostin. In essence, the government's case boils down to the unsupported claim that Mr. Wolfson's 2019 payment to CapitalInvest effectively amounts to a payment to Mr. Kostin because Mr. Kostin secretly controls that entity via his "nominees." Yet when on multiple occasions undersigned counsel asked the government to identify the specific evidentiary support for the alleged "nominee" relationship between CC-1, CC-3, and Mr. Kostin in the at-issue transaction, the government has consistently refused to identify a single witness or otherwise provide evidentiary support. And although undersigned counsel has conducted a thorough review of literally millions of pages of largely irrelevant discovery materials provided by the government to date, we are unable to ascertain the evidentiary basis for the government's fundamental claim that Mr. Kostin benefited in any way from the 2019 transaction.

The government should not be permitted to engage in trial-by-ambush and evade a candid disclosure of its supporting evidence by hiding behind the gigantic volume of discovery materials it has produced to date. Instead, it is incumbent on the government to either provide the evidence supporting the gigantic inferential leap contained in its indictment or admit that none exists and dismiss the case against Mr. Wolfson. A bill of particulars is needed to set this process in motion. Likewise, suppression of evidence and production of grand jury materials is required to remedy prejudice to Mr. Wolfson stemming from the lack of proof.

## FACTUAL BACKGROUND

### A. Mr. Wolfson Buys the Aspen Property from Mr. Kostin in 2014 and Takes Out a Loan Related to the Purchase

Mr. Wolfson bought a residence in Aspen, Colorado, (the "Aspen Property") from Mr. Kostin in 2014. Mr. Wolfson, the former CEO of Russian investment group Otkritie Holding, and Mr. Kostin, President and Board Chairman of Russia-based VTB Bank, knew each other professionally prior to Mr. Wolfson's purchase of the Aspen Property. Mr. Kostin was subsequently added to OFAC's Specially Designated Nationals and Blocked Persons List ("SDN List") in April 2018, roughly four years after Mr. Wolfson bought the Aspen Property from him.

To effectuate the purchase of the Aspen Property from Mr. Kostin, in April 2014 Mr. Wolfson created a company, Altamonte Holdings Limited ("Altamonte"), for the purpose of controlling his U.S. real estate holdings. Declaration of David C. Rybicki ("Rybicki Decl.") ¶ 7, Ex. B at 40NS0000930. Mr. Wolfson was the sole shareholder of Altamonte and its ultimate beneficial owner. *Id.* In May 2014, Altamonte purchased a 100 percent membership interest in 40 North Star LLC ("40 North Star"), a Colorado limited liability company, for $10 million from Ledridge Investments Limited ("Ledridge"), a company owned by Mr. Kostin. *Id.* ¶ 8, Ex. C at 40NS0000062. The Aspen Property was owned by 40 North Star so, practically speaking, by

2

purchasing a 100 percent membership interest in 40 North Star from Ledridge, Mr. Wolfson became the new owner of the Aspen Property. *Id.* at 40NS0000055. Mr. Wolfson's ownership of 40 North Star was transparent and disclosed to financial institutions with which Mr. Wolfson did business. *See id.* ¶ 9, Ex. D. In connection with the purchase of the Aspen Property, Mr. Wolfson obtained a $10 million loan from Capital Business Finance, an investment company owned and controlled by CC-3, a former executive of VTB Bank and former director of RCB Bank Limited, a large, Cyprus-based bank. *Id.* ¶ 10, Ex. E; *id.* ¶ 11, Ex. F at 0000876.

Following his purchase of the Aspen Property in 2014, Mr. Wolfson was its sole beneficial owner. Contemporaneous acknowledgement of Mr. Wolfson as the new owner of the Aspen Property—as well as the termination of Mr. Kostin's ownership—was widely documented at the time and thereafter. *See, e.g.*, Rybicki Decl. ¶ 12, Ex. G (email to an insurance company representative indicating that "Mr. Kostin is no longer a beneficiary" and that ownership had transferred to Altamonte); *id.* ¶ 13, Ex. H (2017 corporate tax return for 40 North Star listing Altamonte and Mr. Wolfson as owners); *id.* ¶ 14, Ex. I (email informing an insurance company representative that Mr. Wolfson is the new owner in response to an inquiry about the "the change of occupant" for the Aspen Property). From time to time between 2014 and 2018, Mr. Wolfson allowed Mr. Kostin and others to visit the Aspen Property. Mr. Wolfson, his family, and friends would also visit periodically prior to Mr. Wolfson's sale of the property in 2020. This information and context, including with regard to Mr. Wolfson's purchase of the Aspen Property in 2014, was omitted from the government's search warrant applications, as described below, which led to a materially inaccurate portrayal of the key events that created substantial prejudice to Mr. Wolfson in this matter.

B.  **Mr. Wolfson Repays the 2014 Loan**

In September 2019, Mr. Wolfson paid back the loan to Capital Business Finance, with interest, by wiring $11,800,000 from his personal bank account at RCB Bank in Cyprus to CapitalInvest, a subsidiary of Capital Business Finance. *Id.* ¶ 15, Ex. J at 00611.[1] Mr. Wolfson also caused his company, Altamonte, to pay approximately $202,000 to CapitalInvest in furtherance of the loan repayment. *Id.* ¶ 15, Ex. J at 00612 (collectively, with the loan repayment to CapitalInvest, the "2019 Transaction"). Pursuant to a contemporaneous Securities Purchase Agreement between Mr. Wolfson and Altamonte, of which he was the sole shareholder, Mr. Wolfson purchased the shares of 40 North Star. *Id.* ¶ 7, Ex. B at 40NS0000967. Contrary to the government's erroneous claim, Mr. Wolfson did not purchase the Aspen Property in 2019—he merely transferred the shares in 40 North Star from his wholly owned real-estate company Altamonte to himself. *See id.* There was never any change in the ultimate beneficial ownership arising out of the 2019 Transaction, and from the time he bought the Aspen Property from Mr. Kostin in 2014, Mr. Wolfson was its sole beneficial owner. Again, the government ignored this information when seeking authorization for search warrants.

C.  **The Government Concedes It Lacks Any Evidence That Mr. Wolfson Paid Mr. Kostin in 2019 and Refuses to Adduce Support for its Claim of a "Nominee" Relationship Between Mr. Kostin, CC-1, and CC-3**

The government has no evidence that Mr. Wolfson paid Mr. Kostin as part of the 2019 Transaction. OFAC added Mr. Kostin to the SDN List in April 2018. Indictment ¶ 1. As stated above, Mr. Wolfson purchased the Aspen Property from Mr. Kostin approximately four years earlier in May 2014—thereafter, Mr. Kostin had no ownership role whatsoever in the Aspen Property. Nonetheless, the government claims that Mr. Wolfson violated the International

---

[1] The original 2014 loan from Capital Business Finance was assigned to CapitalInvest in November 2018. *Id.* ¶ 16, Ex. K.

Emergency Economic Powers Act ("IEEPA") by paying back the loan he received in 2014 from Capital Business Finance, which the government alleges without evidence is "owned and controlled" by CC-1 and CC-3 "on behalf of" Mr. Kostin. Indictment ¶ 48.[2] That the government lacks supporting evidence is not a mere speculative assertion—the prosecution team expressly conceded during an August 19, 2024, meeting with undersigned counsel that the government has no direct proof that the money paid to CapitalInvest in 2019 went to Mr. Kostin. Rybicki Decl. ¶ 3. Although the government insists it can prove its case without such evidence, the prosecution team declined during that meeting to address what testimony or documentary evidence it intended to present on this issue, the heart of its case against Mr. Wolfson. *Id.* Subsequently, in a November 14, 2024, email responding to Mr. Wolfson's good-faith effort to meet-and-confer and avoid the need for this motion, the prosecution team yet again refused to explain how it planned to prove up its case against Mr. Wolfson. *Id.* ¶ 4, Ex. A.

Relatedly, the indictment alleges that Capital Business Finance, CapitalInvest's parent company, "regularly" made payments "related to the maintenance of the Aspen Home" and that the payments also covered the "visits of ANDREY KOSTIN" to the Aspen Property. Indictment ¶ 45. The government appears to use this allegation as circumstantial evidence of a relationship between CapitalInvest, which is the recipient of the 2019 payment from Mr. Wolfson, and Mr. Kostin. Although Mr. Wolfson has identified payments from CapitalInvest's parent company, the basis for the government's allegations regarding the purpose of those payments is not clear. In the

---

[2] A sanctioned individual must have at least a 50-percent interest in an entity in order for U.S. persons to be prohibited from transacting with the entity. *See Entities Owned by Blocked Persons (50% Rule)*, U.S. Dep't of Treasury, *available at* https://ofac.treasury.gov/faqs/398. CC-1's alleged interest in CapitalInvest is not believed to have ever exceeded 10 percent. Accordingly, only CC-3 is even arguably relevant to the discussion here because CC-1's purported interest in the Capital Entities was *de minimis* such that it would be immaterial from a sanctions-compliance perspective.

5

same November 14, 2024, email, the prosecution team refused to provide evidence substantiating its claim and failed to identify the specific supporting payments. Rybicki Decl., ¶ 4, Ex. A.

To date, the government has produced more than 4,400,000 pages of documents. *Id.* ¶ 5. Undersigned counsel has made diligent efforts to understand the basis for the government's allegations, including thorough review of the voluminous document productions, the August 2024 meeting with the government, and the November correspondence regarding this motion. At each step of the way, the government has declined to fill in the obvious gaps in its case, leaving Mr. Wolfson to guess at what evidence the government will introduce at trial—and even whether such evidence exists.

**ARGUMENT**

**A.     Mr. Wolfson Is Entitled to a Bill of Particulars**

The Court should order the government to provide a bill of particulars to enumerate the factual basis for the bare allegations in Paragraphs 44, 45, and 48 of the indictment and to identify the documentary and testimonial evidence it intends to introduce at trial on these issues, specifically:

- The claim that CC-1 and CC-3 nominally owned and controlled the Capital Entities on Mr. Kostin's behalf. *See* Indictment ¶ 44 (alleging that "Capital Business Finance is owned and controlled, through various other shell companies and intermediaries, by CC-1 and CC-3 on behalf of ANDREY KOSTIN"); *id* ¶ 48 (asserting that "Capital Invest [sic] is a wholly owned subsidiary of Capital Business Finance, which…was nominally owned and controlled by CC-1 and CC-3 on behalf of KOSTIN").

- The claim that Capital Business Finance "regularly funded the bank account used by Altamonte" and that such payments "were related to the maintenance of the Aspen House and the visits of ANDREY KOSTIN." *Id.* ¶ 45.

This extremely limited and circumscribed request is necessary to allow Mr. Wolfson to adequately prepare for trial and also to allow the Court to assess whether any evidence actually exists in support of the government's allegations against Mr. Wolfson.

Federal Rule of Criminal Procedure 7(f) "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). Although Rule 7 originally allowed a court to order a bill of particulars only upon a showing of cause, this requirement was dropped in an effort "to encourage a more liberal attitude by the courts toward bills of particulars." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 232 (S.D.N.Y. 2000) (quoting Fed. R. Crim. P. 7 Advisory Committee's Note to 1966 Amendment). In light of this amendment, a motion for a bill of particulars should be granted so long as the relief would provide details of the charge that are "necessary to the preparation of [the] defense, and to avoid prejudicial surprise at trial." *United States v. Torres,* 901 F.2d 205, 234 (2d Cir. 1990) (internal quotation marks omitted), *abrogated on other grounds by United States v. Marcu*s, 628 F.3d 36, 41 (2d Cir. 2010).

In ruling on a motion for a bill of particulars, "the Court considers not only the information provided in the indictment, but also discovery materials and other information provided to the defendant." *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 302 (S.D.N.Y. 2018). This includes an assessment of the volume of documents provided by the government. *See, e.g.*,

*Bortnovsky*, 820 F.2d at 575 ("The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged."); *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010) ("The government may not rely solely on the quantity of information disclosed; sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars.") (internal quotation marks omitted). That the government has "inundate[d] the defense team with numerous files to sift through" militates in favor of a bill of particulars. *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, at *11 (S.D.N.Y. Oct. 9, 2020).

Here, the government has alleged an IEEPA violation arising out of the 2019 Transaction without any direct proof that the SDN-listed party, Mr. Kostin, actually received any funds. The government has attempted to fill this enormous evidentiary hole in the heart of its case by making unsupported claims that the Capital Entities are secretly controlled by Mr. Kostin through CC-3, who allegedly acted as a "nominee" for him and operated the Capital Entities on his behalf. *See, e.g.*, Indictment ¶¶ 44, 48. The government then proceeded to inundate Mr. Wolfson with mountains of largely irrelevant discovery and has refused to answer reasonable and specific questions from Mr. Wolfson about the nature of its intended proof on the key issue of this case—the purported "nominee" relationship between CC-3 and Kostin that automatically renders a payment to CapitalInvest a payment to Mr. Kostin himself. Given the government's failure on multiple occasions to voluntarily provide this information, a bill of particulars is needed to avoid the government's attempt at trial-by-ambush and ensure that Mr. Wolfson can adequately prepare for trial.

**B. The Fruits of the Government's Searches Should Be Suppressed Due to Lack of Probable Cause to Support the Warrants**

The Court should suppress the fruits of the searches of Mr. Wolfson's iPhone, iPad, computer, thumb drives, Apple accounts, Google accounts, and AT&T records. In the alternative, the Court should hold a *Franks* hearing. This relief is warranted due to the barebones search warrant affidavits, insufficient to establish probable cause, coupled with the government's material misstatements and omissions in seeking the warrants.[3]

In the 25-page affidavit dated February 21, 2024, seeking authorization to search Mr. Wolfson's electronic devices—including his iPhone, iPad, computer, and thumb drives—in connection with his arrest, the FBI devotes just two and a half pages to attempting to establish probable cause that Mr. Wolfson committed a crime. The affidavit makes the naked assertion that, "[i]n approximately 2010, Kostin, using intermediaries and shell companies, purchased the Aspen Home located at 40 Northstar Circle, Aspen, CO 81611 for approximately $13.5 million. While the nominal ownership of the Aspen Home changed at certain points in the period between 2010 and September 2019, Kostin remained, at all relevant times, the true beneficial owner of the Aspen Home." Rybicki Decl. ¶ 20, Ex. O at USAO_00000668. The affidavit provides no basis for this assertion, and as explained in Mr. Bond's concurrently filed motion, which is incorporated by reference herein, the statement is at odds with evidence that the FBI had obtained during the course of its investigation.

Indeed, the only purported witness statement in the affidavit that has anything to do with ownership of the property is materially misleading and omits information later provided by the witness that directly undercuts the government's case. The affidavit states: "In a July 2023

---

[3] Mr. Wolfson separately moves in a concurrently filed motion to suppress evidence from his iPhone and iPad due to *Miranda* violations.

interview, the Colorado-based attorney who served as a manager of the LLC that nominally owned the Aspen Home from 2010 until 2020 told the FBI that the paintings and art purchased by Kostin for the Aspen Home were transferred to WOLFSON as part of the sale." *Id.* at USAO_00000669. But that very same attorney, through his counsel, wrote a letter to the government in August 2023—months before the FBI's affidavit—indicating that he had previously "furnished his best recollections…without the benefit of a prior review of relevant documents." *Id.* ¶ 17, Ex. L at 1.

Following his review of records, the attorney was "now certain that he learned…in March 2015, not in 2018 as he might have stated earlier," that Mr. Wolfson was the beneficial owner of Altamonte. *Id.*[4] The letter then provides a summary of emails, which were provided to the government, dating back to 2014 reflecting Mr. Wolfson's purchase of the property that year. *Id.* at 2–7. Those emails describe Mr. Kostin as having found "a purchaser for the property" (*i.e.*, Mr. Wolfson) in 2014 and refer to Mr. Kostin as the "previous client" as a result of the purchase. *Id.* at 2, 4. Altamonte, Mr. Wolfson's entity, is referred to as the "new owner" in an email identified by the lawyer. *Id.* at 3. The letter also describes communications in 2014 and 2015 about removing Mr. Kostin from the insurance policy for the house, as he was no longer the owner, and adding in Mr. Wolfson. *Id.* at 4, 6. The letter concludes by noting that these documents demonstrate the contemporaneous "disclosure that [Mr. Wolfson] was the UBO," meaning ultimate beneficial owner, of the Aspen Property. *Id.* at 7.

In light of the above, there was no basis to contend in the affidavit that Mr. Kostin, through an LLC, owned the Aspen Property from 2010–2020, let alone to cite the statements of the attorney in a paragraph making a factual statement at odds with the information that he provided to the

---

[4] The letter refers to Mr. Wolfson as Mr. Beliaev, which is a misspelling of Belyaev, Mr. Wolfson's surname before it was legally changed to Wolfson.

10

government. Even to the extent the government claims that the statement from the affidavit only pertains to the artwork, the failure to include in the warrant the abundance of exculpatory information, provided by the government's own witness, was improper.

Additionally, the warrant application provides no explanation of why the government believed that Mr. Wolfson provided a benefit to Mr. Kostin through the 2019 Transaction, let alone that he did so with the appropriate *mens rea*. Nor did the government inform the court that it lacked any direct evidence of Mr. Kostin receiving funds from the 2019 Transaction.

The AT&T warrant, supported by a February 20, 2024, affidavit, merely attaches the indictment and arrest warrant and asserts: "As part of that investigation, the FBI learned that, after Kostin was listed as an SDN by OFAC on April 6, 2018, Target Subjects Wolfson and Bond, and others known and unknown, did deal in and cause others to deal in blocked property, specifically a home in Aspen, Colorado, purchased by Kostin in approximately 2010. The FBI further learned that Target Subjects Wolfson and Bond, and others known and unknown, did provide and cause others to provide goods, funds, or services related to the Aspen, Colorado, home for Kostin's benefit." *Id.* ¶ 19, Ex. N at USAO_00000633. No foundation for these statements is provided, and none of the contrary evidence indicating their falsity is disclosed.

The Apple and Google search warrants, with affidavits dated December 5, 2023, and October 21, 2022, respectively, are the same ones that are described in Mr. Bond's concurrently filed motion. *Id.* ¶ 21, Ex. P; *id.* ¶ 22, Exs. Q, R. Mr. Wolfson joins and incorporates by reference the arguments made by Mr. Bond about the deficiencies in these warrants and the reasons why suppression, or in the alternative a *Franks* hearing, is required.

Warrants must be supported by probable cause. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth

in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotation marks omitted). When a "warrant was issued without probable cause in violation of the Fourth Amendment," suppression of the fruits of the search are appropriate in response to "law enforcement's deliberate, reckless, or grossly negligent conduct." *United States v. Jones*, 43 F.4th 94, 110 (2d Cir. 2022). No safe harbors are available to law enforcement in cases where ethe magistrate was "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Id.* at 111 (internal quotation marks omitted).

"[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). The omission of important information can form the basis for ordering a *Franks* hearing. *See Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) ("Intentional or reckless omissions of material information, like false statements, may serve as the basis for a *Franks* challenge."). If, following a hearing, "the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156.

For the reasons reflected above, and also detailed in Mr. Bond's concurrently filed motion,

12

which Mr. Wolfson joins and incorporates by reference as it pertains to him, the warrants were not supported by probable cause. Additionally, statements made in the affidavits supporting the warrants were inaccurate and incomplete, and documents and information known to the FBI at the time of the warrant applications were sufficient to put them on notice of these issues. As a result, suppression, or at the minimum a *Franks* hearing, is appropriate.

### C. Mr. Wolfson Is Entitled to Grand Jury Materials

Mr. Wolfson requests that the government be ordered to produce grand jury minutes, transcripts of testimony heard by the grand jury, and the legal instructions provided to the grand jury directly to Mr. Wolfson or, in the alternative, to the Court for *in camera* inspection. Under Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), disclosure of grand jury materials to the defendant is appropriate if the defendant "shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Dismissal of an indictment can be appropriate to "prevent prosecutorial impairment of the grand jury's independent role." *United States v. Hogan*, 712 F.2d 757, 761 (2d Cir. 1983). In presenting a case to a grand jury, the government "must not deceive the jurors as to the quality of the testimony they hear." *Id.* Additionally, the provision of false testimony can infect an indictment and require dismissal. *See id.* ("While the factual misstatements in the agents' testimony may have been inadvertent, as the government now argues, the fact remains that the appellants were prejudiced by the misstatements of important facts and the grand jury's independent role was impaired."); *see also Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) ("[D]ismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations.") (internal quotation marks omitted).

Mr. Wolfson acknowledges that grand jury proceedings "are accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process," *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) (internal quotation marks omitted), and that remedies are reserved for "misconduct," *United States v. Cabrera*, No. 22 CR. 10 (NRB), 2024 WL 967542, at *2 (S.D.N.Y. Mar. 5, 2024). As a result, a "party seeking disclosure of grand jury [materials] must show a particularized need that outweighs the need for secrecy." *Cabrera*, 2024 WL 967542, at *2 (internal quotation marks omitted).

Mr. Wolfson respectfully submits that particularized evidence abounds in this case. As described, the government has no direct evidence that Mr. Kostin received any benefit from the 2019 Transaction and has refused to provide information about how it intends to prove its case. This is in addition to the aggressive approach taken by the government in all aspects of this case, including securing search warrants with faulty affidavits, extracting Mr. Wolfson's device passcode without providing *Miranda* warnings and failing to produce evidence of such (as described in the concurrently filed motion to suppress), and running slipshod over privilege protections. Without a mischaracterization of fact or a misstatement of law—such as failure to instruct the grand jury that a benefit to Mr. Kostin was required—it is exceptionally difficult to imagine how the grand jury could have indicted Mr. Wolfson. *Cf. United States v. Soliman*, No. 06CR236A, 2008 WL 4490623, at *6 (W.D.N.Y. Sept. 30, 2008) ("[D]isclosure of these [grand jury] instructions is necessary to establish whether prosecutorial misconduct had occurred….").

The only grand jury testimony to which Mr. Wolfson has been provided access only serves to underscore this point. That witness testified that she had no first-hand knowledge of when and how Mr. Wolfson acquired the Aspen Property. Asked for her understanding of that, she testified, "To this day, I really do not know. I mean, I don't know. I really don't." Rybicki Decl. ¶ 18, Ex.

14

M at 58:24-25. She also acknowledged that, from her perspective, Mr. Wolfson may have become the owner of the Aspen Property before Mr. Kostin was sanctioned in 2018:

> Q: And did you have an impression of whether the ownership had changed before your call with [Mr. Kostin's wife]?
>
> A: I can't really say that because—I'm trying to—honestly, I'm trying to remember back—how many years is that? I remember Vadim kind of using the house more and more, you know, from the first time; Mr. Kostin not coming anymore since 2016.

*Id.* at 57:12-19.

In sum, the government's case has gaping holes, the existence of which is evidenced by the government's failure to provide even basic information about how it intends to prove Mr. Wolfson committed any violations. The apparent lack of evidence and the government's evasive answers when pressed suggest that the grand jury may have been deceived or misled as to key legal or factual issues. Mr. Wolfson's particularized need for the grand jury materials that could provide evidence of these violations outweighs the policy considerations surrounding grand jury secrecy.

## CONCLUSION

The Court should direct the government to provide a bill of particulars as to each of the categories of information described in this motion, order suppression of the fruits of the government's searches, and require the production of grand jury materials.

Dated: November 25, 2024

    Respectfully submitted,

    */s/ David C. Rybicki*
    David C. Rybicki
    Michael C. Harper
    Robert S. Silverblatt
    K&L Gates LLP
    1601 K Street, N.W.
    Washington, DC 20006

Telephone: (202) 778-9370
Facsimile: (202) 778-9100
David.Rybicki@klgates.com
*Counsel for Defendant Vadim Wolfson*