UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

VADIM WOLFSON,
  a/k/a "Vadim Belyaev," and

GANNON BOND,

            Defendants.

S2 24 Cr. 91 (GHW)

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

MATTHEW PODOLSKY
Acting United States Attorney
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10007

Emily Deininger
David R. Felton
Jane Kim
Assistant United States Attorneys
   *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................... 2

A.    The Charges Against the Defendants.................................................................. 2

B.    The Evidence Against the Defendants................................................................ 4

ARGUMENT ....................................................................................................................... 8

I.    CERTAIN CATEGORIES OF EVIDENCE SHOULD BE ADMITTED AS DIRECT
      EVIDENCE (OR ALTERNATIVELY UNDER RULE 404(B))..................................... 8

      A.    Applicable Law........................................................................................... 10

            1.    Direct Evidence................................................................................. 10

            2.    "Other Acts" Evidence Under Rule 404(b) ............................... 12

            3.    Rule 403 .............................................................................................. 14

      B.    Evidence of Kostin's Ownership of the Aspen Home Prior to April 2018 Is
            Admissible ................................................................................................... 16

            1.    Relevant Facts.................................................................................... 16

            2.    Discussion ......................................................................................... 17

      C.    Evidence of Kostin's Ownership of Certain Yachts Is Admissible.................... 21

            1.    Relevant Facts.................................................................................... 21

            2.    Discussion ......................................................................................... 23

      D.    Evidence of the Defendants' Preparation to Purchase the Aspen Home Is
            Admissible ................................................................................................... 25

      E.    Evidence From 40 North Star's Federal Tax Filings is Admissible .................... 28

II.   CO-CONSPIRATORS' STATEMENTS IN FURTHERANCE OF THE CONSPIRACY
      SHOULD BE ADMITTED UNDER RULE 801(D)(2)(E)................................................ 31

      A.    Applicable Law........................................................................................... 31

            1.    The Rule Against Hearsay .......................................................... 31

            2.    Rule 801(d)(2)(E)........................................................................... 32

      B.    Discussion ................................................................................................... 35

III.  THE DEFENDANTS' STATEMENTS SHOULD BE ADMITTED AS STATEMENTS
      OF A PARTY OPPONENT UNDER RULE 801(D)(2)(A)............................................. 38

      A.    Wolfson's Sworn Statements to Courts in the United States................................ 38

      B.    Bond's Post-Arrest Statements to the FBI ........................................................... 39

IV.    CERTAIN STATEMENTS REGARDING OWNERSHIP OF THE ASPEN HOME
    SHOULD BE ADMITTED FOR NON-HEARSAY PURPOSES ................................... 40

    A.    Applicable Law ........................................................................................... 41

    B.    Statements of Wolfson Employee-1 to Law Enforcement Are Admissible As
    Evidence of State of Mind, Concealment, and Consciousness of Guilt ............... 42

        1.    Relevant Facts ............................................................................ 42

        2.    Discussion ................................................................................. 43

    C.    Statements of Kostin and His Agents About the Ownership of the Aspen Home
    From the Period Between 2010 and March 2014 Are Admissible For Valid Non-
    Hearsay Purposes ...................................................................................... 44

V.    STATEMENTS OF AGENTS OF THE DEFENDANTS AND THEIR CO-
    CONSPIRATORS SHOULD BE ADMITTED UNDER RULES 801(D)(2)(C) AND (D)
    ..................................................................................................................... 46

    A.    Applicable Law ........................................................................................... 47

    B.    Discussion ................................................................................................. 48

VI.    CERTAIN BUSINESS RECORDS SHOULD BE ADMITTED UNDER RULES 803(6)
    AND 902(11) ................................................................................................... 50

VII.    THE GOVERNMENT SHOULD BE PERMITTED TO CROSS-EXAMINE WOLFSON
    ABOUT HIS PRIOR FRAUDS AND DISHONEST CONDUCT, AMONG OTHER
    IMPEACHMENT TOPICS, SHOULD HE ELECT TO TESTIFY ................................ 52

VIII.    THE DEFENDANTS SHOULD BE PRECLUDED FROM OFFERING EVIDENCE,
    ASKING QUESTIONS, OR MAKING ARGUMENTS RELATING TO THE
    PRESENCE OF COUNSEL OR SUGGESTING AN ADVICE OF COUNSEL
    DEFENSE SHOULD BE PRECLUDED ......................................................... 53

    A.    Applicable Law ........................................................................................... 54

    B.    Discussion ................................................................................................. 55

IX.    THE DEFENDANTS SHOULD BE PRECLUDED FROM OFFERING EVIDENCE OR
    MAKING ARGUMENTS THAT TEND TO SUPPORT JURY NULLIFICATION ..... 57

    A.    Applicable Law ........................................................................................... 57

    B.    Discussion ................................................................................................. 58

CONCLUSION ................................................................................................... 62

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in support of its motions *in limine* in connection with the trial against defendants Vadim Wolfson, a/k/a "Vadim Belyaev," and Gannon Bond (referenced herein as the "defendants") scheduled to commence on June 16, 2025.[1]

<u>The Government moves to admit the following:</u>

1.  Certain categories of evidence as direct evidence of the charges, or alternatively, under Federal Rule of Evidence 404(b), including:

    a.  Evidence of the ownership of a blocked property in Aspen, Colorado (the "Aspen Home") prior to April 6, 2018, which establishes Andrey Kostin's ownership of the Aspen Home beginning in approximately 2010.

    b.  Evidence of Kostin's ownership of certain yachts from at least in or about 2010 through at least in or about 2022, which establish Kostin's ownership practices, including his use of shell companies and nominal owners to obscure his ownership, and Kostin's relationship with certain co-conspirators and agents who also had dealings on his behalf relating to the Aspen Home.

    c.  Evidence of the defendants' preparation to purchase the Aspen Home prior to April 6, 2018.

    d.  Evidence that Wolfson was not disclosed as the ultimate foreign shareholder of 40 North Star prior to September 2018, after Kostin was sanctioned, and that Wolfson's tax preparer was similarly not involved in 40 North Star's tax filings until 2018.

2.  Statements of co-conspirators in furtherance of a conspiracy to conceal Kostin's ownership of the Aspen Home that began by at least in or about March 2014 under Rule 801(d)(2)(E).

3.  Statements of the defendants as statements of a party opponent under Rule 801(d)(2)(A), including:

    a.  Certain of Wolfson's statements made in sworn declarations submitted to courts in the United States from in or about 2017 forward.

---

[1] The Government simultaneously submits a motion *in limine* challenging defendant Wolfson's proposed expert in a separate submission.  ("Gov't Expert MIL").

b.     Certain of Bond's post-arrest statements made to law enforcement in or about February 2024.

4.     Certain statements, not for the truth of the matters asserted, but for non-hearsay purposes, including:

     a.     False statements made by a co-conspirator (one of Wolfson's employees ("Wolfson Employee-1")) to law enforcement as evidence of Wolfson Employee-1's state of mind and as evidence of concealment and consciousness of guilt.

     b.     Statements of Kostin and others relating to Kostin's ownership of the Aspen Home for the non-hearsay purposes of showing the declarants' states of mind, the statements' effect on others, and as evidence that Kostin and his associates and agents exercised dominion and control over the property.

5.     Statements of certain agents of the defendants and their co-conspirators under Rules 801(d)(2)(C) and (D).

6.     Certain business records on the basis of written declarations of relevant records custodians under Rules 803(6) and 902(11).

7.     In addition, should defendant Wolfson testify, the Government seeks permission to cross-examine him about his embezzlement of hundreds of millions of dollars as alleged in certain civil cases as probative of his character for untruthfulness under Rule 609.

<u>The Government moves to preclude the defendants from introducing the following evidence and argument and from pursuing the following lines of cross-examination</u>:

8.     Evidence, questions, or arguments relating to the presence of counsel and/or suggesting an advice of counsel defense.

9.     Evidence, questions, or arguments tending to support jury nullification, including with respect to: (a) the defendants' personal and/or family characteristics; (b) potential punishment and/or consequences; (c) the propriety of sanctions and/or the Kleptocapture Task Force; (d) Wolfson's role or activities as a Russian "dissident," and (e) the propriety of the Government's investigation and/or prosecution.

## **BACKGROUND**

### A.    **The Charges Against the Defendants**

Trial defendants Wolfson and Bond, as well as co-defendant Andrey Kostin, a/k/a "Andrei Kostin," are charged in Indictment S2 24 Cr. 91 (GHW) (the "Indictment"), with one count of conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), and two

counts of violating IEEPA, in violation of 50 U.S.C. § 1705, Executive Order 13661, 31 C.F.R. § 589.201 (for all counts), and 18 U.S.C. § 2 (for the substantive counts).[2] (Indictment ¶¶ 54-60). The Indictment charges that the defendants conspired to violate IEEPA and violated IEEPA from on or about April 6, 2018, when Kostin was sanctioned, through in or about September 2019, by: (i) dealing in blocked property (*i.e.*, the Aspen Home); (ii) providing funds, goods, or services for Kostin's benefit or for the benefit of companies that Kostin owned or controlled, by dealing and causing others to deal with the Aspen Home; (iii) receiving funds, goods, or services from Kostin or from companies Kostin owned or controlled, in connection with the operation, maintenance, and improvement of the Aspen Home; and/or (iv) causing approximately $12 million to be transferred to a shell entity controlled by Kostin, for Kostin's benefit. (*Id.* ¶¶ 56, 58, 60).[3]

Kostin, a Russian oligarch and national, has been the president and chairman of a Russian state-owned bank, VTB Bank, since 2002. (*Id.* ¶ 5). VTB Bank was sanctioned by the United States on or about July 29, 2014 (*id.* ¶ 20), and Kostin was sanctioned on or about April 6, 2018 (*i.e.*, Kostin was listed by OFAC as a "Specially Designated National" or "SDN," and was thus a "blocked" person under IEEPA) (*id.* ¶¶ 5, 15, 21). For years, beginning by at least in or about 2010 and including through the time period charged in the Indictment, Kostin used various shell companies, nominal owners, and trusted associates—including Wolfson—to obscure and conceal his ownership of various assets, including his ownership of the Aspen Home. (*Id.* ¶¶ 1, 2, 5-10). Wolfson, formerly "Vadim Belyaev," also a Russian national, is the founder of Bank Otkritie,

---

[2] Kostin is charged in the Indictment with additional offenses relating to his ownership and maintenance of certain "superyachts."

[3] As discussed below, the conspiracy started prior to April 6, 2018, the date that Kostin was sanctioned, and went as far back as at least in or about March 2014, when Executive Order 13660 was issued. (*Id.* ¶ 12).

formerly one of the largest privately held banks in Russia that was, at times, owned in part by Kostin's bank, VTB Bank. (*Id.* ¶ 6). Bond was Wolfson's close associate and personal assistant. (*Id.* ¶ 7). With Bond's assistance, Wolfson purchased the Aspen Home from Kostin for approximately $12 million on or about September 25, 2019. (*Id.* ¶ 34, 42-45, 48).

**B.        The Evidence Against the Defendants**

At trial, the Government plans to offer various financial, corporate, and other documents and records, email and other communications, the statements of the defendants, their agents, and their co-conspirators, and witness testimony to prove the defendants' guilt beyond a reasonable doubt. The Government expects to prove the following facts, in substance and in part.

In or about April 2010, Kostin purchased the Aspen Home for approximately $13.5 million with the assistance of his trusted associates, including a co-conspirator ("CC-1") who travelled to Aspen to make the purchase on Kostin's behalf. (*Id.* ¶¶ 8, 34). From 2010 until Kostin sold the Aspen Home to Wolfson in 2019, Kostin maintained ownership of the Aspen Home with assistance from the defendants, CC-1, and various other co-conspirators (including "CC-2" and "CC-3"). Like many ultra-wealthy Russian citizens and oligarchs[4]—including defendant Wolfson[5]—Kostin had a practice of using shell companies, nominal owners, intermediaries, associates, and trust

---

[4] The Government intends to call an expert witness who will testify about, among other things: (1) the financial activities of Russian oligarchs and other wealthy Russian citizens, including beneficial ownership of assets through offshore shell companies, intermediaries, trust and investment fund structures, and nominee owners; and (2) the means and methods by which Russian oligarchs evade U.S. sanctions, including the use of close associates to ensure continued access and control over their assets; the use of complex ownership structures to avoid identification, and the use of third-party jurisdictions to move funds and launder proceeds to repatriate those proceeds from the U.S. and to evade detection by law enforcement.

[5] *See infra* §§ IIIA, VII (discussing Wolfson's use of numerous shell companies and straw owners to embezzle hundreds of millions of dollars from his former bank, as alleged in lawsuit against Wolfson).

structures to own property in the United States. *See infra* § I.C (discussing Kostin's use of shell companies and straw owners to maintain ownership of certain yachts). Consistent with that practice, in 2010, Kostin purchased the Aspen Home in the name of 40 North Star LLC ("40 North Star"), an entity that was thereafter managed by a lawyer based in Colorado ("Lawyer-1"). (*Id.* ¶¶ 34-35). Between in or about 2010 through in or about December 2013, 40 North Star's parent company, and 100% shareholder, was a shell company called Soltrop Holdings Limited ("Soltrop"), which itself was owned by a nominee company that held the shares in trust, for yet another shell company, which held them in trust for an individual other than Kostin ("Straw Owner-1"). Records maintained by the Cyprus-based law firm (the "Cyprus Law Firm") that created and managed Soltrop, however, show that Straw Owner-1 had an agreement to transfer the shares of Soltrop to the Lexus Foundation, a trust for which Kostin and his family members were the beneficiaries and that was managed, at different points in time, by CC-1 and CC-3. During the time period in which Soltrop and Straw Owner-1 nominally owned 40 North Star, Kostin regularly visited the Aspen Home and openly held himself out as its owner. For example, in or about 2011, Kostin sent a letter to his Aspen Home neighbors introducing himself and stating that he purchased the Aspen Home using "an entity that I control."

In or about December 2013, Soltrop nominally sold 40 North Star to a new shell company, Ledridge Investments Limited ("Ledridge"), for $13.5 million. Records maintained by the Cyprus Law Firm show that a nominee shareholder held the shares of Ledridge in trust for Kostin. At the time of the transfer from Soltrop to Ledridge, an employee of the Cyprus Law Firm wrote to Lawyer-1, the manager of 40 North Star, confirming that, despite the change in shell entities, "everything else [besides the name of the entity] should remain the same as it was before."

In or about May 2014—approximately six months later, after a March 2014 Executive Order providing for Russian sanctions as a result of the invasion of the Crimean Peninsula, and just two months before OFAC sanctioned VTB Bank, where Kostin was serving as president— nominal ownership of 40 North Star was transferred to a new shell company, Altamonte Holding Limited ("Altamonte"). Altamonte was registered in the British Virgin Islands one month prior, in April 2014, and was specifically created to own 40 North Star. (*See id.* ¶ 42). Nominally, the ultimate beneficial owner of Altamonte, through additional layers of shell companies, was Wolfson. Altamonte purchased 40 North Star for $10 million, using funds obtained from a loan that was financed by Capital Business Finance, an entity owned and controlled, through various other shell companies and intermediaries, by CC-1 and CC-3 on Kostin's behalf. (*Id.* ¶¶ 42-43). At the same time that the loan was provided, Altamonte (*i.e.*, Wolfson) and Capital Business Finance (*i.e.*, Kostin) entered into a call option agreement that allowed Capital Business Finance, at any time, to purchase 40 North Star for $10 million—which would effectively cancel out the loan and make Capital Business Finance (Kostin) the titled owner of 40 North Star and its sole asset, the Aspen Home. In other words, a Kostin-controlled entity could, at its sole discretion, take formal control of the Aspen Home at any time. The call option agreement between Altamonte and Capital Business Finance further provided for Capital Business Finance to make periodic payments to Altamonte, so that Altamonte (Wolfson), with Bond's assistance, could pay the ongoing expenses of the Aspen Home on Kostin's behalf. And in December 2014, Ledridge (Kostin) and Altamonte (Wolfson) further entered into a contract providing that Ledridge, with the assistance of the Cyprus Law Firm, would collect and advise on all invoices, requests for payment, or issues relating to maintaining the property that came from Lawyer-1 and 40 North Star.

While the nominal ownership of 40 North Star changed at certain points between 2010 and September 2019, Kostin remained, at all relevant times, the true beneficial owner of the Aspen Home, as established through witness testimony, email communications, and other evidence. (*Id.* ¶¶ 29, 35, 38-40, 45). The Government anticipates that witness testimony will show that Kostin's use of, and control over, the property remained unchanged from 2010 until at least 2017, including after the nominal transfer to Altamonte (Wolfson) in May 2014. In addition, email communications involving Bond, Lawyer-1, Lawyer-1's assistant ("Lawyer-1 Assistant"), and others repeatedly and regularly referred to individuals other than Kostin and his family who came to stay at the Aspen Home, including Wolfson and his family, as Kostin's guests. (*See id.* ¶ 39). Requests for funding and questions regarding the Aspen Home were also routinely directed to Kostin's assistant and co-conspirator (CC-2) or to other individuals that worked for Kostin or CC-1, demonstrating that Kostin continued to exercise dominion and control over the property. (*Id.* ¶ 40). And the payments that Altamonte provided to 40 North Star were regularly funded by transfers from Capital Business Finance (Kostin), reflecting Kostin's continued financial interests in the Aspen Home. (*Id.* ¶ 45). Indeed, despite Wolfson's assertions in this matter that he became the owner of the Aspen Home as of May 2014, in 2017 Wolfson stated under penalty of perjury that he had no residence in the United States. *See infra* § III.A.

By at least December 2017, there were public media reports regarding anticipated new U.S. sanctions that were likely to be imposed as a result of the ongoing Russia-Ukraine war. (*Id.* ¶ 46). In anticipation of these potential sanctions, Kostin and his co-conspirators, including Wolfson and Bond, took various steps to further conceal Kostin's ownership of the Aspen Home and prepare for the imposition of sanctions against Kostin. *See infra* § I.D. Among other things, in or about January 2018, Bond became the authorized representative for dealings with Lawyer-1 and 40

North Star regarding the Aspen Home, replacing CC-1, CC-2, and their associates. (*See id.* ¶ 47).

Wolfson and Bond also began discussions regarding putting in place a new ownership structure

that would eliminate Altamonte. In January 2018, just one day after Kostin's name was included

on a public report listing various Russian oligarchs being considered for sanctions, Bond wrote to

the property manager for the Aspen Home (the "Property Manager") that it "looks like we are

going forward with what we discussed."

As the defendants anticipated, on or about April 6, 2018, OFAC listed Kostin as an SDN.

(*Id.* ¶ 48). Shortly thereafter, Wolfson's accountant wrote to two of her employees regarding 40

North Star and explained that "[t]his is a new company of Vadim's."

On or about September 25, 2019, Wolfson purchased 40 North Star by: (i) transferring

$11.8 million from a Cyprus bank account he controlled to CapitalInvest Limited

("CapitalInvest"); (ii) causing Altamonte to transfer $200,000, also to CapitalInvest, and (iii) in

connection with those transactions, obtaining the shares of 40 North Star from Altamonte. (*See

id.* ¶ 48). CapitalInvest was a wholly owned subsidiary of Capital Business Finance, and was

likewise also nominally owned and controlled by CC-1 and CC-3 on Kostin's behalf. (*Id.*).

## **ARGUMENT**

### I.    **CERTAIN CATEGORIES OF EVIDENCE SHOULD BE ADMITTED AS DIRECT EVIDENCE (OR ALTERNATIVELY UNDER RULE 404(B))**

The Government expects that one of the key factual disputes between the parties at trial

will be who owned the Aspen Home and when. Indeed, the defendants and their co-conspirators

used sophisticated and intricate ownership structures for this very reason: to hide assets, conceal

ownership, and evade sanctions. As direct evidence of the charged sanctions evasion scheme, first,

the Government should be permitted to introduce evidence of co-conspirator Kostin's ownership

of the Aspen Home beginning in or about April 2010, including the various shell companies and

straw owners he used to maintain and conceal his ownership of the property with a network of close associates, agents, and co-conspirators, including CC-1, CC-2, CC-3, and the Law Firm. Such evidence establishes, among other things, that Kostin maintained control and ownership over the Aspen Home until he sold it to Wolfson in 2019, after he was sanctioned, as well as his practice of using shell companies and nominee associates to maintain the Aspen Home.  It also establishes that Wolfson and Bond assisted Kostin in maintaining the Aspen Home through Altamonte from 2014 through 2019, both during the Indictment period and in the years prior to 2018, when Kostin was sanctioned.

Second, similarly, and also as direct evidence, the Government should be permitted to introduce evidence of co-conspirator Kostin's ownership practices with respect to other assets at the same time Kostin owned the Aspen Home, including his ownership of certain yachts through a variety of other shell entities and straw owners and his reliance on the same network of close associates, agents, and co-conspirators.  This evidence establishes Kostin's trusting relationship with these co-conspirators and his use of the same means and methods to maintain ownership of assets outside of Russia other than the Aspen Home.  Among other things, such evidence establishes that CC-1 and CC-3—who nominally owned Capital Business Finance and CapitalInvest—were doing so for Kostin's benefit in the same way they assisted Kostin in maintaining ownership and control over his yachts and other assets.

Finally, the Government should be permitted to offer evidence of the defendants' actions taken in the months preceding April 2018, in anticipation of the sanctions that were imposed on Kostin and in preparation to purchase the Aspen Home from Kostin (which ultimately occurred in September 2019), also as direct evidence of the charged sanctions evasion scheme.

Each of the above categories of evidence are undeniably relevant, "arose out of the same . . . series of transactions as the charged offenses," "inextricably intertwined with the evidence regarding the charged offense," and "necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997). As discussed below, under well-settled federal precedent, they should be admitted as direct evidence, or alternatively, in some instances, under Rule 404(b).[6]

## A.    Applicable Law

### 1.    Direct Evidence

If evidence is relevant to a charged offense, it is generally admissible at trial. Fed. R. Evid. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Gonzalez*, 110 F.3d at 941; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).

The Second Circuit has repeatedly held that evidence of uncharged activity that is intrinsic or direct proof of a charged crime is admissible. Direct evidence is "not confined to that which directly establishes an element of the crime." *Gonzalez*, 110 F.3d at 941. Actions and statements are admissible as direct evidence of the crimes charged if (i) they "arose out of the same transaction or series of transactions as the charged offense," (ii) they are "inextricably intertwined with the

---

[6] The Government is not seeking to admit under Rule 404(b) the evidence regarding Kostin's ownership of assets other than the Aspen Home, including the yachts, or the evidence regarding Kostin's ownership of the Aspen Home that predates May 2014, when Wolfson became the straw owner for Kostin.

evidence regarding the charged offense," or (iii) they are "necessary to complete the story of the crime on trial." *Id.* at 942; *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007); *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). In such circumstances, the evidence is "necessary to complete the story of the crime on trial, and, thus, appropriately treated as part of the very act charged, or, at least, proof of that act." *Quinones*, 511 F.3d at 309 (internal quotation marks and citations omitted); *see also, e.g., Carboni*, 204 F.3d at 44 (same); Weinstein's Federal Evidence, § 404.20[2][b] (noting that evidence of other wrongs is admissible without regard to Rule 404(b) where those wrongs "were necessary preliminaries to the crime charged").

The Second Circuit has repeatedly affirmed the admissibility of similar act evidence as direct proof of a charged offense, irrespective of whether it relates to conduct predating the charged crime. *See, e.g., United States v. Kemp*, 21-1684-cr (CON), 2023 WL 405763, *6 (2d Cir. Jan. 26, 2023) (affirming admission of evidence of shootings that preceded charged murder to provide necessary context that incident "was not an isolated incident" but was part of ongoing turf war and that co-conspirators generally acted to defend the reputation and territory of their drug operation); *United States v. Muratov*, 19 Cr. 3596 (L), 849 F. App'x 301, 303-04 (2d Cir. 2021) (affirming decision to admit evidence of defendant's attendance at jewelry shows that "linked [defendants] to their principal co-conspirator," "showed how they worked in coordination," and provided necessary context, including helping to establish use of the same sham companies used to defraud victims); *United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012) (evidence that defendant was in prostitution business and controlled prostitutes other than the victim of the charged offenses was necessary "to complete the story of the crime on trial"); *United States v. Kaiser*, 609 F.3d 556, 571 (2d Cir. 2010) (in securities fraud case, holding that bad acts predating the conspiracy were admissible as direct evidence because they had carry-over effects during the conspiracy); *United*

*States v. Rigas*, 490 F.3d 208, 238-39 (2d Cir. 2007) (affirming district court's decision to permit Government to adduce evidence of uncharged fraudulent acts predating the charged conspiracy as direct proof of charged accounting fraud conspiracy because the evidence was "'inextricably intertwined with'" the proof of the charged conspiracy and "'necessary to complete the story of the crime on trial'"); *Carboni*, 204 F.3d at 44 (in case charging false statements to maintain a line of credit, affirming admissibility of uncharged acts of falsification of business inventory, which occurred at or around the same time as the charged crimes, as direct proof inextricably intertwined with charged conduct); *Roldan-Zapata*, 916 F.2d at 804 (evidence of pre-existing drug trafficking relationship between co-conspirators admissible to aid jury's understanding of how transaction for which defendant was charged came about and respective roles).

Where, as here, an indictment charges a conspiracy, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999); *see United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (explaining that "uncharged acts may be admissible as direct evidence of the conspiracy itself"). Moreover, evidence of uncharged acts is properly admitted to "provide background for the events alleged in the indictment," even if it does not directly establish an element of the offense charged. *Coonan*, 938 F.2d at 1561. "Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.), *cert. denied*, 488 U.S. 821 (1988)).

### 2.    "Other Acts" Evidence Under Rule 404(b)

Evidence of a defendant's prior crimes, wrongs, or acts are admissible under Rule 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake,

or lack of accident." Fed. R. Evid. 404(b).  It is well-established that evidence of "other acts" is admissible under Rule 404(b) if the evidence (i) is advanced for a proper purpose; (ii) is relevant to an issue in the case; (iii) has probative value that is not substantially outweighed by any unfair prejudicial effect, and (iv) if requested, is admitted with limiting instructions to the jury.  *See United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012); *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992).

The Second Circuit "has long adopted an 'inclusionary' approach to the admission of uncharged crime evidence, under which evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity." *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) (internal quotation marks omitted); *see also United States v. Memoli*, 648 F. App'x 91, 93 (2d Cir. 2016) (quoting *Scott*, 677 F.3d at 79) (same); *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (same).  Applying this approach, the Second Circuit has routinely approved the admission of "other acts" evidence with respect to knowledge, intent, and/or motive. *See, e.g.*, *United States v. Thomas*, 54 F.3d 73, 81-82 (2d Cir. 1995); *United States v. Meyerson*, 18 F.3d 153, 166-67 (2d Cir. 1994); *see also United States v. Watts*, No. S3 09 Cr. 62 (CM), 2011 WL 167627, at *6 (S.D.N.Y. Jan. 11, 2011) ("Evidence of a defendant's participation in other, similar fraud is routinely admissible pursuant to Rule 404(b) to show knowledge and intent."). Where the defendant claims his conduct has an innocent explanation, the admission of such evidence of prior acts is particularly appropriate. *See, e.g.*, *Zackson*, 12 F.3d at 1182 ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").

13

It is also well-established that evidence of a *modus operandi* to show a common scheme, plan, or identity is admissible under Rule 404(b).  *See, e.g.*, *United States v. Carlton*, 534 F.3d 97, 101-02 (2d Cir. 2008) (holding that district court did not err in admitting evidence of defendant's three prior convictions for bank robbery to show identity because the prior robberies were similar in location, takeover style, and use of a getaway car); *United States v. Sliker*, 751 F.2d 477, 486-87 (2d Cir. 1984) ("The similarity sufficient to admit evidence of past acts to establish a recurring *modus operandi* need not be complete; it is enough that the characteristics relied upon are sufficiently idiosyncratic to permit a fair inference of a pattern's existence."); *United States v. Reed,* 639 F.2d 896, 906 (2d Cir. 1981) ("[E]vidence of the [other] transactions was . . . admissible to show a common scheme or plan.").  Other act evidence is also routinely admitted "to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017) (citing *Diaz*, 176 F.3d at 79).

Ultimately, trial courts have broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and their rulings will be reviewed for abuse of discretion.  *See United States v. Guang*, 511 F.3d 110, 121 (2d Cir. 2007).

### 3.    Rule 403

Finally, regardless of whether the evidence is admitted as direct evidence or as other acts evidence under Rule 404(b), the evidence is, like all other evidence, admissible under Federal Rule of Evidence 403 only if its probative value is not substantially outweighed by the danger of unfair prejudice.  Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing

14

the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The prejudice that Rule 403 refers to is *unfair* prejudice because, by definition, "any proof highly probative of guilt is prejudicial to the interests of [the] defendant," whereas evidence is inadmissible only if it is prejudicial for some reason beyond just proving "the fact or issue that justified its admission into evidence." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (citation omitted); *see* Rule 403 advisory committee note ("'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."); *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("[B]ecause virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair."). The Second Circuit has found admission appropriate where the offered evidence "'did not involve conduct any more sensational or disturbing than the crimes with which [the defendants were] charged.'" *Pitre,* 960 F.2d at 1120 (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)); *see also United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (evidence of uncharged act properly admitted where it "did not involve conduct more inflammatory than the charged crime"); *United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004) ("Evidence is unfairly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." (citation and internal quotation marks omitted)). The fact that evidence may be damning does not render it inadmissible. *See United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972). To the extent that there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to

preclude prejudice); *see generally United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions.").

### B.    Evidence of Kostin's Ownership of the Aspen Home Prior to April 2018 Is Admissible

#### 1.    Relevant Facts

The Government intends to offer evidence at trial that Kostin purchased the Aspen Home in or about 2010 for approximately $13.5 million, and that he maintained ownership and control of the property through his April 2018 OFAC designation and up until Wolfson's purchase of the home in September 2019. Kostin purchased the home through 40 North Star, which was created for him by Lawyer-1. From the time that he purchased the property, Kostin and his co-conspirators structured the ownership of the Aspen Home and 40 North Star through various shell entities and nominal owners. The Government intends to offer the following categories of evidence relating to Kostin's ownership of the home from 2010 through the time of his OFAC designation:

- Testimony from individuals with personal knowledge of Kostin's and Wolfson's use of the Aspen Home prior to April 2018.

- Corporate and business records showing ownership and transactions of relevant entities, including 40 North Star and the shell entities that controlled it, including but not limited to: records and communications involving call options, purchase agreements, debt transfer agreements, debt restructuring documents, articles of dissolution, or shareholder decisions from any of the relevant entities.[7]

- Kostin's 2011 letter to his Aspen, Colorado neighbors.[8]

---

[7] The Government plans to authenticate these business records through stipulations and/or under Rules 803(6) and 902(11), as discussed below, *see infra* § VI. The other evidence listed here is admissible because they are co-conspirator statements under Rule 801(d)(2)(E), statements of agents under Rules 801(d)(2)(C) and (D), statements of a party opponent under Rule 801(d)(2)(A), or they are statements not offered for their truth, as discussed below. *See infra* §§ II-V.

[8] As discussed below, *infra* § IV.C, this is admissible for a non-hearsay purpose to establish Kostin's state of mind and as circumstantial evidence that Kostin exercised dominion and control of the Aspen Home during a time period when he did not formally have title.

- Insurance policies for the Aspen Home showing that the home insurance policies for the property were held in Kostin's name from 2010 through 2015.[9]

- Records and communications regarding owner and guest visits to the Aspen Home, requests to fund or reimburse 40 North Star, and the operations and management of the Aspen Home.[10]

- Records of Kostin's and his family's travel to the United States showing that they identified the Aspen Home as their destination.[11]

The above evidence will establish that Kostin indirectly maintained possession, control, dominion, and a financial interest in the Aspen Home for the entirety of the period from 2010, through his OFAC designation in April 2018, and up to his sale of the property to Wolfson in September 2019, regardless of the various entities and straw owners that had nominal ownership of the Aspen Home.

## 2. Discussion

Evidence of Kostin's ownership of the Aspen Home from approximately 2010 through September 2019—including a period of time prior to the Indictment period—is plainly relevant and admissible as direct evidence of the offenses charged.[12]  The Government must prove that the defendants dealt in blocked property or that they provided goods, funds, or services for Kostin's benefit after he was sanctioned.  This evidence of Kostin's ownership of the Aspen Home therefore

---

[9] The Government anticipates that it will seek to admit these as business records pursuant to Rule 803(6).

[10] These are admissible as business records pursuant to Rule 803(6), statements of the defendants, pursuant to Rule 801(d)(2)(A), statements of co-conspirators under Rule 801(d)(2)(E), as statements of the defendants' or of a co-conspirator's agents under Rule 801(d)(2)(D), or for a non-hearsay purpose to establish a relevant individual's state of mind or as circumstantial evidence of who was exercising dominion and control of the property during the relevant time periods.  *See infra* §§ II, IV, & V.

[11] These are admissible as business records pursuant to Rule 803(6), or as public records pursuant to Rule 803(8).

[12] The Government submits this motion in an abundance of caution because the Indictment time period begins on or about April 6, 2018.

goes directly towards proving an element of the charged IEEPA offenses.  Such evidence goes to the heart of the key factual dispute between the parties: the ownership of the Aspen Home at the time Kostin was sanctioned.  As such, it is "part of the very act charged."  *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992).  In particular, evidence establishing that Kostin purchased the Aspen Home in 2010 and continuously owned and controlled it in subsequent years up until 2018, "directly establishes an element of the crime[s]," *Gonzalez*, 110 F.3d at 941, in that it furnishes proof that Kostin also owned the property as of April 6, 2018, when he was sanctioned and the Aspen Home became blocked property.  Establishment of that fact is central to whether Wolfson and others committed sanctions violations when they participated in maintaining, improving, or otherwise providing services for the Aspen Home after April 2018 and when Wolfson purchased the Aspen Home from Kostin in 2019.

Such evidence is also necessary to rebut Wolfson's anticipated defense that he obtained actual ownership over the Aspen Home in 2014, prior to Kostin's designation.  Kostin's ownership of the Aspen Home prior to the Indictment period "arose out of the same transaction or series of transactions as the charged offense[s]," is "inextricably intertwined with the evidence regarding the charged offense[s]," and it is "necessary to complete the story of the crime[s] on trial."  *See id.*; *Carboni*, 204 F.3d at 44.  Thus, evidence of who owned the Aspen Home and when is critical to the jury's determination of whether the defendants violated IEEPA.

Evidence of Kostin's ownership of the Aspen Home from 2010 forward is also admissible as direct evidence because it provides pertinent "background for the events alleged in the indictment."  *Coonan*, 938 F.2d at 1561.  The evidence establishes the way in which Kostin, the defendants, and others worked to manage and/or obscure Kostin's ownership of the Aspen Home through the use of various shell entities, nominal owners, and the call option.  The intricate

ownership structure of the Aspen Home establishes the conspiracy's "background and history," including the relationships between the defendants, Kostin, and other co-conspirators, as well as the various shell entities and methods used to commit the charged crimes. *See, e.g.*, *id*; *United States v. Langford*, 990 F.2d 65, 70 (2d Cir. 1993) ("[E]vidence of acts committed prior to the time charged in the indictment [is admissible] to prove the existence of the alleged conspiracy as well as to show its background and history.").

For example, evidence of Kostin's ownership of the Aspen Home, and what representatives and agents Kostin used to manage and operate the home on his behalf, during the pre-April 2018 period provides relevant background and context establishing that, when Wolfson and Bond obtained the $10 million loan from Capital Business Finance in 2014, received periodic payments from that company to fund the Aspen Home's operations, and, ultimately, transferred almost $12 million to Capital Business Finance's subsidiary in September 2019, they were—and well knew they were—dealing with an entity and individuals that were acting on Kostin's behalf.  Evidence that Wolfson and Bond visited the Aspen Home between in or about 2015 through 2017 as Kostin's guests shows that the defendants knew the entities and individuals they were dealing with in connection with Wolfson's role as a straw owner—and then later again in connection with the $12 million September 2019 transaction—were acting on Kostin's behalf.  This evidence is thus intertwined with the charged scheme and is relevant to provide background, context, and to "furnish an explanation of the understanding or intent with which certain acts were performed." *Coonan*, 938 F.2d at 1561.

Alternatively, the evidence relating to ownership of the Aspen Home for the period of time beginning in at least May 2014, when Wolfson and Bond become involved in the scheme to conceal Kostin's ownership, is also admissible under Rule 404(b).  Evidence of Kostin's

ownership of the Aspen Home as outlined above is undeniably admissible because (i) it is relevant; (ii) it is advanced for the proper purposes of proving motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, or lack of accident; and (iii) its probative value is not substantially outweighed by any unfair prejudice. *See Scott*, 677 F.3d at 79; *Zackson*, 12 F.3d at 1182. The evidence shows that in 2014, shortly before Kostin's bank was sanctioned, Wolfson assisted Kostin by becoming the straw owner of 40 North Star and the Aspen Home, and that Bond assisted Wolfson in this endeavor by processing funding and other requests on Altamonte's behalf in response to inquiries from Kostin's associates and agents. Wolfson's history as a straw owner of 40 North Star and the Aspen Home serves to show that Wolfson was aware of relevant sanctions that were being imposed, and that he assisted Kostin in efforts to conceal his ownership of the Aspen Home and evade, or attempt to evade, those sanctions. It is therefore relevant to show opportunity, intent, preparation, and knowledge—all valid purposes for such evidence under Rule 404(b). And, again, evidence that Wolfson and Bond visited the home as Kostin's guests prior to 2018 is highly relevant to show there was no mistake, when facilitating the $12 million September 2019 payment, as to who those funds were going to benefit. The evidence is not prejudicial and its probative value in proving an element of the offense is significant.

Evidence of Kostin's ownership of the Aspen Home from approximately 2010 forward should thus be admitted as direct evidence of the charged offenses—or alternatively, with regard to the evidence for the period beginning in or about May 2014, under Rule 404(b) as "other acts" evidence.

### C.    Evidence of Kostin's Ownership of Certain Yachts Is Admissible

#### 1.    Relevant Facts

At trial, the Government intends to offer evidence that shows how Kostin owned and maintained his assets (*i.e.*, Kostin's ownership practices), including Kostin's ownership of certain yachts, from at least in or about 2010 through at least in or about 2022, through shell entities and straw owners, and with the assistance of several associates and agents—including CC-1, CC-2, and CC-3—who helped him manage and operate those assets, including the yachts and the Aspen Home.[13]

In particular, the Government expects to introduce the testimony of at least one individual who co-owned and operated a yacht management company ("Witness-1") and two individuals who were employed by a design firm utilized by Kostin ("Witness-2" and "Witness-3").[14]  Witness-1 is expected to testify, in sum and substance, that Kostin commissioned the *Sea Rhapsody* and the *Sea & Us* to be built in or about 2008 and in or about 2016, respectively, and was, at all relevant times, their true owner.  Witness-1 is further expected to testify that CC-2 was Kostin's right-hand man; that CC-1 worked for Kostin and served as Kostin's nominee owner of multiple vessels, including the *Sea Rhapsody*; and that when Witness-1 met with Kostin regarding the yachts, Kostin, CC-2, and a woman named [CC-3's first name] were usually present.

---

[13] For clarity, the evidence the Government seeks to admit regarding the yachts is limited to that described below regarding the entities and individuals utilized by Kostin to facilitate his ownership of those assets.  The Government does not intend to admit evidence that Kostin violated sanctions in connection with his ownership of those yachts, as alleged in Counts One and Two of the Indictment.

[14] Witness-2 and Witness-3 are subject to the Government's pending Rule 15 motion.  (Dkts. 119, 127, 132).

Witness-2 is expected to testify, in sum and substance, that, between at least in or about 2010 through in or about 2021, he worked on several architectural and design projects for Kostin, including projects involving a residence in Moscow, the *Sea & Us,* and the *Sea Rhapsody.* During the course of those projects, he interacted with CC-2, who handled various logistical operations for Kostin, and CC-3, who organized and was present for at least the start of one meeting with Kostin in the South of France regarding the *Sea & Us.* Witness-3 is similarly expected to testify, in sum and substance, that, beginning or about 2018, he worked on several architectural and design projects for Kostin, including projects involving a residence in Moscow and the *Sea & Us*, and that during the course of those projects, he interacted with CC-2, who worked for Kostin, and a woman named [CC-3's first name] who worked for Kostin as part of his project management group. Both Witness-2 and Witness-3 are expected to testify that they were instructed to use the name of a corporate entity, Osten Services Company, as the "client" in connection with Kostin's Moscow residence, and Witness-3 is further expected to testify that he received an email from CC-2 in which CC-2 asked Witness-3 to remove Kostin's and CC-2's names from the relevant paperwork.[15]

The Government further expects to introduce public, corporate, and business records regarding the entities used to hold the *Sea Rhapsody* and the *Sea & Us* on Kostin's behalf. With regard to the *Sea Rhapsody*, those records show that (i) between in or about 2007 through 2013, the yacht *Sea Rhapsody* was nominally owned by an entity called Solston Shipping Limited ("Solston"), whose nominal shareholder was Mediterranean Nominees Limited, which held those

---

[15] Witness-2 and Witness-3 are not willing to come to the U.S. to testify, but have agreed to participate in a Rule 15 deposition. The Government's motion to preserve their testimony pursuant to a Rule 15 deposition is currently pending. (Dkts. 119, 127, & 132). Defendants have objected to that motion only on availability grounds.

shares in trust for CC-1, and (ii) in or about 2013, the nominal ownership of Solston was transferred to an entity called Seaside Holding Corp. ("Seaside"), whose shares were held in trust for an another individual ("Straw Owner-2").  With regard to the *Sea & Us*, those records establish that the yacht *Sea & Us* was nominally owned by an entity called Pasithea Shipping Limited ("Pasithea"), the shares of which were held in trust by a nominal shareholder for Seaside.  The Government anticipates that these records will show that many of the relevant entities were set up and managed by the Cyprus Law Firm, which also set up and managed the shell entities that Kostin used to indirectly hold the Aspen Home.

## 2.    Discussion

Evidence of Kostin's ownership practices, including the way in which he used shell entities and straw owners to indirectly own and control the yachts, and was assisted in doing so specifically by CC-1, CC-2, and CC-3, is direct evidence of the charged IEEPA offenses.  Indeed, defendants have effectively acknowledged that such evidence is relevant and material—they opposed the Government's motion to take the Rule 15 depositions of Witness-2 and Witness-3 only on unavailability grounds.  (Dkt. 131).

As discussed above, uncharged acts are admissible in a conspiracy case when the evidence is helpful to explain the relationship between co-conspirators, complete the story of the crime charged, or provide background for the events alleged in the indictment.  *Diaz*, 176 F.3d at 79; *see also Thai*, 29 F.3d at 812.  Here, the evidence is necessary and relevant for all of these reasons.  It establishes Kostin's practice of holding his various assets through straw owners and nominee entities, a practice which is at the core of the charged sanctions evasion scheme regarding the Aspen Home.  Kostin's ownership of the yachts utilizing these entities and nominees directly overlapped with the time period in which he also used similar entities and nominees—indeed,

some of the same nominees—to hold the Aspen Home on his behalf, facilitated by the same Cyprus-based law firm.

The evidence further establishes the roles of CC-1, CC-2, and CC-3 as Kostin's associates and representatives for purposes of holding Kostin's assets, which directly relates to their provision of the same or similar services in connection with the Aspen Home. The Government anticipates that the evidence will show, for example, that CC-1 served as the straw owner of the Aspen Home between in or about 2010 and 2013; that an email address used by CC-1's assistant and associated with CC-3 was provided to Lawyer-1 as the point of contact for the Aspen Home following the May 2014 transfer of 40 North Star to Altamonte; and that CC-2 and CC-2's employees were in communication with Lawyer-1 and the Lawyer-1 Assistant regarding expenses and other matters relating to the Aspen Home, including after May 2014. As discussed above, evidence of the relationship between Kostin and these co-conspirators—and particularly the relationship between Kostin and CC-1 and CC-3, who owned and controlled Capital Business Finance and its subsidiary, CapitalInvest, on Kostin's behalf—is highly relevant to establish that the $12 million September 2019 payment from Wolfson to CapitalInvest in fact benefitted Kostin. Also, as discussed above, the Second Circuit has repeatedly affirmed the admissibility of similar act evidence as direct proof of a charged offense, irrespective of whether it relates to conduct predating the charged crime. *See supra* at § I.A.1 (citing, *e.g.*, *Kemp*, 2023 WL 405763; *Muratov*, 49 F. App'x 301; *Robinson*, 702 F.3d at 37; *Kaiser*, 609 F.3d at 571; *Rigas*, 490 F.3d at 238-39; *Carboni*, 204 F.3d at 44; *Roldan-Zapata*, 916 F.2d at 804). Here too, Kostin's substantially similar ownership practices are highly relevant and probative of the charged offenses, and they provide the jury with important context and background.

Finally, none of this evidence is excludable under Rule 403 as unduly prejudicial. That Kostin owned other assets that he owned through shell entities and nominee straw owners is not any more inflammatory as the conduct at issue with respect to the charged scheme regarding the Aspen Home. To the extent there is any risk of unfair prejudice from admission of this otherwise probative evidence, the court may provide limiting instructions to remind the jury that the defendants are not on trial for any offense other than the crimes charged, and are not alleged to have been involved with any offenses relating to any of Kostin's assets other than the Aspen Home. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice to defendant); *see generally Parker v. Randolph*, 442 U.S. 62, 75 n.7 (1979) ("The 'rule' – indeed, the premise upon which the system of jury trials functions under the American judicial system – is that juries can be trusted to follow the trial court's instructions."). This evidence, moreover, will be admitted in a streamlined way. The testimony of the witnesses is expected to be relatively brief and focused, and the relevant corporate and business records will be presented as part of the testimony of a summary witness who will also testify regarding similar records for the entities and individually that nominally owned the Aspen Home during the relevant time periods.[16]

### D. Evidence of the Defendants' Preparation to Purchase the Aspen Home Is Admissible

The Government intends to offer evidence showing that, in the months immediately preceding the imposition of sanctions on Kostin, the defendants engaged in conduct in preparation

---

[16] The Government does not seek to offer the above evidence under Rule 404(b). As already noted, it does not allege that Wolfson or Bond had any dealings with Kostin with respect to the yachts.

for those anticipated sanctions.[17]  In particular, the Government anticipates admitting the following evidence:[18]

- Calendar entries recovered from one of Wolfson's iCloud accounts showing that, on or about November 29, 2017, Wolfson flew from London to Cyprus for a series of meetings with, among others, Straw Owner-1 (who served as the straw owner of the Aspen Home from in or about 2010 through in or about December 2013) and "K" (*i.e.*, Kostin), before returning to London on December 14, 2017.

- On or about January 4, 2018, newterra@post.com ("NewTerra"), an email address used by CC-3 and her employees, emailed Bond and told him that "[i]n accordance with the agreement reached[,] bills and all correspondence related to the object [i.e., the Aspen Home] you shall receive from [the Lawyer-1 Assistant]."  Bond responded that they should "find a time to chat."

- On or about January 5, 2018, Bond emailed NewTerra and stated that he had "spoken with representatives of the property"—who he planned on meeting "to finalize a new [ownership] structure."

- On or about January 10, 2018, Bond informed NewTerra via email that "our US counsel" had recommended that they liquidate Altamonte, terminate the option agreement held by Capital Business Finance permitting it to purchase the shares of 40 North Star from Altamonte, and to "add a new entity in place of Alt[amonte]."

- On or about January 10, 2018, Bond sent another email to NewTerra, cc'ing the Property Manager, asking for "confirmation that we will now be giving instructions to [Lawyer-1] in relation to the property on both a technical as well as administrative aspect."  The next day, NewTerra wrote back that "We confirm."[19]

- On or about January 30, 2018, Bond wrote several text messages to the Property Manager, informing her that it "looks like we are going forward with what we discussed" and then

---

[17] The Government anticipates eliciting testimony from an expert witness that Russian oligarchs took steps, in anticipation of U.S. sanctions being imposed in 2018, to conceal and protect their ownership of assets with a nexus to the United States, including by transferring the assets to different shell entities, legal structures, or close associates.

[18] These statements are admissible as statements of an opposing party, pursuant to Fed. R. Evid. 801(d)(2)(A), statements of an opposing party's agent, pursuant to Fed. R. Evid. 801(d)(2)(D), statements of a co-conspirator, pursuant to Fed. R. Evid. 801(d)(2)(E), or, to the extent the evidence reflects certain statements made to Bond, for the non-hearsay purpose of proving Bond's state-of-mind.

[19] Later that same day, an email address associated with CC-1's assistant wrote to Lawyer-1 and informed him that Bond was now the "authorized representative" for "all business correspondence, instructions and necessary approvals regarding the [Aspen Home]."

sending a pdf link to a public report to Congress, issued on January 29, 2018, pursuant to the Countering America's Adversaries Through Sanctions Act of 2017, that listed a number of senior Russian political figures and oligarchs, including Kostin.

These calendar entries and emails—evidence that shows that Kostin, Wolfson, and Bond, just months before sanctions were imposed, took steps to further distance Kostin from the Aspen Home and to impose a new structure for management and operation of the property—are admissible as direct evidence of the sanctions evasion conspiracy. Indeed, these acts are steps that were "done in furtherance of the alleged conspiracy." *Diaz*, 176 F. 3d at 79. Wolfson's calendar entries, and Bond's emails regarding his new role with respect to the Aspen Home, are also further "background evidence" of "the circumstances surrounding the events" and "furnish an explanation of the understanding or intent with which certain acts were performed," *id.*, namely, that Wolfson and Bond did not have control or management of the Aspen Home prior to the sanctions imposed on Kostin, and instead effected a scheme to ultimately obtain such ownership in anticipation of the sanctions imposed on Kostin. This evidence is thus also critical to rebut the anticipated defense that Wolfson had been the true owner of the home since 2014, when Altamonte became the nominal owner of 40 North Star.

In the alternative, the above-described evidence is admissible pursuant to Rule 404(b), as it is highly probative of Wolfson's and Bond's intent, plan, knowledge, and absence of mistake or accident in engaging in the charged crimes. The January 30th text sent by Bond, Wolfson's agent, in particular, shows that the defendants were well aware that Kostin was likely to be sanctioned and were taking action with regard to the Aspen Home in anticipation of those sanctions. The Government is entitled to use this evidence to rebut any arguments by defendants that they were unaware that Kostin had a financial interest in the Aspen home after 2014, that they were unaware of the sanctioning of Kostin, or that Wolfson had been the true owner of the home since 2014.

### E.  Evidence From 40 North Star's Federal Tax Filings is Admissible

The Government seeks to admit IRS records for 40 North Star, from tax years 2013 through 2019, and for Wolfson, from tax years 2017 through 2019.  Tax information may only be introduced at a federal criminal trial "if the court finds that such return or taxpayer return information is probative of a matter in issue relevant in establishing the commission of a crime or the guilt or liability of a party."  26 U.S.C. § 6103(i)(4)(A)(i).  Here, the tax information will show, first, that prior to the 2018 tax year, the tax returns for 40 North Star were prepared by a Colorado-based accounting firm. This was true despite the fact that Wolfson had a New York-based accountant who prepared his personal tax returns, and tax filings related to other entities that Wolfson owned, by at least the 2017 tax year.  And that Colorado-based accounting firm was the same one utilized in 2013, a period in which it is undisputed that Kostin was the owner of, and in control of, 40 North Star and the Aspen Home.  Tellingly, it was only in 2018, after Kostin was sanctioned, that Wolfson's New York-based accountant was first tasked with preparing the tax returns for 40 North Star, which she then did for the 2018 and 2019 tax years.

*Second*, no ultimate foreign shareholder for 40 North Star was disclosed on the applicable IRS form until September 2018, after Kostin was sanctioned.  For each of the 2013, 2014, 2015, and 2016 tax years, 40 North Star's filings disclosed its direct foreign shareholders—i.e., Soltrop, Ledridge, and/or Altamonte—but left blank the portion of the relevant form for disclosure of the ultimate foreign shareholder.  It was only in 40 North Star's 2017 tax return, which was filed in September 2018, after sanctions were imposed on Kostin, that Wolfson was identified for the first time as 40 North Star's indirect ultimate foreign shareholder.  This evidence is admissible as direct evidence of the charged crimes and, in the alternative, pursuant to Rule 404(b).

Wolfson—and Kostin's—failure to disclose an ultimate foreign shareholder of 40 North Star in the tax filings submitted between 2014 and 2017 (reflecting the 2013 to 2016 tax years) provides direct evidence that they acted with an intent to conceal the true ownership of the Aspen Home to U.S. authorities.  The disclosure of Wolfson as the ultimate foreign shareholder in September 2018, after sanctions were imposed on Kostin, and not prior, further evidences that Wolfson was not the ultimate beneficial owner of the home in 2014, as he has claimed.  In other words, it provides direct proof of the defendants' corrupt intent. *See United States v. Bergstein*, 788 F. App'x 742, 745 (2d Cir. 2019) ("The government properly introduced [the defendant's] tax returns to show that even though he maintained that his income was legitimate, shell companies under his control did not report or pay taxes on [the] income."); *United States v. Adelekan*, No. 19 Cr. 291 (LAP) (S.D.N.Y. Oct. 22, 2021) (Tr. 488) (denying defense motion to preclude IRS testimony at trial regarding failure to file tax returns and report income because "the testimony will be direct evidence of the concealment of the source of the funds"); *United States v. Hogan*, 886 F.2d 1497, 1507 (7th Cir. 1989) (finding that "evidence that [defendant] did not report the money he received from attorneys suggests that he knew that the payments were unlawful"); *United States v. Hatfield*, 685 F. Supp. 2d 320, 324 (E.D.N.Y. 2010) (finding that evidence that the defendants failed to include certain payments and property on their tax returns was inextricably intertwined with non-tax charges, because it showed consciousness of guilt").  That fact that Wolfson did not report that he was the ultimate shareholder of 40 North Star and Altamonte is direct evidence of his knowledge that he was engaged in an illicit scheme and was acting only as a straw owner.  As noted above, this is particularly true given that, after Kostin was sanctioned, Wolfson *did* disclose that he was the ultimate shareholder.  Moreover, that evidence, and the evidence that 40 North Star

began using Wolfson's accountant and tax preparer only in 2018, is directly relevant to rebutting the expected defense that Wolfson was the true owner of the home beginning in 2014.

In the alternative, the records are admissible pursuant to Rule 404(b), as they are highly probative of Wolfson's intent, plan, knowledge, and absence of mistake or accident in engaging in the charged crimes. Wolfson's efforts to conceal the identity of the ultimate foreign shareholder of the Aspen Home demonstrates intent and knowledge. And that tax records show an absence of mistake or accident in that Wolfson took active steps to conceal both Kostin's ownership of the home and his (Wolfson's) nominal connection to it. The tax returns are therefore important both to show Wolfson's intent and to rebut any defense that he was acting in good faith as the owner of the home since 2014. *See Bergstein*, 788 F. App'x at 745; *United States v. Osarenkhoe*, 439 F. App'x 66, 68 (2d Cir. 2011) (approving admission of tax return evidence under Rule 404(b)); *United States v. Avenatti*, No. 19 Cr. 374 (JMF) (S.D.N.Y. Jan. 13, 2022) ("[I]f the proceeds were lawful, legitimate proceeds to which Mr. Avenatti was entitled, they would have presumably been income and he would have been required to report them to the IRS. The fact that he did not do so tends to rebut any claim that they were lawful and legitimate.").

Finally, there is no basis to think that Wolfson's failure to disclose his ultimate shareholder position would be unfairly prejudicial within the meaning of Rule 403. As in other cases where similar evidence has been admitted, there is nothing salacious or unfair about documentary evidence regarding Wolfson's disclosure or non-disclosure of his position on the relevant IRS form. *See United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000). Moreover, given the high probative nature of the evidence to what are almost certain to be the most important issues at trial—the defendant's

knowledge and intent—any prejudice would not "substantially outweigh[]" the probative value of the evidence.

The Government accordingly respectfully seeks an order authorizing it to introduce 40 North Star's tax filings for the 2013 to 2019 tax years and Wolfson's tax filings for the 2017 to 2019 tax years at trial.

## II.    CO-CONSPIRATORS' STATEMENTS IN FURTHERANCE OF THE CONSPIRACY SHOULD BE ADMITTED UNDER RULE 801(D)(2)(E)

At trial, the Government intends to introduce for their truth out-of-court statements made by Kostin, CC-1, CC-2, CC-3, and other co-conspirators.  Certain of those statements were made during the time period of the conspiracy offense charged in the Indictment, while others were made in an earlier time period, beginning in or about March 2014—when Executive Order 13660, pursuant to which relevant Russian sanctions were first imposed, was issued.  These statements are not hearsay statements because they were in furtherance of a conspiracy between Kostin, Wolfson, Bond, and others that existed as of at least March 2014, they are otherwise relevant and reliable, and are thus admissible.[20]

### A.    Applicable Law

#### 1.    The Rule Against Hearsay

The Federal Rules of Evidence define hearsay as a declarant's out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  However, certain types of out-of-court statements are not considered hearsay, and therefore are admissible for their truth.  As relevant here, out-of-court statements made by a co-

---

[20] The Government makes these arguments without prejudice to its ability to argue that other exceptions and exclusions may also apply, including, for example, the exception under Fed. R. Evid. 803(6) for business records or that the statements are not hearsay because they are not being admitted for the truth of the matter asserted therein.

conspirator in furtherance of the conspiracy are non-hearsay.  In addition, out-of-court statements

that are offered for a purpose other than their truth, such as for their effect on a listener, are also

admissible "[i]f the significance of an offered statement lies solely in the fact that it was made, no

issue is raised as to the truth of anything asserted, and the statement is not hearsay."  Fed. R. Evid.

801(c) advisory committee's note.  Thus, a statement offered to show its effect on the listener or

for some other valid purpose other than to establish the truth of the matter asserted is not hearsay.

*Id.*; *United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a

statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener

was put on notice."); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out

of court statement offered not for the truth of the matter asserted, but merely to show that the

defendant was on notice of a danger, is not hearsay.").

### 2.      Rule 801(d)(2)(E)

Federal Rule of Evidence 801(d)(2)(E) provides in relevant part that "[a] statement is not

hearsay if . . . the statement is offered against an opposing party and . . . was made by the party's

co-conspirator during and in furtherance of the conspiracy."  To admit a statement under this rule,

a district court must find two facts by a preponderance of the evidence: (i) that a conspiracy that

included the defendant and the declarant existed; and (ii) that the statement was made during the

course of, and in furtherance of, that conspiracy.  *Bourjaily v. United States*, 483 U.S. 171, 175

(1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).  "In determining the existence

and membership of the alleged conspiracy, the court must consider the circumstances surrounding

the statement, as well as the contents of the alleged coconspirator's statement itself."  *United States

v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014).  "Although Rule 801(d)(2)(E) requires that both the

declarant and the party against whom the statement is offered be members of the conspiracy, there

is no requirement that the person to whom the statement is made also be a member." *United States v. James*, 712 F.3d 79, 106 (2d Cir. 2013).

When determining whether the predicate conspiracy has been established, the district court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000); *see also Bourjaily*, 483 U.S. at 178-79 ("Congress has decided that courts may consider hearsay" in making preliminary factual determinations relevant to Rule 801(d)(2)(E)). "As [the Second Circuit] has repeatedly held, once a conspiracy is established, only slight, even circumstantial evidence is needed to link another defendant with it." *United States v. Cota*, 953 F.2d 753, 758 (2d Cir. 1992). In addition, the defendant does not have to have been a member of the conspiracy at the time the statement was made. *See United States v. Farhane*, 634 F.3d 127, 161 n.35 (2d Cir. 2011).

The conspiracy between the declarant and the defendant "need not be identical to any conspiracy that is specifically charged." *Gigante*, 166 F.3d at 82; *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment."); *see also United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) ("[I]t is not necessary that the Government charge a conspiracy to take advantage of Fed. R. Evid. 801(d)(2)(E)."); *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990) (same). Indeed, for purposes of the co-conspirator hearsay exception, a conspiracy's objective "need not be criminal at all" and a "joint venture" among the parties counts as a "conspiracy" for purposes of the Rule. *United States v.*

33

*Russo*, 302 F.3d 37, 45 (2d Cir. 2002).[21]   The Second Circuit has explained that, to admit a co-conspirator statement made in a separate conspiracy, the Government must show only that the defendant and the declarant are members of some conspiracy that somehow is "factually intertwined" with the charged offenses.  *See Stratton*, 779 F.2d at 829.

Although admissible co-conspirator statements are limited to those made "in furtherance" of the conspiracy, this standard is not unduly restrictive.  To be in furtherance of a conspiracy, a statement "must in some way have been designed to promote or facilitate achievement of the goals of that conspiracy."  *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994).  Under this standard, a co-conspirator statement is admissible if it "can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy."  *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

Thus, statements are in furtherance of the conspiracy if they, for example: (i) inform or provide an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (ii) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958; (iii) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158; (iv) "provide reassurance," *id.*;

---

[21] "The exception can apply if people act together by mutual understanding in pursuit of a common purpose . . . even if the proponent does not show that the venture is unlawful." 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FED. EVID. § 8:59 (3d ed.).  *See, e.g.*, *United States v. Guo*, No. 23 CR. 118 (AT), 2024 WL 3275265 at *5 (S.D.N.Y. July 1, 2024) (obscuring ultimate beneficial ownership of firm by making "opaque statement" about "the management . . . "without specifying who actually made decisions" on behalf of the firm); *United States v. Postal*, 589 F.2d 862, 886 n.41 (5th Cir. 1979) (journey on a seafaring vessel), *cert. denied*, 444 U.S. 832 (1979); *United States v. Layton*, 855 F.2d 1388, 1397-1400 (9th Cir. 1988) (obscuring from visiting Congressman the living conditions in Jonestown); *United States v. Gewin*, 471 F.3d 197, 200-202 (D.C. Cir. 2006) (promotion of stocks in company in which coconspirators had hidden shares).

(v) "serve to foster trust and cohesiveness," *id.*; (vi) "facilitate and protect" the conspiratorial activities, *United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (vii) inform a co-conspirator of "the identity and activities of his co-conspirators," *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

Further, "so long as a coconspirator statement was in furtherance of the conspiracy, there is no requirement that it have been in furtherance of the interests of the defendant himself or of any particular coconspirator." *Gupta*, 747 F.3d at 124. Nor is it necessary that the defendant have known the co-conspirator who made the statement or the person to whom the statement was made. *See United States v. Casamento*, 887 F.2d 1141, 1157-58 (2d Cir. 1989) ("A lack of evidence connecting one defendant with others does not preclude a determination that all the defendants were co-conspirators; a single conspiracy may be found to link them all so long as each defendant knew from the scope of the operation that others were involved in the performance of functions vital to the success of the endeavor.").

## B.    Discussion

There is substantial evidence that, by at least in or about March 2014, Wolfson, Bond, and certain of their employees were in a conspiracy with Kostin, CC-1, CC-2, CC-3, and their employees to hide Kostin's ownership of the Aspen Home, to allow Kostin to control and manage the property indirectly despite his lack of any connection to it on paper, and to evade sanctions that were anticipated in connection with the Russian invasion of Crimea and the resulting Russia-Ukraine war. As an initial matter, the Government expects the Property Manager to testify that Kostin remained the owner of the Aspen Home after 2014, exercising control and managing the property through his trusted associates and their agents. That anticipated testimony will be supported by, among other things, numerous contemporaneous emails and records, described in

35

part above, *supra*, Background § A, showing that, even after Altamonte's nominal purchase of the Aspen Home in 2014, Kostin was referred to and treated as the owner of the home while Wolfson and Bond were referred to and treated as Kostin's guests.  And the Government anticipates eliciting expert testimony explaining that, after Russia's invasion of the Crimean Peninsula in February 2014, many Russian oligarchs, in anticipation of potential U.S. sanctions, took steps to conceal and protect their ownership of assets with a nexus to the United States, including by transferring the assets to different shell entities or legal structures.

The conspiracy between Kostin, Wolfson, Bond, and their associates included, among other things, the use of Altamonte, a company nominally owned by Wolfson, to purchase 40 North Star in May 2014 using $10 million obtained from Capital Business Finance, which was controlled on Kostin's behalf by CC-3.  The conspiracy further included a call option agreement that permitted Capital Business Finance to purchase the shares of 40 North Star at any time for the same amount as the $10 million loan—which would effectively result in a cancellation of the loan—and a contract that allowed Ledridge, another Kostin-controlled entity, to continue to manage the day-to-day operations of the Aspen Home.

For these reasons, starting in at least March 2014, statements by Kostin, CC-1, CC-2, CC-3, and other co-conspirators relating to the management, finances, and operations of the Aspen Home were in furtherance of a conspiracy with the defendants and are admissible under Federal Rule of Evidence 801(d)(2)(E).

The Government anticipates that this evidence will include, for example, the following:[22]

---

[22] The Government reserves its right to seek to admit other statements of co-conspirators not explicitly listed herein pursuant to Rule 801(d)(2)(E), and this motion is further made without prejudice to the Government's ability to argue that there are other valid hearsay exceptions for these statements or that the statements are not hearsay because they are not being admitted for the

- Witness testimony from the Property Manager that, in or about 2016, Kostin instructed the Property Manager to get a dog to live at the Aspen Home with her.

- On or about January 15, 2015, CC-2—who is identified in certain emails as the "Head of the office of Mr. Kostin"—emailed the Property Manager and Lawyer-1 and told them that "the boss [i.e., Kostin] has invited to stay in the house in February [a] guest" and "[t]he boss has confirmed that we cover all the expenses during his family stay. . . . [The guest] may use all the rooms in the house except for the boss' master bedroom."

- On or about February 8, 2015, CC-2 emailed the Property Manager, introducing her to one of Wolfson's employees, and explaining that the Wolfson employee would "be responsible for the visit of Mr. Vadim Belyaev and his family in the end of February. . . . As the boss [i.e., Kostin] said we cover all the expenses so I would appreciate if you could make the list as soon as possible so we could transfer the fund on time."

- On or about November 17, 2015, NewTerra—the email address associated with CC-3 and her team—wrote an email to Bond, in response to his inquiry, confirming that the email address info1@realtyagent.com—which had been provided to Lawyer-1 in or about June 2014 as the new point of contact for questions regarding fees and guests at the Aspen Home following Altamonte's nominal purchase of the property in May 2014—was connected to their team.

- On or about October 5, 2016, CC-2 emailed the Property Manager and told her that "[w]e have received the last financial report and the boss [i.e., Kostin] is asking to get more detailed info about some expenses," before listing specific areas of expenses that required explanations.

These statements were all made during the conspiracy which began by at least May 2014 and in furtherance of its objectives of concealing Kostin's true ownership of the home, facilitating Kostin's continued control over the home despite his lack of connection—at least one paper—to it, and evading anticipated U.S. sanctions by holding the property in the name of a straw owner— *i.e.*, Wolfson via Altamonte—and using shell entities and anonymous email addresses, among other things. In other words, all of these statements were made in furtherance of, or to facilitate,

---

truth of the matter asserted therein. *See United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands . . . or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay.").

Kostin's continued exercise of dominion and control over the Aspen Home, and protection Kostin's financial interests in the property, despite the fact that Wolfson nominally held the title (via Altamonte). Because the categories of statements described above are meant to promote or facilitate the objectives of the conspiracy, these are non-hearsay co-conspirator statements that are admissible under Rule 801(d)(2)(E). *See Rivera*, 22 F.3d at 436 (statements admissible if "designed to promote or facilitate achievement of the goals of the conspiracy"); *Diaz*, 176 F.3d at 87 (statements admissible to "facilitate and protect" the conspiratorial activities).

## III. THE DEFENDANTS' STATEMENTS SHOULD BE ADMITTED AS STATEMENTS OF A PARTY OPPONENT UNDER RULE 801(D)(2)(A)

The Government is permitted to introduce at trial statements made by the defendants as party admissions, pursuant to Federal Rule of Evidence 801(d)(2)(A). *See Russo*, 302 F.3d at 43 ("Statements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party." (citing Fed. R. Evid. 801(d)(2)(A))). The defendants, however, do not have a parallel ability to offer their statements into evidence. "When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982). As discussed below, the Government intends to offer, among other statements made by the defendants, statements that Wolfson made in sworn declarations to the New York Supreme Court and statements that Bond made to the FBI following his arrest. These statements are relevant and admissible under Rule 801(d)(2)(A).

### A. Wolfson's Sworn Statements to Courts in the United States

In or about 2020, National Bank Trust ("NBT") and PJSC Bank Otkritie Financial Corporation ("Otkritie") sued Wolfson in efforts to "recover hundreds of millions of dollars in assets that were allegedly misappropriated through a large-scale fraud and misconduct scheme"

perpetrated by Wolfson.  *Nat'l Bank Trust et al. v. Wolfson*, No. 156903-2020, Dkt. 2 (Complaint) (N.Y. Sup. Ct. Aug. 28, 2020).  In connection with that and other civil cases in the United States, Wolfson has filed various documents, including his own affidavits sworn under penalty of perjury. For example, in a sworn affidavit Wolfson signed on February 24, 2017, seeking to allege his limited ties to the United States, Wolfson stated, under penalty of perjury, the following:

> I am the founder, President, Chairman of the Board of Directors and the largest shareholder of Otkritie Holdings JSC ("Otkritie Holding"), a Russian legal entity. . . . I am a Russian and Cypriot citizen and I live in London.  I travel to New York from time to time for business or personal reasons, but not with any regularity.  I do not have an office in the United States or a residence there.  There is a work station at Otkritie Capital U.S. Inc. that is made available to me when I am in their offices.

*Id.*, Dkt. 84 ¶¶ 1, 13 (affirmation initially submitted in *Ilya Yurov v. Otkritie Holding JSC*, No. 656788/2016 (N.Y. Sup. Ct. Feb. 24, 2017).[23]  At trial, the Government intends to offer redacted copies of Wolfson's sworn statements submitted to courts in the United States, which are admissible under Rule 801(d)(2)(A).  This evidence, in which Wolfson states, under penalty of perjury, that he did not have a residence in the United States as of February 2017, directly contradicts Wolfson's anticipated defense that he became the owner of the Aspen Home, through Altamonte, as of May 2014.

## B.    Bond's Post-Arrest Statements to the FBI

On February 22, 2024, Bond was arrested at his residence in Edgewater, New Jersey, by law enforcement agents pursuant to a judicially authorized warrant.  He was then transported to the FBI's New York Field Office in Manhattan for processing before being presented before a

---

[23] Similarly, in a sworn affidavit Wolfson signed on November 6, 2020, Wolfson stated, under penalty of perjury, the following: "During the time period primarily at issue in this action, that is, 2015-2017, I resided mainly in Russia, England, and Cyprus."  *Id.*, Dkt. 30.

magistrate judge in this district.  After having been reading his *Miranda* rights, during transport and at the FBI's field office, Bond made a number of spontaneous statements to law enforcement agents.  A written summary of those statements, which were not recorded, was produced to Bond on or about April 5, 2024.[24]

Pursuant to Rule 801(d)(2)(A), the Government may seek to admit, through the testimony of an FBI Special Agent who was present during Bond's transportation and processing, the following statements made by Bond, in sum and substance, on or about February 22, 2024:

- Bond had worked for Wolfson for approximately ten years, and referred to Wolfson as the "principal;"

- That there was a specific individual ["Lawyer-2"], based in Cyprus, with whom Bond and Wolfson worked;

- That Bond hoped that there were others being arrested that day;

- That Bond had never met Kostin in person, but understood Kostin to be indispensable to certain people; and

- That Bond has a "treasure trove" of information that he was sure that the FBI Special Agents would be interested in.

All of these statements are admissible pursuant to Rule 801(d)(2)(A).

## IV.  CERTAIN STATEMENTS REGARDING OWNERSHIP OF THE ASPEN HOME SHOULD BE ADMITTED FOR NON-HEARSAY PURPOSES

The Government seeks to admit certain statements not for their truth but for other proper purposes, including as evidence of: the declarant's state of mind, the statement's effect on others (*i.e.*, the listener or recipient), as evidence of concealment and/or consciousness of guilt, and as evidence, as reflected by the act of making the statement, of the exercise of dominion and control by Kostin over the Aspen Home.  These types of statements are routinely admitted in this Circuit,

---

[24] Bond has not filed a motion to suppress, or otherwise indicated to the Government that he believes there to have been any impropriety during Bond's arrest, transport, or processing.

as discussed below, and their probative value outweighs any potential prejudice, the latter of which can be addressed through a limiting instruction.

### A.    Applicable Law

A statement is not hearsay if it is not admitted for the truth of the matter asserted.  Fed. R. Evid. 801(c).  For example, out-of-court statements may be offered for proper purposes including the declarant's or reader's state of mind or subjective beliefs, the act of making the statement, or as consciousness of guilt.  *See, e.g.*, *United States v. Kohan*, 806 F.2d 18, 22 (2d Cir. 1986) (declarant's statements regarding source of checks properly admitted for purpose his showing "his belief that . . . activities were legitimate"); *United States v. Iotova*, No. 23-129-cr, 2024 WL 5198747, at *4 (2d Cir. Dec. 23, 2024) (affirming admission of records admitted for non-hearsay purpose of "demonstrating that the defendants were put on notice" of an issue relevant to charged offenses); *United Staes v. Graham*, 51 F. 4th 67, 83 (2d Cir. 2022) (affirming admission of emails to show intent and knowledge"); *United States v. Figueroa*, No. 7:23-CR-161 (MAD), 2023 WL 8258735, at *7 (S.D.N.Y. Nov. 29, 2023) (false exculpatory statements are "not hearsay because they are not being offered for their truth" but instead "to prove . . . consciousness of guilt regarding . . . involvement in the . . . scheme").

Indeed, out-of-court statements that are not offered for their truth are consistent with the Confrontation Clause, which "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  *United States v. Crawford*, 541 U.S. 36, 59 n.9 (2004) (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)); *United States v. Stewart*, 433 F.3d 273, 291 (2d Cir. 2006) ("*Crawford* expressly confirmed that the categorical exclusion of out-of-court statements that were not subject to contemporaneous cross-examination does not extend to evidence offered for purposes other than to establish the truth of the matter asserted."); *United*

41

*States v. Porter*, 886 F.3d 562, 567 (6th Cir. 2018) ("Detective Atkins's testimony concerning Chet

Crace's prior statements to investigators did not violate Porter's confrontation rights because they

were not offered to prove the truth of the matter asserted.  Rather, it was the government's position

that Chet Crace's statements were false.").

**B.    Statements of Wolfson Employee-1 to Law Enforcement Are Admissible As Evidence of State of Mind, Concealment, and Consciousness of Guilt**

**1.    Relevant Facts**

Beginning in or about December 2018, Wolfson Employee-1, acting on Wolfson's behalf

in her role as his employee, became one of the primary points of contact for CC-3 and members

of the Cyprus Law Firm when they needed to deal with Wolfson with regard to the Aspen Home.

Indeed, as of December 13, 2018, Wolfson Employee-1 was designated, in an updated letter of

engagement between Wolfson and the Cyprus Law Firm, as the sole authorized person who could

give instructions on Wolfson's behalf with respect to the services the Cyprus Law Firm provided

for Altamonte.  Shortly thereafter, Wolfson Employee-1 was informed by Lawyer-2, who had

previously served as Wolfson's "authorized person" for dealings with the Cyprus Law Firm

regarding Altamonte, that the "contact person for 40 NS" was CC-3 and that CC-3's email address

was newterra@post.com (i.e., NewTerra, as discussed above, *supra* § I.D).

Wolfson Employee-1 was thereafter involved in reviewing expenses regarding the Aspen

Home for 2018 and 2019, and communicating with CC-3 and Bond regarding the settlement

agreement that resulted in Wolfson's purchase, in September 2019, of 40 North Star from

Altamonte and the transfer of approximately $12 million to CapitalInvest.  On or about September

23, 2019, Wolfson Employee-1 messaged Wolfson regarding that transaction and informed him,

in sum and substance, that the bank had "agreed to transfer directly avoiding Altamonte" and that

42

"we will sign all the paperwork to liquidate [Altamonte] prior to the transfer, and will make up some fairy tales in order to not disclose the new documents.[25]

On or about March 17, 2023, Wolfson Employee-1 was interviewed in the Los Angeles international airport by two FBI special agents and an Assistant United States Attorney.  During that interview, Wolfson Employee-1 acknowledged having worked for Wolfson between at least in or about 2013 and at least in or about 2019, to still being in touch with Wolfson, and to having plans to meet with Wolfson the following morning.  When asked about Altamonte, Wolfson Employee-1 falsely stated, in sum and substance, that she was not familiar with and had not handled a company with that name.  Wolfson Employee-1 also falsely denied knowing the name of CC-3.

### 2.    Discussion

Because Wolfson Employee-1's statements are not being admitted for purpose of establishing the truth of the matter asserted, they are not testimonial under *Crawford*.  *See Crawford*, 541 U.S. at 59 n.9; *Stewart*, 433 F.3d at 291.  In short, Wolfson Employee-1's false statements to law enforcement will be admitted for a valid non-hearsay purpose—to reveal the state of mind of the co-conspirators, namely, that there was an agreement to evade sanctions and as evidence of concealment and consciousness of guilt.  *See Securities and Exchange Commission v. AT&T, Inc.*, 626 F. Supp. 3d 703, 737 (S.D.N.Y. 2022) (defendant's false statements to analysts were not "offered to prove the truth of the . . . defendant's statement, but to reveal his state of mind and/or the effect on the listener); *United States v. Sacket*, 598 F.2d 739, 742-43 (2d Cir. 1979) (statements within medical records were not hearsay when introduced to prove the state of mind

---

[25] This text exchange was conducted in Russian, and the statements summarized herein are based upon a draft translation.  The Government anticipates obtaining a certified translation prior to trial.

of the defendant and his family). Wolfson Employee-1's false statements to law enforcement are accordingly admissible at trial.

 **C.**  **Statements of Kostin and His Agents About the Ownership of the Aspen Home From the Period Between 2010 and March 2014 Are Admissible For Valid Non-Hearsay Purposes**

  The Government anticipates that it will seek to admit at trial certain out-of-court statements made by Kostin and his agents (later, co-conspirators), including CC-1 and CC-2, that reflect that they understood that between at least 2010 and May 2014, Kostin was the owner of the Aspen Home regardless of who the nominal owner was on paper.  That evidence includes, for example, the following:

- Witness testimony from the Property Manager that Kostin told her, in or about 2010, that he intended to purchase the Aspen Home.[26]

- A letter sent by Kostin, in or about May 2011, to neighbors of the Aspen Home in which he introduces himself, attaches his resume, and states that "[a]n entity that I control purchased [the Aspen Home] last year."

- On or about February 21, 2014, CC-2 emailed the Property Manager and told her that "I got confirmation from the boss that he invited to stay in Aspen [a] guest . . . . We will cover all the expenses for his stay."

  These statements may be admitted for the non-hearsay purpose of establishing the state of mind of the declarant and the state of mind of the individuals who heard or received the statements. In particular, the evidence is relevant to establish the belief of Kostin, his agents, the Property Manager, and others as to who the Aspen Home's owner was—namely, Kostin.  "[U]nder Federal Rule of Evidence 801(c), where a statement is offered as circumstantial evidence of the declarant's state of mind rather than for the truth of the matter asserted, it is not hearsay."  *United States v.*

---

[26] This statement is also admissible pursuant to Rule 803(3) as a statement of Kostin's then-existing state of mind.

*Gotti*, 457 F. Supp. 2d 395, 397 (S.D.N.Y. 2006) (quotation marks omitted); *Smith v. Duncan*, 411 F.3d 340, 347 n.4 (2d Cir. 2005). Their beliefs as to who owned the property are relevant because the fact that Kostin and others all believed Kostin to be the owner, and treated him as such, shows that Kostin exercised dominion and control of the Aspen Home, even during the period between 2010 and December 2013 when the nominal owner of 40 North Star's parent entity was Straw Owner-1, not Kostin. This is relevant to establish not only that Kostin was the true beneficial owner of the home, but also that he used shell entities and straw owners—even beyond Altamonte and Wolfson—to do so. A straw owner may hold bare legal title but does not exercise "dominion and control" over the property. *See, e.g.*, *United States v. Premises & Real Prop. with Bldgs., Appurtenances & Improvements at 500 Delaware St., Tonawanda, N.Y.*, 868 F. Supp. 513, 518 (W.D.N.Y. 1994), *aff'd sub nom. United States v. Premises & Real Prop. with Bldgs., Appurtenance & Improvements at 500 Delaware St., Tonawanda, New York*, 113 F.3d 310 (2d Cir. 1997); *United States v. U.S. Currency, $81,000.00*, 189 F.3d 28, 35 (1st Cir. 1999); *United States v. Premises Known as 526 Liscum Drive, Dayton, Montgomery Cnty., Ohio*, 866 F.2d 213, 217 (6th Cir. 1989). For that reason, these statements may be admitted as non-hearsay.[27]

---

[27] For the same reason, many, if not all, of the statements of co-conspirators that the Government seeks to admit from the period beginning March 2014 are admissible, in the alternative, for valid non-hearsay purposes because they establish the relevant individual's belief that Kostin was the owner. *See supra* § II.B (describing co-conspirator statements). This is relevant circumstantial evidence that Kostin, and not Wolfson, continued to exercise dominion and control over the property after it was nominally transferred in May 2014 to Altamonte. In addition, certain of the co-conspirators' statements were made to Wolfson or Bond and therefore are admissible for showing that Wolfson and Bond were on notice of Kostin's ownership of the home. That is a core issue and is relevant to rebut the defense theory that Wolfson became the true owner of the home in 2014.

## V.    STATEMENTS OF AGENTS OF THE DEFENDANTS AND THEIR CO-CONSPIRATORS SHOULD BE ADMITTED UNDER RULES 801(D)(2)(C) AND (D)

At trial, the Government will seek to introduce communications by certain individuals who worked for Wolfson and/or Kostin and acted as their agents and representatives regarding the Aspen Home.  These communications are admissible as non-hearsay under Rule 801(d)(2)(C) and/or 801(d)(2)(D) and will show that Kostin exercised dominion and control of the Aspen Home and, as discussed above, that Wolfson did not purchase the Aspen Home until September 2019. Alternatively, the statements are admissible for a non-hearsay purpose because they reflect the declarant's beliefs as to who the owned the Aspen Home.  *See supra* § IV.C.

In particular, the Government anticipates that it will seek to admit:

- Statements made by the Property Manager, who lived at and managed the Aspen Home between in or about 2010 through in or about 2020—initially for Kostin, and subsequently for Wolfson after he purchased the home in September 2019.

- Statements made by Lawyer-1, who was the manager of North Star between in or about 2010 through in or about 2020, and his employee, the Lawyer-1 Assistant, both of whom initially acted on Kostin's behalf, and ultimately for Wolfson after he purchased the home in September 2019.

- Statements made by a New York-based certified public accountant who was employed by Wolfson as an accountant and tax preparer ["Wolfson Employee-2"] and who prepared the 2018 and 2019 tax returns filed on behalf of 40 North Star.

For example, between in or about 2018 and 2019, as Wolfson prepared to purchase the Aspen Home, Lawyer-1, Lawyer-1 Assistant, the Property Manager, and Wolfson Employee-2 communicated with each other and third parties about Wolfson's "new" ownership of 40 North Star and the changes Wolfson was making to the management of the Aspen Home and 40 North Star.  Such statements were made within the scope of their agency (*i.e.*, as part of their work for

46

and on behalf of Wolfson and/or 40 North Star), and therefore their statements are admissible under the Federal Rule of Evidence 801(d)(2)(D).[28]

### A.  Applicable Law

Rule 801(d)(2)(D) provides that "[a] statement is not hearsay if . . . [it] is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency of employment, made during the existence of the relationship."  The Second Circuit has stated that admissibility under this rule "should be granted freely," *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992), recognizing, among other things, that an employee is usually the person best informed about certain acts committed in the course of his employment, *see id.*

A sufficient foundation to support the introduction of agent admissions therefore requires only that a party establish (1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency.  *Pappas*, 963 F.2d at 537; *see also Farganis v. Town of Montgomery*, 397 F. App'x. 666, 668 (2d Cir. 2010).

---

[28] Many of the statements made by CC-1, CC-2, CC-3, and their employees which the Government seeks to admit as statements of co-conspirators, as discussed above *supra* § II, are also admissible as statements made by agents of Kostin.  Statements by agents of co-conspirators are non-hearsay against other members of the conspiracy because "[t]he co-conspirator-in-furtherance exception has its roots in the law of agency," deeming each coconspirator "to have authorized the acts and declarations of others undertaken to carry out their joint objective."  *Russo*, 302 F.3d at 45; *see also Miltland Raleigh-Durham v. Myers*, 807 F. Supp. 1025, 1054 (S.D.N.Y. 1992) (admitting documents written by one of the coconspirator's employees through one of his corporate entities as "statements by an agent of a co-conspirator."); *United States v. Santana*, 503 F.2d 710, 717 (2d Cir. 1974) (admitting statements of a translator interpreting a conversation between a charged co-conspirator and an unindicted co-conspirator, due to translator's role as "an agent for the two co-conspirators").

The Second Circuit has explained an agency relationship exists where a declarant is answerable to a defendant. *See United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996); *United States v. Goldstein*, 21 Cr. 550 (DC), 2023 WL 3662971, at *7 (E.D.N.Y. May 25, 2023) ("a direct reporting relationship is sufficient, but not necessary"). Although the statement to be introduced may not itself be relied upon to establish the alleged agency relationship, "this foundational predicate may be established by circumstantial evidence." *Pappas*, 863 F.2d at 538; *Farganis*, 397 F. App'x at 668.

## B. Discussion

At trial, the Government anticipates that the evidence will establish an agency relationship between Wolfson, Kostin, and various individuals, including Wolfson Employee-2, Lawyer-1, the Lawyer-1 Assistant, and the Property Manager. In particular, Wolfson Employee-2 provided accounting and tax preparation services for Wolfson and Bond beginning in at least in or about 2017; Lawyer-1 served as the manager of 40 North Star, which was indirectly owned and controlled by Kostin for the entirety of the relevant period from 2010 through at least September 2019; and the Property Manager similarly served as the property manager for the Aspen Home for the entirety of the relevant period from 2010 through at least September 2019, while the property was indirectly owned and controlled by Kostin.[29] For example, in January 2018, Bond made an

---

[29] The Government believes that the evidence will establish that 40 North Star was indirectly owned and controlled by Kostin, via straw owners, until September 2019. Accordingly, these agents' statements are admissible because of their role providing services as the agents of Kostin, a co-conspirator. *Russo*, 302 F.3d at 45; *Miltland Raleigh-Durham*, 807 F. Supp. at 1054; *Santana*, 503 F.2d at 717. However, even crediting defendants' assertion that Wolfson was the true owner of the Aspen Home in May 2014—which he was not—it would make no difference with respect to the admissibility of the statements of Lawyer-1, Lawyer-1 Assistant, and the Property Manager, because they would then be admissible based on their responsibilities and roles as agents of Wolfson.

email introduction between Wolfson Employee-2 and Lawyer-1 Assistant, informing Wolfson Employee-2 that Lawyer-1 Assistant was "the bookkeeper at counsel for the entity we have in Aspen.  Please feel free to initiate a dialogue with her to give you a clear picture of what we have here."  Wolfson Employee-2 did just that, with both Lawyer-1 Assistant and the Property Manager. In or about July 2018, in response to inquiries from Wolfson Employee-2 regarding various expenses, the Property Manager explained that "this has been the normal expenses for the last 8 yrs.  Pls advise . . . what the new owner would prefer."  Around the same time, Wolfson Employee-2 wrote to two of her employees regarding 40 North Star and explained that "[t]his is a new company of Vadim's."

Statements such as these made by Wolfson Employee-2, Lawyer-1, Lawyer-1 Assistant, and the Property Manager regarding expenses, management, accounting services, and other matters relating to the Aspen Home, including changes implemented by Wolfson and Bond starting in 2018, were made on a matter within the scope of their employment and made during the existence of the agency relationship, and are therefore plainly admissible.[30]

---

[30] Alternatively, statements made by Kostin and Wolfson's agents regarding services provided for 40 North Star and the Aspen Home are admissible as non-hearsay evidence reflecting the declarant's belief as to who owned the Aspen Home. *See Gotti*, 457 F. Supp. 2d at 397.  Evidence that the Property Manager, Lawyer-1, and Lawyer-1 Assistant believed Wolfson to be a guest of Kostin's prior to 2018, and that Wolfson Employee-2, the Property Manager, Lawyer-1, and Lawyer-1 Assistant all believed Wolfson to be a "new owner" of the property starting in 2018, and treated him accordingly, shows that Wolfson did not exercise dominion and control over the Aspen Home during the time period in which he has claimed to be the true owner, regardless of whether he was the owner on paper.

## VI.    CERTAIN BUSINESS RECORDS SHOULD BE ADMITTED UNDER RULES 803(6) AND 902(11)

Prior to trial, the Government plans to confer with the defense about potential stipulations to authenticate certain documents.  The Government is hopeful that the parties will reach agreement with respect to authenticity stipulations.  To the extent that the parties do not reach agreement, however, the Government plans to admit certain business records on the basis of written declarations from the relevant custodians of records, pursuant to Rules 803(6) and 902(11).  For example, the Government may seek to offer records provided by service providers, such as Google and Apple, or by other relevant businesses, such as 40 North Star and the Cyprus Law Firm. [31]

Under Rule 803(6), a record may be admitted as non-hearsay if it was made at or near the time by someone with knowledge, or who had the information transmitted to them by someone with knowledge; the record was kept in the course of a regularly conducted activity of a business or organization; and making the record was a regular practice of that business activity.  Fed. R. Evid. 803(6).  "[T]he principal precondition to admission of documents as business records pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable."  *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632-33 (2d Cir. 1994) (internal quotation marks omitted).  The Second Circuit has taken a "generous view of the business records exception, construing it to favor [] the admission of evidence . . . if it has any probative value at all."  *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995) (internal citations omitted).

---

[31] Certain of these records are also admissible under Rule 807.

Business records of regularly conducted activity that meet the necessary conditions to qualify under the hearsay exception may be authenticated, among other methods, by a certification that complies with Rule 902(11).  Fed. R. Evid. 803(6)(D); *see also United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019) ("Records are self-authenticating if they include a custodian certification that the records 'meet[] the requirements of Rule 803(6)(A)-(C).'").  Specifically, Rule 902(11) provides, in relevant part, that "[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person . . ." is self-authenticating and requires no extrinsic evidence of authenticity to be admitted.[32]  Prior to trial, the proponent of the records must also give the adverse party reasonable written notice of the intent to offer the records and make the records and certifications available for inspection so that the adverse party has a fair opportunity to challenge them.  *Id.*

Courts in this District routinely admit business records on the basis of records certifications.  *See United States v. Kumar*, No. 21. Cr. 755 (JPO), Dkt. No. 63 (S.D.N.Y. Apr. 18, 2023) (granting Government's motion to admit business records from multiple financial institutions, a phone carrier, U.S. Customs and Border Protection ("CBP"), and NYPD on the basis of written declaration of records certification under Rules 803(6) and 902(11)); *United States v. Conde*, No. 19 Cr. 808 (VEC), Dkt. No. 244 (S.D.N.Y. July 14, 2021) (granting Government's

---

[32] Similarly, 18 U.S.C. § 3505 provides that a "foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that" the record meets the elements of Rule 803(6).  *See also United States v. Qualls*, 613 F. App'x 25, 28 (2d Cir. 2015) (affirming admission of foreign records accompanied by certification of authenticity); *United States v. Miller*, No. 18 Cr. 202 (ARR), 2018 WL 4961458, at *3 (E.D.N.Y. Oct. 15, 2018) ("The language of § 3505 'tracks quite closely to the language of Federal Rule of Evidence 803(6)' and 'should be interpreted in the same manner as the comparable language in Rule 803(6) is interpreted.'").

motion to use records certification to establish the foundation as well as the authenticity of bank records and certain other business records); *United States v. Weigand*, No. 20 Cr. 188 (JSR), 2021 WL 568173, at *3 (S.D.N.Y. Feb. 14, 2021) (finding that where "[d]efendants offer[ed] no specific reason to doubt the self-authenticability" of certain bank records and other similar business records, those records were self-authenticating); *Ayelotan*, 917 F.3d at 401-03 (finding that "email provider's statement that one user wrote and sent a message to another user at the recorded time" was a self-authenticating business record when accompanied by proper certificate from records custodian); *see also* Fed. R. Evid. 803(6)(E) (noting that records of regularly conducted activity in accordance with Rule 803(6)(A)-(D) are admissible absent a showing that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness). Here, as noted above, should the parties be unable to reach agreement with respect to the authenticity and admissibility of business records, the Government intends to offer such records with corresponding custodian declarations under Rules 803(6) and 902(11).  Accordingly, the Government respectfully requests that the Court rule that the Government may introduce at trial business records pursuant to Rules 803(6) and 902(11) and without the live testimony of any document custodian.

## VII.    THE GOVERNMENT SHOULD BE PERMITTED TO CROSS-EXAMINE WOLFSON ABOUT HIS PRIOR FRAUDS AND DISHONEST CONDUCT, AMONG OTHER IMPEACHMENT TOPICS, SHOULD HE ELECT TO TESTIFY

Should Wolfson elect to testify, the Government should be permitted to cross-examine him about his commission of prior frauds and/or other dishonest conduct under Rule 608 because such topics are probative as to Wolfson's truthfulness and may call into question the defendant's explanation for the charged conduct.  For example, as noted above, Wolfson has been sued several times in courts within the United States.  In one lawsuit, Wolfson is alleged to have "engaged in a

number of schemes," including during the time period leading up to Otkritie's and NBT's collapse in August 2017, "many of which involved the same pattern and sequence of transactions, to divert money out of [Otkritie] and NBT and into entities that he and his associates controlled." *NBT*, No. 156903, Dkt. 2 ¶ 4. Through a "network of more than 150 shell companies," Wolfson and others concealed "the large-scale diversion of funds" from Otkritie to himself and to his associates. *Id.* ¶¶ 21-22.

Under Rule 608, on cross-examination, "specific instances of a witness's conduct . . . may be inquired into if they are probative of the character of the truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608. Here, Wolfson's fraud scheme involving hundreds of millions of dollars in assets is probative of his character for untruthfulness and is also relevant under Rule 404(b) in showing Wolfson's knowledge, intent, and ability to employ various shell entities and associates to conceal the ownership and transfer of funds, including prior to 2017. Wolfson's fraud and betrayal of Otkritie—the bank he partially owned—also directly contradicts his anticipated claim that he was a "Russian dissident" and fled Russia in 2017 because of his political views (Gov't Expert MIL)—when, in actuality, he fled Russia because he had stolen hundreds of millions of dollars from a bank partially owned by the Russian government. The Government should be permitted to cross-examine Wolfson as to his massive fraud schemes.

## VIII.   THE DEFENDANTS SHOULD BE PRECLUDED FROM OFFERING EVIDENCE, ASKING QUESTIONS, OR MAKING ARGUMENTS RELATING TO THE PRESENCE OF COUNSEL OR SUGGESTING AN ADVICE OF COUNSEL DEFENSE SHOULD BE PRECLUDED

Neither defendant has indicated that they intend to raise an advice of counsel defense. The Government's Rule 16 productions, however, contain communications between Bond and Lawyer-1, and numerous corporate and business records, including share transfer agreements, operating agreements, and call option agreements relating to the Aspen Home that state, on their

face, that they were prepared by attorneys. To the extent either defendant intends to assert, through questioning or argument, that the presence of such counsel constitutes evidence of his faith with respect to the scheme charged in the Indictment (i.e., a "presence of counsel" defense), such attempts should be rejected as inappropriate and a prejudicial end run around the obligations attending assertion of a true advice-of-counsel defense.

### A.    Applicable Law

Courts in this district have rightly approached a "presence of counsel" defense with skepticism, mindful that it risks injecting irrelevant or prejudicial information into criminal trials. As to the potential prejudice, from a legal standpoint, the presence of counsel defense is not materially different from the advice of counsel defense, which "is not an affirmative defense that defeats liability even if the jury accepts the government's allegations as true," but is, instead, evidence that "if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an unlawful intent." *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). Because an established body of law, developed under the rubric of the advice of counsel defense, governs when and how criminal defendants are entitled to rely on the involvement of lawyers to negate mens rea,[33] courts

---

[33] A true advice of counsel defense requires a defendant to show "that he (1) honestly and in good faith sought the advice of counsel; (2) fully and honestly la[id] all the facts before his counsel; and (3) in good faith and honestly follow[ed] counsel's advice, believing it to be correct and intending that his acts be lawful." *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012) (internal quotations omitted). A true advice of counsel defense also requires a defendant to waive the applicable privilege and permit discovery into their dealings with the relevant counsel. *See In re Grand Jury Proceedings*, 219 F. 3d 175 (2d Cir. 2000) (assertion of advice-of-counsel defense is "quintessential example" of a defendant affirmatively relying on privileged communications and is "thereby deemed to have waived his privilege with respect to the advice that he received"); *United States v. Scali*, No. 16 Cr. 446, 2018 WL 461441, at *8 (S.D.N.Y. Jan. 18, 2018), *judgment aff'd* 820 F. App'x 23 (2d Cir. 2020) ("A defendant must clearly elect whether [he] will raise an

have been reluctant to endorse a presence of counsel defense that would allow a defendant to functionally mount an advice of counsel defense without meeting the required elements.

Thus, for example, in *S.E.C.* v. *Tourre*, 950 F. Supp. 2d 666, 683-84 (S.D.N.Y. 2013), Judge Forrest precluded the defendant from highlighting the fact that a lawyer participated in certain communications and transactions once it was clear that the defendant could not show a valid advice of counsel defense. In precluding the defendant from presenting anything short of a proper advice of counsel, Judge Forrest explained:

> A lay jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly "blessed" the legality of all aspects of a transaction. Likewise, the fact that lawyers saw and commented on disclosure language could be understood as "blessing" the sufficiency of that disclosure. This misunderstanding would give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense.

*Id.* *See also United States v. Bankman-Fried*, No. 22 Cr. 0673 (LAK), 2024 WL 477043, at *3 (S.D.N.Y. Feb. 7, 2024) ("such evidence risks suggesting to the jury that, because lawyers were involved to some degree with one aspect of events, the defendant was entitled to conclude that he was acting within the law with respect to some other aspect"); *United States v. Rangott*, 23 Cr. 004 (JHR), 2024 WL 3488038, at *2 (S.D.N.Y. July 19, 2024) ("This misunderstanding would give the defendant all of the essential benefits of the advice of counsel defense without having to bear the burden of proving any of the elements of the defense.").

**B.    Discussion**

That is precisely the concern here. Beyond enabling the defendants to benefit from an incomplete advice of counsel defense, the presence of counsel defense risks injecting irrelevant or

---

advise-of-counsel defense . . . in time to allow for [necessary] discovery."). That has not happened here, nor have the defendants suggested that they intend to raise this defense.

confusing evidence into this trial, because the involvement of counsel in a scheme is not probative

of a defendant's state of mind unless it is established that the counsel was informed of all relevant

facts regarding the scheme. *See Tourre*, 950 F. Supp. 2d at 683-84; *SEC v. Lek Securities Corp.*,

17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019) ("References to counsel's

communications are not relevant in the absence of an advice-of-counsel defense and should be

excluded as well pursuant to Rule 403.").

Here, questioning or argument regarding the fact that counsel reviewed documents,

participated in the management of 40 North Star, or participated in communications or meetings

would be irrelevant, prejudicial, and misleading. There is no admissible foundation to show that

such counsel were apprised of all the material facts of the scheme, such that their presence would

be probative of the defendants' state of mind. Nor is there adequate evidence of the nature and

scope of counsel's advice, as would be the case if the defendants were asserting a true advice-of-

counsel claim. Accordingly, any such evidence and argument should be excluded.

In the alternative, if either defendant wishes to assert a presence of counsel defense, he

should be required to provide a detailed factual proffer that such evidence is relevant and not

unfairly prejudicial or misleading, including describing what particular interactions and counsel

communications they may introduce, when they occurred, what information was available to

counsel, and why and how such interactions and communications are relevant.[34]    Absent a

---

[34] Importantly, insofar as defendants seek to introduce such evidence or argument, they should
also be required to produce any evidence upon which they would rely in support thereof, regardless
of whether a claim of privilege may attach to that evidence. *See United States v. Bilzerian*, 926
F.2d 1285, 1292 (2d Cir. 1991) (recognizing that a defense based on interactions and
communications with lawyers may waive the attorney-client privilege with respect to those
dealings).

sufficient foundation, the mere presence of lawyers would serve no purpose other than to mislead the jury into believing that a lawyer had "blessed" the defendants' conduct.  The invocation of lawyers in that way would be highly prejudicial to the Government and should be excluded under both Rules 401 and 403.

## IX.    THE DEFENDANTS SHOULD BE PRECLUDED FROM OFFERING EVIDENCE OR MAKING ARGUMENTS THAT TEND TO SUPPORT JURY NULLIFICATION

### A.    Applicable Law

Juries are not "to act based on their . . . sympathy."  *United States v. Stroming*, 838 F. App'x 624, 627 (2d Cir. 2021) (summary order); *see, e.g.*, *United States v. Mustaga*, 753 F. App'x 22, 37 (2d Cir. 2018) (summary order) ("The district court correctly recognized that evidence of solitary confinement could be used for the improper purpose of provoking juror sympathy.").  Any attempt to encourage such sympathy is therefore an attempt at nullification, which is itself plainly improper.  *See, e.g.*, *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997) (Jury nullification is "by no means a right or something that a judge should encourage or permit if it is within his authority to prevent."); *id.* at 614 ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent."); *see also United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983) (per curiam) ("A jury has no more '*right*' to find a 'guilty' defendant 'not guilty' than it has to find a 'not guilty' defendant 'guilty,' and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law.  Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power." (emphasis in original)).

57

**B.    Discussion**

The defendants should be precluded from offering evidence or making arguments that seek to appeal to the jury's sympathy and/or tend to support jury nullification, including with respect to the following topics:

Personal Characteristics of the Defendant:  The Government is unaware of any lawful basis for either of the defendants to offer evidence or argument concerning their personal and family backgrounds (including any children), health conditions (their own or those of their family members), or any other similar personal factors unconnected to their guilt.  The defendants should be precluded from offering such sympathy-arousing information and from mentioning such subjects in their opening statement, absent a pre-trial showing that such facts bear on their guilt. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy); *United States v. Raines*, No. 22 Cr. 18-02 (NSR), 2023 WL 6211980, at *6 (S.D.N.Y. Sept. 25, 2023) (precluding evidence that the defendant "is a devoted family member" and "has serious health problems" because such information bears "little relevance" to the crimes charged and "may improperly elicit the jury's sympathies"); *United States v. Battaglia*, No. S9 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

Potential Punishment or Consequences.  Similarly, the defendants should be precluded during all phases of the trial from offering evidence or argument concerning the punishment or collateral consequences they face if convicted because such information would be irrelevant and

prejudicial.  The jury's function is to find the facts and to determine whether, based on those facts, the defendants are guilty of the crimes charged.  Where, as here, the jury has no role at sentencing, it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"  *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)).  This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion."  *Id.*  Moreover, information regarding the potential consequences of a guilty verdict is "irrelevant to the jury's task" and threatens to confuse the jury, risking nullification.  *See id.*

The Propriety of Sanctions and/or the Kleptocapture Task Force.  The defendants should be precluded from offering evidence, making arguments, and/or suggesting that the sanctions at issue in this case were politically motivated, otherwise improper, and/or that the jury should not convict the defendants because the law is unfair, political, or partisan.  The defendants should also be precluded from making reference to the Kleptocapture Task Force, which was established in or about 2022 by the U.S. Department of Justice under one administration, and was dismantled in or about February 2025 in a different administration.  These topics are not relevant to the defendants' guilt and would only be discussed in efforts to support jury nullification.  *See, e.g.*, *In re United States*, 945 F.3d 616, 630 (2d Cir. 2019) ("Evidence admitted solely to encourage nullification is by definition irrelevant, and thus inadmissible, regardless of what other evidence might be introduced at trial.").  Because such evidence and argument are entirely irrelevant to the jury's task of determining guilt or innocence and will only "invite[ jurors] to ponder matters that are not within their province, distract[ing] them from their factfinding responsibilities, and creat[ing] a strong

possibility of confusion," such evidence and argument should be precluded.  *Id.* (quoting *Shannon*, 512 U.S. at 579 (internal quotation marks omitted)).

> Wolfson's Alleged Role As A Russian "Dissident"

Similarly, the defendants should be precluded from offering evidence, making arguments, and/or suggesting that they would not have gotten involved in a scheme to evade Russian-related sanctions because Wolfson was a Russian "dissident."  *See* Gov't Expert MIL.  Wolfson's political beliefs and undertakings during the time period when he resided in Russia—which was before the sanctions were imposed on Kostin—and evidence tending to show any hostility of Russia and/or Putin towards Wolfson are not relevant to the defendants' guilt.  They would only be discussed in an effort to engender sympathy and, as with the other topics discussed above, to encourage jury nullification.  *See, e.g.*, *In re United States*, 945 F.3d at 630.  The defendants should therefore be precluded from introducing any evidence or making any arguments on this subject.

> The Propriety of the Government's Investigation or Prosecution.  The defendants should also be precluded from suggesting any impropriety with respect to the Government's investigation and/or prosecution.  Any defense challenges to the Government's investigation and/or prosecution should have been raised pretrial with the Court—and should not be presented before the jury. *United States v. Regan*, 103 F.3d 1072, 1083 (2d Cir. 1997) (claims of purported government misconduct must be "directed to the court rather than jury").  Allegations concerning the government's conduct are "ultimately separate from the issue of [a defendant's] factual guilt" and concern an alleged "defect in the institution of the prosecution."  *Id.* (internal quotation marks omitted).  Accordingly, district courts routinely and correctly preclude defendants from raising these arguments at trial.  *See id.* ("[W]e agree with the district court's decision to resolve for itself whether the government's conduct was lawful and to prevent Regan from presenting evidence on

that subject."); *United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude the defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting" the defendant), *aff'd and remanded*, 433 F.3d 273 (2d Cir. 2006).

Indeed, courts routinely bar attempts to shift the focus of criminal trials from the charges against the defendant to the conduct of the investigation, under Federal Rules of Evidence 401 and 403. *See, e.g.*, *United States v. Malpeso*, 115 F.3d 155, 162-63 (2d Cir. 1997); *United States v. Reese*, 933 F. Supp. 2d 579, 583-84 (S.D.N.Y. 2013) ("a defendant 'may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case.'") (quoting *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004)); *United States v. Ortiz*, 367 F. Supp. 2d 536, 547-48 (S.D.N.Y. 2005) (holding that defendant's rights were not violated by refusal to grant an adjournment so he could develop defense that he had been setup by police since any evidence supporting the theory would have been inadmissible under Rule 403). In particular, a defendant's allegation that the investigation was in some way defective does not make the alleged deficiency relevant, absent some connection between the claimed deficiency and the evidence of the charges.

*          *          *

Accordingly, the Court should preclude any defense argument and/or evidence tending to support jury nullification, including with respect to: (i) the defendants' personal and/or family background; (ii) potential punishment and/or consequences; (iii) the propriety of sanctions and the Kleptocapture Task Force; (iv) Wolfson's alleged role or actions as a Russian "dissident"; and (v) the propriety of the Government's investigation and/or prosecution of the defendants.

## CONCLUSION

For the foregoing reasons, the Court should grant the Government's motions *in limine* in their entirety.

MATTHEW PODOLSKY
Acting United States Attorney

By:    /s/
      Emily Deininger
      David R. Felton
      Jane Kim
      Assistant United States Attorneys